UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 21 Cr. 379 (VSB)

CARLOS ORENSE AZOCAR,
a/k/a "El Gordo,"

Defendant.

Trial
------------------------------x

New York, N.Y.
November 17, 2023
8:45 a.m.

Before:

HON. VERNON S. BRODERICK,
District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: MICHAEL D. LOCKARD
KAYLAN E. LASKY
KEVIN T. SULLIVAN
Assistant United States Attorneys

FOY & SEPLOWITZ LLC
Attorneys for Defendant
BY: JASON E. FOY
ERIC J. SARRAGA

Also Present: Cristina Weisz
Humberto Garcia
Mercedes Avalos
Vivian Goa
Erika de los Rios
Interpreters (Spanish)

William Sirmon, Paralegal Specialist
Meusette Gonzalez, Paralegal
Special Agent Matthew s. Passmore

effect, seeking here is the internal deliberations of the Southern District of Florida based on the information that we have gone to the Southern District of Florida and collected and produced. And if I'm hearing Mr. Foy correctly, it sounds like, given the wealth of information we have already turned over, the *Giglio*, the *Brady*, the disclosures about prior criminal conduct, it sounds like, as Mr. Foy is talking about what he believes are inconsistent statements, it sounds like there's enough there that the defense has what it needs to assess the credibility of our witnesses and to challenge that credibility here in these proceedings.

THE COURT: Well, let me just ask. It sounds as if the prosecutor, back in 2020, spoke to these folks and the information that at that time that the prosecutor got was the Southern District of Florida didn't have any issues with witness credibility. Is that an accurate statement?

MR. SULLIVAN: That it didn't have any credibility concerns.

THE COURT: Credibility concerns. Witness credibility concerns.

MR. SULLIVAN: And since that time, we have, as Mr. Foy well knows, collected voluminous materials from the Southern District of Florida and from the various agencies on that team and we have turned it over in this case.

THE COURT: OK. All right. So, with regard to the

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 21 Cr. 379 (VSB)

CARLOS ORENSE AZOCAR,
a/k/a "El Gordo,"

Defendant.

Trial
------------------------------x

New York, N.Y.
November 29, 2023
9:30 a.m.

Before:

HON. VERNON S. BRODERICK,
District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: MICHAEL D. LOCKARD
KAYLAN E. LASKY
KEVIN T. SULLIVAN
Assistant United States Attorneys

FOY & SEPLOWITZ LLC
Attorneys for Defendant
BY: JASON E. FOY
ERIC J. SARRAGA

Also Present: Cristina Weisz
Humberto Garcia
Mercedes Avalos
Vivian Goa
Erika de los Rios
Interpreters (Spanish)

William Sirmon, Paralegal Specialist
Meusette Gonzalez, Paralegal
Special Agent Matthew s. Passmore

A. Yes.

Q. Who?

A. Many times we had the support of the armed forces or the support of the police.

Q. And when you say the armed forces, what group in particular, or groups, are you referring to?

A. The National Guard.

Q. Who, in particular, from the military escorted or assisted with escorting loads of cocaine?

A. Hugo Carvajal helped us out. He provided us with a lot of support, and -- yeah, Hugo Carvajal.

Q. To be clear, was Hugo Carvajal present when loads were escorted?

A. No.

Q. Who was present?

A. Different members of the armed forces. Sometimes they were in uniform. Sometimes they were without uniform, but they were always in official armed forces vehicles, many military men.

Q. Do you recall anyone in particular who escorted loads of cocaine from the military?

A. Yes.

Q. Who?

A. Captain Vassyly Kotosky.

Q. And who is Vassyly Kotosky?

A. Vassyly Kotosky was an armed forces captain that assisted

Q. Let's move on, before we talk more about the types of radars, let's talk about the conversation regarding the military radar at Guarico.

You mentioned General Carvajal. Was anyone else present?

THE INTERPRETER: What was the end of the question with Mr. Carvajal?

Q. Was anyone else present?

A. Yes.

Q. Who?

A. Mr. Carlos Orense, Mr. Carvajal, some people that worked for Mr. Carvajal, for the security.

Q. What do you recall about that conversation?

A. They were talking about the radar, the military radar that was in Guarico. El Pollo said we didn't have to worry about it because he had it under control.

