UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| UNITED STATES OF AMERICA,<br><br>- AGAINST -<br><br>HUGO ARMANDO CARVAJAL BARRIOS,<br><br>DEFENDANT. |

11 Cr. 205 (AKH)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO COMPEL**

ZMO Law PLLC
353 Lexington Avenue, Suite 900
New York, NY 10016
(212) 685-0999
zach@zmolaw.com

*ATTORNEYS FOR DEFENDANT HUGO ARMANDO CARVAJAL BARRIOS*

## TABLE OF CONTENTS

FACTS ................................................................................................................. 2

I.   BACKGROUND ......................................................................................... 2

II.  THE INDICTMENTS OF HUGO CARVAJAL ................................................... 3

III. NUMEROUS OTHER INDIVIDUALS ARE BEING PROSECUTED IN THE NEW
     YORK AND FLORIDA FEDERAL COURTS FOR THE CONSPIRACY ALLEGED
     IN THE INDICTMENT. ............................................................................... 6

IV.  PRIOR PROCEEDINGS AND NEGOTIATIONS WITH THE GOVERNMENT ... 9

     A.  Government disclosures to date ............................................................. 9

     B.  The defense demanded discovery relating to other aspects of the
         allegations against Gen. Carvajal. ........................................................ 9

     C.  The government has repeatedly failed to respond to the defense's basic
         demands for discovery and *Brady* regarding the Indictment. ............... 10

     D.  The defense understands that the government has agreed to make early
         disclosure of material discoverable under 18 U.S.C. § 3500 to prevent
         any *Brady* violations and has narrowed its demands accordingly. ....... 11

ARGUMENT ...................................................................................................... 11

THE GOVERNMENT SHOULD BE REQUIRED TO TURN OVER ALL ITEMS
MATERIAL TO PREPARING THE DEFENSE AND ALL EXCULPATORY
MATERIAL ACCESSIBLE BY THE AGENTS AND PROSECUTORS WORKING
ON THE CASE. .................................................................................................. 11

     A.  Other DEA and prosecutors' offices holding materially exculpatory
         evidence about the conspiracy alleged in the Indictment are part of the
         "prosecution team." ............................................................................ 12

     B.  The government should be required to turn over all the requested
         material because the U.S. Attorney's Offices for the Eastern District of
         New York and the Southern District of Florida are members of the team
         prosecuting General Carvajal. .............................................................. 15

     C.  At a minimum, the government should be required to search the
         databases that it has already searched for the names and topic areas
         described in the defense's discovery demand. ....................................... 17

CONCLUSION ................................................................................................... 19

Hugo Carvajal Barrios, a retired Venezuelan major general who led that country's military intelligence agency from 2004 to 2011, faces charges that he was a member of the "Cartel de los Soles,"—a group of top Venezuelan government officials (including current Venezuelan president Nicolas Maduro) who trafficked cocaine out of Venezuela bound for the United States. Under indictment since 2011, Carvajal is specifically charged with being responsible for 5.6 metric tons of drugs found on a retrofitted DC-9 passenger jet crash landed in Mexico in April 2006. The government contends that it has turned over all discoverable material in its possession. But the government has failed to disclose essential documents from at least five related cases that we have identified in which alleged co-conspirators of Carvajal have been prosecuted in the Eastern District of New York and the Southern District of Florida for conduct related to the allegations in the S-1 Superseding Indictment[1] against Carvajal. Some of this material is likely to be exculpatory and must be promptly disclosed pursuant to *Brady v. Maryland* because it provides evidence that people other than Carvajal engaged in the acts that Carvajal is accused of. Accordingly, we hereby move for an order requiring the government to turn over all exculpatory and Fed. R. Crim. P. 16 material in its possession, including but not limited to all material relating to the allegations in the Indictment found in government files relating

---

[1] General Carvajal was extradited from Spain based on the S-1 Indictment (hereinafter "Indictment"). ECF No. 8. Although the government subsequently superseded, General Carvajal can only be prosecuted on the S-1 Indictment as a result of limitations triggered by the extradition from Spain. Our understanding is that the government is proceeding against General Carvajal solely based on the S-1 Indictment.

to Luis Frank Tello Candelo, Pedro Luis Martin Olivares, Vassyly Kotosky Villaroel Ramirez, Fernando Blengio, and Rafael Antonio Villasana Fernandez.[2]

The basis for this motion is set forth in further detail below.