Q. What did you think that meant?

A. Well, the words that he stated that it was under control, that he had it already under control.

Q. Do you understand what the radar does?

A. The radar detects in the air when the aircrafts are going through or coming by. So the military radar is the one who depicts when there are aircraft in the air that don't have permission, and they alert the military about a plane that is out there who doesn't have a permit, so that they can come and

knock them down.

Q. What do you mean they can come and knock them down?

A. If you have a flight that's leaving without any permission, and it's unknown from the control tower without a permission, so, the military radar alerts the Armed Forces, and they immediately send their airplanes from the Armed Forces to knock them out of the air.

So the radar alerts that there's an aircraft in the air that doesn't have permission, and then they call the military to send their flights to knock out the airplanes.

Q. So what does a black flight enable you to do?

A. To go through the radars without being detected because they're turned off. And then the aircraft can leave.

Q. Were there any people in particular who directly helped the defendant with airport controllers?

A. Yes.

Q. Who?

A. Mr. Vassyly Kotosky helped a lot with the radars. Another person known as Roberto who also helped with the radars.

Q. Did Kotosky work out of any particular locations?

A. He was an officer of the Armed Forces. He was a captain.

Q. Were there particular airports that he assisted with?

A. Yes, at the Valencia Airport.

MR. FOY: Excuse me, your Honor. At this time I am going to renew my application at sidebar and move to strike.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 21 Cr. 379 (VSB)

CARLOS ORENSE AZOCAR,
a/k/a "El Gordo,"

Defendant.

Trial
------------------------------x

New York, N.Y.
November 28, 2023
9:50 a.m.

Before:

HON. VERNON S. BRODERICK,

District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: MICHAEL D. LOCKARD
KAYLAN E. LASKY
KEVIN T. SULLIVAN
Assistant United States Attorneys

FOY & SEPLOWITZ LLC
Attorneys for Defendant
BY: JASON E. FOY
ERIC J. SARRAGA

Also Present: Cristina Weisz
Erika de los Rios
Mercedes Avalos
Vivian Goa
Interpreters (Spanish)

William Sirmon, Paralegal Specialist
Meusette Gonzalez, Paralegal
Special Agent Matthew s. Passmore

Q. Do you know who his partners were?
A. Yes.
Q. How do you know?
A. Because I saw them in person many times.
Q. Who were his main partners?
A. General Hugo Carvajal Barrios, Pedro Luis Martin Olivares.
Q. And does General Hugo Carvajal Barrios ever go by a nickname?
A. Yes.
Q. What is that nickname?
A. Pollo.

MS. LASKY: Mr. Sirmon, please show the Court, the parties and the witness Government Exhibit 102.

Q. Mr. Arvelaiz, do you recognize this.
What is it?
A. Yes. A photo of Pedro Luis Martin Olivares.
Q. Is that a fair and accurate photo of Pedro Luis Martin Olivares?
A. Yes.

MS. LASKY: The government offers Government Exhibit 102.

THE COURT: All right. Any objection?

MR. FOY: No objection.

THE COURT: Government Exhibit 102 is admitted in evidence.

103.

THE COURT: All right. Government Exhibit 103 is admitted in evidence.

(Government Exhibit 103 received in evidence)

MS. LASKY: Permission to publish?

THE COURT: You may.

MS. LASKY: Mr. Sirmon, please publish Government Exhibit 103.

Q. Now, Mr. Arvelaiz, who is General Hugo Carvajal?

A. General Hugo Carvajal was the head of military counterintelligence in Venezuela.

Q. And are certain letters ever used to refer to that organization in the government?

A. Yes.

Q. When you worked for the defendant, approximately how often did you see Carvajal?

A. Many times.

Q. Are you able to approximate how often?

A. Yes. At least four or five times a month.

Q. Now, what, generally speaking, was Carvajal's role in the cocaine distribution operation?

A. General Hugo Carvajal provided us also with credentials, with vehicles, and he enabled us to travel freely throughout national territory to make our business fruitful.

THE COURT: Counsel, it's about 5:15. As I mentioned

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 21 Cr. 379 (VSB)

CARLOS ORENSE AZOCAR,
a/k/a "El Gordo,"

Defendant.