### FACTS

In the sections below we outline General Carvajal's background as a public official in Venezuela under the government of Hugo Chavez, the indictments filed against him, the prosecutions we are aware of in other districts relating to the crimes in the Indictment, and our prior negotiations with the government as we have attempted to obtain the material sought without court intervention.

### I.      Background

There will be no dispute at trial that Hugo Carvajal Barrios retired from the National Bolivarian Armed Force (*i.e.* the Venezuelan army) as a major general in 2011. Gen. Carvajal worked in military intelligence starting in 2002 and became head of the Directorate of Military Intelligence (known by its Spanish acronym as the DIM and later as DGIM and DGCIM as its functions changed; we will refer to the agency as the DIM below despite these changes in its acronym) in 2004. Ind. ¶ 7. Carvajal retained that position until 2011 and assumed it again briefly, as a civilian, in 2013 after the death of

---

[2] As discussed below, the relief sought herein is substantially narrower than the discovery we have demanded from the government, which also included files relating to likely trial witnesses Eladio Aponte Aponte, Leamsy Salazar, and Rafael Garcia Torres. We narrowed the demand based on the government's representation that it has already provided all discoverable material related to Makled and will provide information relating to these three witnesses sufficiently in advance of trial for the defense to use it. Due to the complexity of the charges in the indictment and to avoid trial delays, we respectfully request the government be directed to provide material related to these and all other trial witnesses at least 60 days before the trial date.

Venezuelan President Hugo Chavez. As director of the DIM, Carvajal reported directly to Chavez. Although Carvajal had armed "functionaries" ("funcionarios" in Spanish) under his command who could make arrests, the DIM's primary function was gathering intelligence and providing it to Chavez, to the vice president, or to prosecutors who would decide what action, if any, would be taken. DIM generally did not have a role in drug interdiction.

After Chavez's death, co-defendant Nicolas Maduro took over as president of Venezuela and brought the country down an increasingly authoritarian path. Gen. Carvajal ran for the Venezuelan House of Deputies and was elected to represent his home state of Monagas in 2016. Ind. ¶ 10. In 2019, after Maduro was re-elected amid widespread allegations of voter fraud, Gen. Carvajal publicly broke with the regime and fled to Spain, where he was arrested on the S-1 Indictment and, ultimately, extradited to the U.S. to stand trial. *See* "Venezuela's Ex-Spy Chief Rejects Maduro, Accusing Leader's Inner Circle of Corruption," New York Times, Feb. 21, 2019, *available at* https://www.nytimes.com/2019/02/21/world/americas/hugo-carvajal-maduro-venezuela.html.

## II.     The Indictments of Hugo Carvajal

Gen. Carvajal was originally charged in 2011 in a three-page sealed indictment alleging only that he engaged in a conspiracy in April 2006 to import 5,600 kilograms of cocaine into the United States. ECF No. 2. The only overt act alleged in the original indictment is that Carvajal "coordinated the transportation" of the cocaine from Venezuela

to Mexico. ECF No. 2, ¶ 4(a). That month, a retrofitted DC-9 passenger plane coming from Venezuela carrying 5.6 tons of cocaine made an emergency landing in Campeche, Mexico.

The S-1 Superseding Indictment was filed on April 15, 2019, three days after Gen. Carvajal was arrested in Spain. It alleged a much broader, harder-to-pin-down conspiracy to engage in narcoterrorism, drug importation, and possession of machine guns in connection with cocaine trafficking from 1999 to 2019. It did not name any alleged co-conspirators—Cliver Alcala, Nicolas Maduro and others would be named in a later S-2 superseding indictment. The narcoterrorism count was based on an allegation that Carvajal worked with the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), a designated foreign terrorist organization, to traffic the cocaine from Colombia through Venezuela, and onward to Mexico, the Caribbean, and the United States.

The S-1 Indictment alleges the following specific acts that we now seek more information about:

- The expulsion of the U.S. Drug Enforcement Administration and subsequent dispatch of "large shipments of cocaine on planes departing from airports and clandestine airstrips in places such as Apure, Venezuela[.]" Ind. ¶ 12.