Trial

------------------------------x

New York, N.Y.
November 29, 2023
9:30 a.m.

Before:

HON. VERNON S. BRODERICK,
District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: MICHAEL D. LOCKARD
KAYLAN E. LASKY
KEVIN T. SULLIVAN
Assistant United States Attorneys

FOY & SEPLOWITZ LLC
Attorneys for Defendant
BY: JASON E. FOY
ERIC J. SARRAGA

Also Present: Cristina Weisz
Humberto Garcia
Mercedes Avalos
Vivian Goa
Erika de los Rios
Interpreters (Spanish)

William Sirmon, Paralegal Specialist
Meusette Gonzalez, Paralegal
Special Agent Matthew s. Passmore

credentials, and official vehicles so that we could circulate throughout the national territory, and that way we could avoid the checkpoints in case it was necessary.

Q. In addition to that, did he have any other role in the organization?

A. Yes. He was Mr. Carlos Orense's partner.

Q. Going back for one moment. Approximately how much money did you receive in connection with your work with the DEA?

A. Over $30,000.

Q. Do you know where -- excuse me, one moment.

Did General Carvajal have any role with respect to obtaining cocaine?

A. Yes.

Q. What role?

A. He provided the connections with people from Colombia, members of the FARC, and people who distributed cocaine from Colombia to Venezuela.

Q. You mentioned the FARC. What is the FARC?

A. *Fuerzas Armadas Revolucionarias de Colombia*.

Armed Revolutionary Forces of Colombia.

Q. Who are they, generally?

A. The guerilla.

Q. Do you know from what country the defendant, Carvajal, and Pedro Luis Marin got the majority of their cocaine?

A. Yes.

Q. How do you know that?
A. Because I assisted in bringing in the merchandise, the cocaine from Colombia into Venezuela.
Q. So to be clear, from what country did they get the majority of their cocaine?
A. Colombia.
Q. A moment ago, you said you assisted with bringing cocaine from Colombia to Venezuela.

After the cocaine was in Venezuela, was it transported elsewhere?
A. Yes.
Q. To which countries did they commonly transport cocaine?
A. Guatemala, the Dominican Republic, and Puerto Rico.
Q. What did they use in order to transport the cocaine?
A. Planes and speedboats.
Q. How large was a typical airplane load of cocaine?
A. 1,000 kilos.
Q. To be clear, did that sometimes vary?

THE INTERPRETER: I'm sorry?

Q. To be clear, did that sometimes vary?
A. Yes. Depending on the size of the aircraft.
Q. How large was a typical boatload of cocaine?
A. Between 800 and 1,000 kilos.
Q. Again, did that sometimes vary?
A. Yes.

A. Yes.

Q. Where?

A. In Caracas. Also in an area called La Boyera. Also at the Hotel Melia.

Q. Where at the Hotel Melia did you receive cocaine?

A. In the parking lots that are -- when you -- as you entered, to the left.

Q. So besides receiving cocaine, what, if any, drug-trafficking activities happened at the Hotel Melia?

A. There were meetings with people. We received cocaine. I received money. We had weapons there. Yes.

Q. What people did you meet with there?

A. Pedro Luis Martin would go. Pollo would go. Mr. Ramon would go with his people. Different people.

Q. And who was Pollo?

A. General Hugo Carvajal.

Q. When you said you received money at Hotel Melia, what did you mean?

A. There was money there. I would receive money, like, when I had to go make payments, I had to go pay the pilots, I had to pay San Martin.

THE COURT: Counsel, is now a good time nor for us to take our morning break?

MS. LASKY: Yes, your Honor.

THE COURT: All right. Ladies and gentlemen, we're

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 21 Cr. 379 (VSB)

CARLOS ORENSE AZOCAR,
a/k/a "El Gordo,"

Defendant.

Trial
------------------------------x

New York, N.Y.
November 30, 2023
10:10 a.m.