- The 2006 dispatch of "a 5.6 ton shipment of cocaine from Venezuela to Mexico on a DC-9 jet[.]" *Id.*

- "[M]ulti-ton shipments of cocaine" described in ¶ 13 of the Indictment;

- The provision of "sensitive intelligence and law enforcement information to drug traffickers to facilitate cocaine shipment and other drug-trafficking activities[.]" Ind. ¶ 13;

- Interference "with drug-trafficking investigations and pending criminal cases in Venezuela and elsewhere[.]" *Id.*; and

- Sales of "large quantities of previously-seized cocaine to drug traffickers in exchange for millions of dollars." *Id.*

An S-2 Superseding Indictment was unsealed in March 2020. ECF No. 11. The charges against Gen. Carvajal in the S-2 Indictment remained materially the same, but the grand jury also charged as co-defendants Venezuelan president Nicolas Maduro, General Cliver Alcala, politician Diosdado Cabello, and two FARC figures. The charges were announced with some fanfare in a press release from the Southern District U.S. Attorney's Office which quoted the Attorney General of the United States, the Acting Administrator of the DEA, and the Acting Executive Associate Director of Immigration and Customs Enforcement. Then U.S. Attorney Geoffrey S. Berman "praised the outstanding investigative work of the DEA's Special Operations Division Bilateral Investigations Unit, New York Strike Force, and Miami Field Division, as well as the U.S. Department of Justice's Office of International Affairs and the National Security Division's Counterterrorism Section." *See* U.S. Attorney's Office for the Southern District of New York, *Manhattan U.S. Attorney Announces Narco-Terrorism Charges Against Nicolas Maduro, Current and Former Venezuelan Officials, and Farc [sic] Leadership,* March 26, 2020 Press Release, *available at* https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-narco-terrorism-charges-against-nicolas-maduro-current. As is discussed in further detail below, the U.S. Attorney's Office for the Southern District of Florida issued a press release announcing the S-2 Superseding Indictment the same day. *See* Ex. N:[3] The Florida press release also discussed the indictments of Vassyly Kotosky Villaroel Ramirez. *Id*.

---

[3] Exhibits refer to exhibits appended to the Attorney Declaration of Zachary Margulis-Ohnuma filed herewith.

**III.    Numerous other individuals are being prosecuted in the New York and Florida federal courts for the conspiracy alleged in the Indictment.**

Gen. Carvajal is just one of several individuals who have either admitted or been accused publicly of engaging in the acts described in the preceding paragraph. We are aware of – and have asked the government for further information about – indictments or public confessions by the following individuals:

- **Walid Makled** ("Makled") was charged in this district in a 2009 indictment, 09 Cr. 614 (RWS) with coordinating the 5,600-kilogram shipment of cocaine that Carvajal is charged with in ¶ 12 of the instant indictment. In fact, as the trial evidence will show, the DIM under Gen. Carvajal's command participated in dismantling Makled's extensive drug organization centered in the city of Valencia.

  Makled is also charged in the same indictment with coordinating a flight from Venezuela to Honduras on May 10, 2009 that crash landed with 1,500 kilograms of cocaine. *U.S. v. Makled*, 09 Cr. 614 (RWS) ECF No. 5, ¶ 4(c).

- **Luis Frank Tello Candelo** ("Tello") was charged in the Eastern District of New York in an S-2 superseding indictment on June 10, 2010 with conspiracies to (1) distribute and (2) import cocaine into the United States between 2004 and 2009; (3) international distribution "of approximately 15,000 kilos of cocaine" between July 2006 and April 2007; (4) international distribution of approximately 5,500 kilograms of cocaine in September 2006; and (5) international distribution of approximately 10,000 kilograms of cocaine in March 2007. *United States v. Luis Frank Tello Candelo*, 10 Cr. 6 (RJD), ECF No. 4 (S-2 Superseding Indictment). According to press reports, Tello was a Colombian trafficker captured in Venezuela and extradited to the United States. According to a sentencing memo submitted on his behalf, part of the crime included "bribing corrupt law enforcement and public officials who enabled the passage of narcotics from Colombia to Venezuela." *U.S. v. Tello*, 10 Cr. 6 (RJD) ECF No. 151 at 6.

  Defense witness Fernando Blengio, the owner of the DC-9 referenced in ¶ 12 of the instant indictment (see *infra*), has reported that Tello told him he was bribing General Carvajal. However, as Blengio has repeatedly explained, it turned out that Tello was, in fact, either keeping the money intended for the bribe or paying it to someone else. *See* Ex C: Ballesteros, Frank, *The Darkest Secrets of a Spy Chief*, ITEMP NEWS, Dec. 30, 2020 *available at* https://www.itempnews.org/2020/12/30/the-darkest-secrets-of-a-spy-chief/. It also appears that Blengio provided information about Tello to the government. *See U.S. v. Luis Fernando Bertulucci Castillo*, 11 Cr. 20321, ECF No. 135-1 at 5 (S.D. Fl. Nov. 15, 2017) (sworn statement by Blengio

stating he was "debriefed by EDNY DEA agent Walter Norkin in regards to Kotosky and Luis Frank Tello Candelo"); *id.* at 41 (handwritten notes mentioning Blengio, Kotosky, Tello and Norkin).[4]

- **Luis Fernando Bertulucci Castillo**, also known as **Fernando Blengio Cesena** ("Blengio"), was indicted on May 6, 2011 in the Southern District of Florida and charged with four counts connected to drug trafficking from the Dominican Republic starting in September 2009 and falsifying airplane records in Miami in 2009 and 2010. *U.S. v. Luis Fernando Bertulucci Castillo*, 11 Cr. 20321 (PAS), ECF No. 3 (S.D. Fl. May 6, 2011). As noted above, Blengio has stated that he was an owner of the DC-9 that landed in Mexico in 2006 and that he coordinated the flight for which Gen. Carvajal is charged with *other* Venezuelan government officials (i.e not Carvajal). *See* ECF 108-1. Limited documents provided in discovery also suggest that, in addition to Blengio's admissions, third-party sources told the DEA that Blengio was involved in the DC-9 flight.[5]

  Counsel moved for Blengio's deposition in this Court, but that application was denied. Counsel intends to call Blengio as a witness at trial, most likely by remote means since he is unable to travel to the United States due to his prior conviction.

- **Vassyly Kotosky Villaroel Ramirez** ("Kotosky") was charged in 2013 in the Eastern District of New York with cocaine importation conspiracy from 2004 to 2009, importation of 7,709 kilos of cocaine in February and March 2006, importation of 9,490 kilos of cocaine in March and April 2006, importation of 10,557 kilos of cocaine in May and June 2006, importation of 15,013 kilos of cocaine in July and August 2006, and importation of approximately 10,000 kilos of cocaine in February and March 2007. *U.S. v. Kotosky et al.*, 11 Cr. 247, ECF No. 17: S-3 Superseding Indictment (E.D.N.Y. March 20, 2013).

  Although it is not specified that the April 2006 shipment is the same as the cocaine aboard the DC-9 that Gen. Carvajal is specifically charged with, testimony at the trial last month of Carlos Orense Azocar before Judge Broderick made clear that the government believes that Kotosky was a co-conspirator with Orense and Carvajal. Cooperating witness Antonio Arvelaiz testified that Kotosky escorted loads of cocaine belonging to Orense and Carvajal: "Q: Who in particular from the military escorted or assisted with escorting loads of cocaine? A: Hugo Carvajal helped us out. He provided a lot of support, and – yeah Hugo Carvajal….Q: Do you recall anyone in particular who escorted loads of cocaine from the military? A: Yes.

---

[4] Based on the docket sheet in Tello's case, it appears that Mr. Norkin was, in fact, an assistant United States attorney. Mr. Blengio was indicted under the name Luis Fernando Bertulucci Castillo, which is an alias.

[5] These discovery documents, which are subject to a protective order, are on file with this office and, if the government contests this assertion, will be provided to the Court.

Q: Who? A: Captain Vassyly Kotosky." Ex. G: Orense Tr. at 386. *See also id*. at 447-48 (Kotosky and Carvajal helped disable military radar to allow Orense's drug planes to fly).

- **Pedro Luis Martin Olivarez** ("Martin") was indicted in the Southern District of Florida in 2015 and charged with cocaine importation conspiracy from 2000 to September 2010. *U.S. v. Pedro Luis Martin Olivarez*, 15 Cr. 20299 (S.D. Fl.). According to an Interpol Red Notice filed on the public docket in that case, Martin used "his associations with high level government officials in Venezuela and Colombia to facilitate the export of large loads of drugs from airports, airstrips and other means by shutting down military radars and bribing other government officials[.]" Ex. I: Red Notice. Martin is accused in the Red Notice of two specific drug drops off the northern coast of Tortola on September 28 and 29, 2010 that were intercepted and connected to the "Hurtado drug trafficking organization." *Id*. Mendez Hurtado and his co-defendant Alvaro Ricardo Nino-Bonilla appear to be witnesses against Gen. Carvajal who provided information included in the affidavit presented to the Kingdom of Spain to support Gen. Carvajal's extradition to the United States. Ex. J: Extradition Affidavit.

  Moreover, as counsel has discussed with the government, there is evidence that Martin gave the government false information about the murder of a DEA informant, Luis Rodriguez, and claimed, via a Miami attorney (now under investigation in this District) who briefly represented Gen. Cavajal, that the information came from Carvajal.

  Finally, and perhaps most significantly, the government elicited cooperator testimony at the Orense trial claiming that Carvajal and Martin worked together to supply Carlos Orense with drugs. *See* Ex. G: Orense Tr. at 319 ("Q Who were [Orense's] main partners? A Hugo Carvajal, Pedro Luis Martin Olivares."), 322, 347-48 (Carvajal and Martin "got the majority of their cocaine" from Colombia), 381 (describing meetings at Hotel Melia with Orense, Carvajal and Martin), 510 (drug meeting attended by both Carvajal and Martin); 514 and 649 (Orense, Martin and Carvajal would seek out and "kill" witness if he returns to Venezuela).

- **Eladio Aponte Aponte, Leamsy Salazar,** and **Rafael Garcia Torres** are witnesses effectively identified in an affidavit that the government submitted in 2019 to secure Gen. Carvajal's extradition from Spain. *See* Ex. J: Baldeo Affidavit. While there does not appear to be any public prosecution of any of them in the United States, Salazar and Aponte have been identified by name by journalists. *See, e.g.,* Ex C: Itemp News article.

### IV.     Prior Proceedings and Negotiations with the Government

#### A.     Government disclosures to date

Starting almost a month after Gen. Carvajal arrived in the United States, the government provided discovery in eight tranches. By sheer volume, the bulk of the discovery was related to the search for Gen. Carvajal when he was a fugitive (mostly via subpoenas on his family members' internet accounts), specific to his co-defendant Cliver Alcala, or material seized surreptitiously from Gen. Carvajal's apartment in Venezuela, none of which appear to be incriminating. The government also provided highly relevant discovery relating to the prosecution of Walid Makled, the 2006 DC-9 with 5.6 tons of cocaine, and the prosecution of Carlos Orense. Puzzlingly, it provided discovery about a 2013 drug seizure in Paris and about the case against Yesid and Didier Rios Galindo, two brothers from Colombia who were extradited from Venezuela to the United States in 2011. It did not provide discovery specific to Blengio, Kotosky, Tello, Martin, Aponte, Salazar or Torres, though Blengio is mentioned in some of the material about the DC-9.

#### B.     The defense demanded discovery relating to other aspects of the allegations against Gen. Carvajal.

In a letter dated October 19, 2022, the defense requested that the government turn over all material in its possession relating to the charges in the Indictment. Ex. K. In the letter, we specified that the discovery should include anything about the acts specified in the Indictment relating to Gen. Carvajal (*see* Facts § II, *supra*) and that it should include material related to the nine other people we knew of who have been accused of participating in those acts: the eight listed in Facts § III, *supra*, and Kotosky's co-defendant, Rafael Villasana, all of whom are accused of conspiring with Gen. Carvajal to "'flood' the

United States with cocaine." Ind. ¶ 11; Ex. J at 6 ("Chavez urged the group, in substance and in part, to promote his policy objectives by 'flooding' the country with cocaine.").

### C.   The government has repeatedly failed to respond to the defense's basic demands for discovery and *Brady* regarding the Indictment.

The government responded to the defense demands by promising to look into whether more material was available and, citing international travel by the prosecution team and then the Orense trial, asking for more time to investigate. The government delayed this way in numerous emails and phone calls from October 2023 through January 2024. Starting in December, the government settled on some semblance of an explanation for the lack of obviously relevant and likely exculpatory discovery that multiple government agencies had accumulated since at least 2008 (when sanctions were imposed against Gen. Carvajal via the Treasury Department). Prosecutors told us in emails and over the phone that:

- The government would not provide information from any other U.S. Attorney's Office (such as the Southern District of Florida and Eastern District of New York, where Kotosky, Tello, Blengio, and Martin are being prosecuted) because it was not required to do so.

- The government was not required to search all DEA offices and therefore it limited its search for material to the Bilateral Investigations Unit of the DEA's Special Operations Division and, as a courtesy, "reviewed DEA investigative files across other DEA offices that contained reference to variations or iterations of [Gen. Carvajal's] name." Ex. L at 2 (emails).

In making these representations, the government challenged us to provide authority that it was required to search specific DEA "holdings." *E.g. id.* at 3. In an email dated December 8, 2023, defense counsel cited "USAM 9-5.002-Criminal Discovery and Judge Hellerstein's Rule 5(f) order in this case, which both contemplate a broad search for

discoverable material from 'all current or former federal, state, and local prosecutors, law-enforcement officers, and other officials who have participated in the investigation that led to, or prosecution of, the offense or offenses with which the defendant is charged.'" Ex. M at 2. The government was apparently unmoved by these authorities and this motion followed.

       **D.**    **The defense understands that the government has agreed to make early disclosure of material discoverable under 18 U.S.C. § 3500 to prevent any *Brady* violations and has narrowed its demands accordingly.**

In an email dated January 17, 2024, the government indicated it would "consider advance disclosure of certain categories of 3500 material" which we presume means that the government intends to timely disclose material related to Aponte, Salazar, Garcia, and other potential trial witnesses once a trial date is set, which would explain why none has appeared in discovery thus far. This material will have to be investigated by the defense and, to the extent it may be exculpatory, it must be turned over in time for us to use it effectively at trial. Accordingly, and in reliance on the government's apparent understanding of this concern, we do not press our demands for discovery relating specifically to these three witnesses at this time, though we urge the Court to impress upon the government the importance of timely disclosure under *Brady*.

## ARGUMENT

**The government should be required to turn over all items material to preparing the defense and all exculpatory material accessible by the agents and prosecutors working on the case.**

Gen. Carvajal is seeking an order requiring immediate disclosure of DEA reports, notes, emails, photographs, recordings, cell phone dumps, search warrant and subpoena

returns, and any other discoverable evidence relating to cocaine trafficking from Venezuela between 1999 and 2019 by Kotosky, Tello, Makled, Blengio, Martin and any others alleged to have conspired with Venezuelan government officials who the government claims are part of the conspiracy alleged in the Indictment. The government has never taken the position that this material is not material to preparing the defense under Rule 16(a)(1)(E)(1) of the Federal Rules of Criminal Procedure or exculpatory under *Brady*. Nor could it: evidence regarding the crimes alleged in the Indictment is by definition material to the defense; evidence that people other than Carvajal committed those crimes is materially exculpatory.

Instead, the prosecutors we have spoken to have claimed that the material we seek is not discoverable—*even if it is exculpatory*—because it is not in the possession of the prosecution team. For the reasons explained below, the prosecutors are wrong. The material must be turned over without further delay.

### A.   Other DEA and prosecutors' offices holding materially exculpatory evidence about the conspiracy alleged in the Indictment are part of the "prosecution team."

For the purposes of *Brady*, "[a] prosecutor is deemed to have constructive knowledge of information known to persons who are a part of the 'prosecution team.'" *U.S. v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015), *citing U.S. v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006). "[T]he propriety of imputing knowledge to the prosecution is determined by examining the specific circumstances of the person alleged to be an 'arm of the prosecutor.' It does not turn on the status of the person with actual knowledge, such as a law enforcement officer, prosecutor or other government official. In other words, the

relevant inquiry is what the person *did*, not who the person *is*." *U.S. v. Stewart*, 433 F.3d at 298, *quoting U.S. v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975).

"The Second Circuit has not yet articulated a test to decide when knowledge of *Brady* material may be imputed from one agency to another." *U.S. v. Velissaris*, 2022 WL 2392360 at *2 (S.D.N.Y. 2022) (Cote, D.), *citing U.S. v. Hunter*, 3 F.4th 22, 38, n. 70 (2d Cir. 2022). Several district courts have interpreted this standard for being part of the "prosecution team" as requiring a joint investigation but the Second Circuit does not appear to have adopted such language.[6] *See, e.g., U.S. v. Middendorf*, 2018 WL 3956494 at *4-5 (S.D.N.Y. Aug. 17, 2018) (Oetken, J.). Those courts utilizing the "joint investigation" standard have looked at various factors to determine if a joint investigation took place, including:

> whether the other agency: (1) participated in the
> prosecution's witness interviews, (2) was involved in
> presenting the case to the grand jury, (3) reviewed
> documents gathered by or shared documents with the
> prosecution, (4) played a role in the development of
> prosecutorial strategy, or (5) accompanied the prosecution to
> court proceedings.

*Id.* at *4.

However, the Second Circuit's cautionary words in a recent decision cast doubt on overly strict applications of the "joint investigation" standard in some district courts. *See U.S. v. Hunter*, 3 F.4th 22, 38 (2d Cir. 2022). In *Hunter*, the government argued that it had conducted an investigation with one arm of the DEA—the Bilateral Investigations Unit

---

[6] Our research has not uncovered any Second Circuit case using the phrase "joint investigation" in an analysis under *Brady* and Rule 16.

(DEA-BIU)—and thus a failure to disclose information held by another unit within the DEA—the Special Projects Section (DEA-SPS)—was not a *Brady* violation. *Id.* In making this argument:

> the Government submitted an affidavit from the Assistant Special Agent in Charge of the DEA-SPS explaining that while the DEA-SPS and DEA-BIU are both part of the DEA's Special Operations Division [DEA-SOD], they are 'separate and distinct' and '[p]ersonnel assigned to the [DEA-BIU] were not read on nor given access to information available to and collected by personnel assigned to the [DEA-SOD]' in this case.

*U.S. v. Hunter*, 3 F.4th at 26.

However, despite this claimed separation between the units, DEA-SPS applied to the district court requesting a protective order to deny disclosure of relevant materials to the prosecution team and the defense. *Id.* The Second Circuit did not reach the question of whether the DEA-SPS was part of the prosecution team: instead, it found that the information at issue was not material and therefore no *Brady* violation had occurred.

But the Court cautioned the government, noting that it "strongly question[ed] whether—had the withheld information been material—our jurisprudence circumscribing the 'prosecution team' would have been adequate to protect Defendants' rights in the circumstances presented here." *Id.* at 38. The Court's reasoning was that the *actions* of DEA-SPS in requesting the protective order belied the notion that there was no overlap. *Id.* at 37-8. None of the factors listed in *Middendorf* appear to have been present in *Hunter*, yet the Court still indicated that DEA-SPS could be part of the prosecution team when looking at what the DEA-SPS "*actually did.*" *Id.* at 37 (emphasis in original).

B.    **The government should be required to turn over all the requested material because the U.S. Attorney's Offices for the Eastern District of New York and the Southern District of Florida are members of the team prosecuting General Carvajal.**

In this case, the government has acknowledged publicly that the investigation involved several U.S. attorneys and DEA offices. When announcing the indictment of General Carvajal and his alleged co-conspirators, the Southern District of Florida issued a press release entitled: "Nicolás Maduro Moros and 14 Current And Former Venezuelan Officials Charged With Narco-Terrorism, Corruption, Drug Trafficking and Other Criminal Charges." Ex. N.[7] The press release described charges brought by several U.S. attorney's offices that participated in the investigation of Hugo Carvajal, including the Southern District of New York, the Southern District of Florida, the Eastern District of New York and the District of Columbia. *Id.* Since then, these different offices have shared resources, including key testifying cooperators, in making cases against alleged members of this widespread conspiracy.  For example, Antonio Arvelaiz was a cooperating witness with an agreement with the U.S. Attorney for the Southern District of Florida and a key witness in the Southern District of New York's recent trial against Carlos Orense, who is alleged to be a co-conspirator of General Carvajal. At the trial of Mr. Orense, Mr. Arvelaiz testified at length about Gen. Carvajal's alleged participation in the conspiracy and his joint actions with Pedro Luis Martin Olivares, another alleged co-conspirator being prosecuted in the Eastern District of New York. *See* Ex. G: Arvelaiz testimony excerpts. The 3500 produced

---

[7] As of this filing, the Florida press release remained *available at* https://www.justice. gov/usao-sdfl/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco.

at the Orense trial included information gathered from the Southern District of Florida by the prosecution team here in the Southern District of New York. AUSA Kevin Sullivan stated on the record at the Orense trial: "we have…collected voluminous materials from the Southern District of Florida and from the various agencies on that team and we have turned it over in this case." Ex. G at 51.

Thus, as contemplated in *Hunter*, the Court should focus not on how the government has labeled the offices, but on what investigators have *actually done* to gather evidence. Much like in *Hunter*, the prosecution team's actions in the trial of Gen. Carvajal's alleged co-conspirator reveal they did find it necessary—and were able—to gather information from the Southern District of Florida. It is also clear from the press releases that the Eastern District of New York and various components of the DEA and Immigration and Customs Enforcement shared resources in making cases against various alleged participants in the conspiracy alleged in the Indictment. The conclusion that follows is that these offices are part of the prosecution team in this particular case and their files are subject to disclosure to the defense.

Further, it seems clear that the goal of the cases analyzing the breadth of prosecution teams is to avoid reversing of convictions due to *inadvertent* failures to disclose *Brady* material by prosecutors unaware of the actions of other offices. The courts seek to avoid overburdening prosecutors by requiring far-flung fishing expeditions in every case. But here, for unknown reasons the U.S. government has decided to divide up the conspiracy— *i.e.* the prosecution of the "Cartel de los Soles"—across different offices. The

16

defense has asked for specific information about alleged co-conspirators who have also been charged by the U.S. government.

As the Fifth Circuit has stated in the context of Rule 16 disclosures, "[a] prosecutor is not 'allowed to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial.'" *U.S. v. Griffin*, 379 F. Supp. 337, 342 (S.D.N.Y. 2004), *quoting U.S. v. Trevino*, 556 F.2d 1265, 1272 (5th Cir. 1977). While in other cases it may be true that one U.S. Attorney's Office is not part of the same prosecution team as another, here the *case* investigated is not just an investigation into one person, General Carvajal but a wide-ranging multi-agency case against alleged narcotics trafficking within the Venezuelan government that took the form of a conspiracy whose various tendrils were divided up among different U.S. Attorney's Offices. The prosecutors here have proven themselves more than able to draw on the resources of their sister offices as they've sought and obtained guilty convictions of other members of the conspiracy such as Mr. Orense. The government should not be able to use the information held by these offices as a sword, without turning it over to General Carvajal to use as a shield.

C.   **At a minimum, the government should be required to search the databases that it has already searched for the names and topic areas described in the defense's discovery demand.**

While parts of an organization—such as the DEA or the Department of Justice— rather than the whole may not be part of the prosecution team, the inquiry does not end with the prosecution's simple declaration of which parts of the agency participated in a given case. Rather, courts must—as prescribed by *Stewart*—look to what the different arms

17

of an agency *did*. *See e.g. U.S. v. Hunter*, 3 F.4th at 26 *citing U.S. v. Stewart*, 433 F.2d at 298.

> In an email, the government explained to the defense that it had:

>> reviewed the investigative files of the DEA component working with our office in this case, the Special Operations Division, Bilateral Investigations Unit ("BIU"). This included approximately twenty years of records in the BIU's holdings concerning multiple investigations of drug trafficking in Venezuela. Second, we reviewed DEA investigative files across other DEA offices that contained reference to variations or iterations of your client's name. These reviews included documents and records related to the charged conspiracy (regardless of whether your client is mentioned in those documents and records), to the extent we were aware of a connection to the charged conspiracy. Following our reviews, we produced materials identified as discoverable pursuant to Brady and Rule 16 (including recordings).

> Ex. L at 2.

As in *Hunter*, where an arm of the DEA decided to submit a request for a protective order, someone at the U.S. Attorney's Office believed that material that needed to be produced to the defense was held in "DEA investigative files across other DEA offices." *Id.* Furthermore, the prosecution team is in possession of these documents because they—or members of their DEA team—were *able* to do such a search. Therefore, the prosecutors here should *at least* be required to search the same records already searched for "reference to variations or interactions of [General Carvajal's] name" for the names and topics listed in the defendant's demand letter to determine whether there is material that is discoverable pursuant to *Brady* as well as Rule 16.

The government should be required to describe which specific DEA offices' files were searched, what the basis was for delineating between which offices it searched and

what access its team has to other, unsearched, documents held by the DEA. In other words, like the government did in *Hunter*—thought it was unpersuasive to the Court there given the specific circumstances—the government should be required to submit an affidavit explaining what access the agents in this case have to DEA files in various offices. Then they should be required to search the DEA files for which they have access for material and potentially exculpatory information.

## <u>CONCLUSION</u>

Because it is discoverable under Rule 16 and *Brady*, material related to the participation of Martin, Blengio, Kotosky, Villasana, Makled and Tello in the conspiracy alleged in the Indictment should be ordered disclosed forthwith.

Dated:      January 26, 2024
            New York, New York

Respectfully submitted,
ZMO Law PLLC

By: *Zachary Margulis-Ohnuma*

      Zachary Margulis-Ohnuma
      353 Lexington Avenue, Suite 900
      New York, NY 10016
      (212) 685-0999