Before:

HON. VERNON S. BRODERICK,

District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: MICHAEL D. LOCKARD
KAYLAN E. LASKY
KEVIN T. SULLIVAN
Assistant United States Attorneys

FOY & SEPLOWITZ LLC
Attorneys for Defendant
BY: JASON E. FOY
ERIC J. SARRAGA

Also Present: Cristina Weisz
Mercedes Avalos
Vivian Goa
Erika de los Rios
Interpreters (Spanish)

William Sirmon, Paralegal Specialist
Meusette Gonzalez, Paralegal
Special Agent Matthew s. Passmore

A. Yes. Well, it had to come back grouped with it because it was part of the same shipment. So whenever it was paid, it was paid in full.

Q. Now, did there come a time after the money went missing that the defendant asked to speak with you?

A. Yes.

Q. Where did he ask you to go?

A. Well, this was at a restaurant in Caracas. When I got there, he, Pollo and Pedro were there. They were accusing me for the money that had gone missing, and they were asking me how I planned to pay for the money. And I told them that I was not going to pay the money because I had not stolen it.

Q. And when you said him, who were you referring to being there?

A. Pollo Carvajal was there. Pedro Luis Martin, Carlos Orense and certain members of the security detail were there.

Q. How did the meeting end?

A. Upset, because I was not willing to accept the debt, and so I took off.

Q. Immediately after this meeting, how was your relationship with the defendant?

A. Bad.

Q. What do you mean?

A. Bad. There was no interaction whatsoever.

Q. Now, directing you to a few months later, what, if

A. They were different types of guns. Handguns, rifles, full-action gun, a Winchester rifle, a machine gun, an Uzi machine gun with suppressor, Glocks, Berettas, shotguns. There were many guns.

Q. And where did you put the guns?

A. In the suitcases that were --

THE INTERPRETER: May the interpreter confirm?

A. In the trunk of the vehicles we were in.

Q. And why did you take the guns?

A. Because when a person that you are having trouble with has power and has guns, if you remove their guns, you weaken them.

Q. And what person are you talking about here?

A. Carlos Orense.

Q. After this incident, did there come a time that you left Venezuela?

A. Yes.

Q. Why did you leave Venezuela?

A. Well, because I knew that I had attempted to do something and I had failed at it, and I knew that they would seek me out for payback. I did not have the necessary forces to fight back, and I decided to leave.

Q. Who would seek you out?

A. Carlos Orense, Pollo Carvajal and Pedro Luis Martin.

Q. Do you have concerns about returning to Venezuela?

A. If I go back to Venezuela, I'm a dead man. Pedro Luis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 21 Cr. 379 (VSB)

CARLOS ORENSE AZOCAR,
a/k/a "El Gordo,"

Defendant.

Trial
------------------------------x

New York, N.Y.
December 4, 2023
2:00 p.m.

Before:

HON. VERNON S. BRODERICK,
District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: MICHAEL D. LOCKARD
KAYLAN E. LASKY
KEVIN T. SULLIVAN
Assistant United States Attorneys

FOY & SEPLOWITZ LLC
Attorneys for Defendant
BY: JASON E. FOY
ERIC J. SARRAGA

Also Present:
Humberto Garcia
Mercedes Avalos
Christina Potter
Erika de los Rios
Interpreters (Spanish)

William Sirmon, Paralegal Specialist
Meusette Gonzalez, Paralegal
Special Agent Matthew s. Passmore

A. So it is the Bolivian service of national intelligence.
Q. What is it?
A. The old DISIP. The political police of Venezuela.
Q. So when you were referring to the head of SEBIN, who were you talking about?
A. Pedro Luis Martin Olivares.
Q. Mr. Arvelaiz, did you tell U.S. authorities about drug trafficking by Pedro Luis Martin Olivares?
A. Yes, correct.
Q. Did you tell U.S. authorities about drug trafficking by Carvajal?
A. Yes, that's true.
Q. Have you testified about drug trafficking by those people at this trial?
A. Yes, I have.
Q. What do you believe may happen if you return to Venezuela?
MR. FOY: Objection.
THE COURT: I'll allow it. Objection overruled.
A. They will kill me.
Q. Who's "they"?
A. Pedro Luis Martin, Hugo Carvajal, and Carlos Orense.
MS. LASKY: Nothing further.
THE COURT: Any recross?

RECROSS EXAMINATION

BY MR. FOY: