UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

HUGO ARMANDO CARVAJAL BARRIOS,
a/k/a "El Pollo,"

Defendant.

S1 11 Cr. 205 (AKH)

# THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
# TO DEFENDANT HUGO ARMANDO CARVAJAL BARRIOS'S MOTION TO COMPEL

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Nicholas S. Bradley
Kaylan E. Lasky
Kevin T. Sullivan
Assistant United States Attorneys
        *-Of Counsel-*

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT.................................................................................... 1

II.  BACKGROUND .................................................................................................... 2

     A.   Overview ..................................................................................................... 2

          1.   The Cartel and the FARC ................................................................. 2

          2.   The Defendant ................................................................................. 5

     B.   Procedural History ...................................................................................... 6

     C.   The Government's Discovery Productions .................................................. 6

     D.   The Defendant's Motion to Compel ........................................................... 8

III. ARGUMENT ....................................................................................................... 10

     A.   The Motion to Compel Fails Because the Materials Are Not in the
          Possession of the Prosecution Team ...................................................... 10

          1.   Applicable Law ............................................................................. 10

          2.   Discussion .................................................................................... 15

     B.   The Defendant's *Brady* Claims Are Speculative .................................... 23

     C.   The Government Will Collect and Review Possible *Giglio* and Jencks Act
          Materials from USAOs that Prosecuted Any Cooperating Witnesses in
          Advance of Trial ....................................................................................... 25

     D.   No Further Fact Finding Is Necessary ..................................................... 26

IV.  CONCLUSION .................................................................................................... 27

The Government respectfully submits this memorandum of law in opposition to defendant Hugo Armando Carvajal Barrios's motion to compel discovery from other United States Attorney's Offices ("USAOs," or when referred to individually, "USAO") and offices of the U.S. Drug Enforcement Administration ("DEA") that are not part of the prosecution team in this case. ("Def. Mot.," D.E. 157.)

## I.   PRELIMINARY STATEMENT

From in or about 1999 through in or about 2019, the defendant, the former head of Venezuela's military intelligence agency, worked with terrorists and other major drug traffickers in South America and elsewhere to ship massive quantities of cocaine into the United States. In doing so, the defendant and other high-ranking officials in the government of Venezuela comprising the *Cartel de Los Soles* (the "Cartel") worked with the leadership of the *Fuerza Armadas Revolucionarias de Colombia* ("FARC")—which, at all relevant times, was designated as a foreign terrorist organization—to coordinate multi-ton drug shipments, provide heavily armed security to protect these drug shipments, and flood the United States with cocaine.

Since the defendant's extradition from Spain in July 2023, the Government has produced extensive discovery that has exceeded its obligations under Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963). That discovery includes nearly twenty years of investigative files in the possession of the prosecution team in this case—specifically, the USAO for the Southern District of New York ("USAO-SDNY") and the DEA's Special Operations Division, Bilateral Investigations Unit ("BIU"). The Government will continue to comply with its obligations under Rule 16 and *Brady*.

The defense agrees that the Government's disclosure obligations are limited to materials within the possession of the prosecution team. However, citing a joint press release and discrete requests made to another USAO for a different case, the defendant now argues that the Government

must search decades of records held by two separate USAOs and the entire DEA for at least five individuals allegedly "relating to cocaine trafficking from Venezuela between 1999 and 2019" to meet its disclosure obligations in this case. (Def. Mot. at 11-12.) The defendant does not cite a single case in support of this unprecedented discovery demand. Nor can he—indeed, his request is squarely foreclosed by Second Circuit law, and multiple courts in this District have reached the same conclusion. The Court should reject the defendant's invitation to ignore well-worn precedent and deny his motion.

## II.    BACKGROUND

### A.    Overview

#### 1.    The Cartel and the FARC

On April 15, 2019, a grand jury in this District returned Superseding Indictment S1 11 Cr. 205 (AKH) (the "S1 Indictment"), which charged the defendant with (i) narcoterrorism conspiracy, in violation of 21 U.S.C. § 960a (Count One); (ii) cocaine importation conspiracy, in violation of 21 U.S.C. § 963 (Count Two); (iii) possession of machineguns and destructive devices, in violation of 18 U.S.C. § 924(c)(1)(A), (c)(1)(B)(ii), and 2 (Count Three); and (iv) conspiracy to possess machineguns and destructive devices, in violation of 18 U.S.C. § 924(o) (Count Four). (D.E. 8.) The charges stem from the defendant's participation in the corrupt and violent conspiracy involving the Cartel and the FARC between approximately 1999 and 2019. (*Id.* ¶¶ 1-4.) A Second Superseding Indictment (the "S2 Indictment") was filed on March 5, 2020, charging the defendant with the same conduct but adding multiple co-defendants, including Nicholas Maduro Moros, the *de facto* ruler of Venezuela; Diosdado Cabello Rondon, president of Venezuela's National

Constituent Assembly; and Cliver Antonio Alcala Cordones, a former general in the Venezuelan military. (S2 Indictment ¶¶ 7-10.)[1]

The Cartel was a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials who abused their positions and corrupted the legitimate institutions of Venezuela—including parts of the military, intelligence apparatus, legislature, and judiciary—to facilitate the importation of tons of cocaine into the United States. (*Id*. ¶ 3.) The name of the Cartel is a reference to the sun insignias affixed to the uniforms of high-ranking Venezuelan military officials who were members of the Cartel. (*Id*.) The former President of Venezuela, Hugo Rafael Chávez Frias ("Chávez"), was one of the leaders of the Cartel until his death in 2013. (*Id*. ¶¶ 7, 15(e).) After Chávez died, Maduro assumed the Presidency and continued to lead the Cartel and participate in cocaine trafficking on a massive scale. (*Id*. ¶ 7.) Under Maduro's leadership, the Cartel sought not only to traffic staggering quantities of cocaine for financial gain, but also to weaponize the drug by "flood[ing]" the United States with it, thereby inflicting the drug's harmful and addictive effects on users in this country. (*Id*. ¶ 4.) In other words, the Cartel prioritized using cocaine as a weapon against the United States and importing as much cocaine as possible into the United States to harm the U.S. population. (*Id.*)

The S2 Indictment also charged two members of the FARC's leadership bodies: Luciano Marin Arango, a/k/a "Ivan Marquez," and Seuxis Paucis Hernandez Solarte, a/k/a "Jesus Santrich." (*Id.* ¶ 2.) For decades, the FARC was one of the largest cocaine producers in the world, operating cocaine fields and laboratories in Colombia and Venezuela. (*See id.* ¶¶ 2, 11.) The FARC has also directed violent acts against U.S. persons and property in foreign jurisdictions, including, but not

---

[1] The Court also succinctly summarized the salient facts in its November 7, 2023 Order. (D.E. 135.) Although the defendant correctly notes that he will be tried on the S1 Indictment, both Indictments allege the same conduct.

limited to, Colombia. (*Id.* ¶ 11.) For example, the FARC leadership ordered FARC members to kidnap and murder U.S. citizens and to attack U.S. interests in order to dissuade the United States from continuing its efforts to fumigate FARC coca fields and disrupt the FARC's manufacturing and distribution of cocaine and cocaine paste. (*Id.*) Consistent with these activities, in 1997, the U.S. Department of State (the "State Department") designated the FARC as a Foreign Terrorist Organization. (*Id.*) The FARC remained so designated until November 30, 2021.[2]

For over 20 years, the FARC and the Cartel worked together to produce and distribute massive quantities of cocaine. (*Id.* ¶¶ 1-10.) The defendants were all either leaders of the Cartel or the FARC during that time period. (*Id.*) Starting in 1999, while the FARC purported to negotiate peace with the Colombian government, the FARC also agreed with leaders of the Cartel to move certain cocaine production operations to Venezuela under the protection of the Venezuelan government. (*Id.* ¶ 14(a).) FARC members and associates began to cultivate coca leaves on farms in this region, such as southwest Colombia and in the mountain range spanning the Venezuela-Colombia border. (*Id.* ¶ 14(b).)

The FARC and the Cartel dispatched processed cocaine from Venezuela, often to the United States, via transshipment points in Central America and the Caribbean, including Honduras. (*Id.* ¶ 14(c).) Maritime shipments proceeded north from Venezuela's coastline using go-fast vessels, fishing boats, and container ships. (*Id.*) Planes loaded with cocaine also took off from Venezuela, often dispatched from clandestine airstrips, typically made of dirt or grass, concentrated in Apure State. (*Id.*) In order to safely transport this cocaine, members and associates of the FARC and the Cartel paid bribes, which ultimately benefited the defendant and others who worked in the

---

[2] Simultaneous to that delisting, the State Department designated two successor organizations of the FARC as foreign terrorist organizations: the FARC-EP and Segunda Marquetalia.

Venezuelan government, for access to ports and airspace and protection from arrest and investigation. (*Id.* ¶ 14(d).) In addition, the defendant, along with other high-ranking members of the Venezuelan government, coordinated with the FARC to transport and distribute those large cocaine shipments; benefitted from, and caused others to participate in, the provision of heavily armed security to protect the cocaine shipments; caused large quantities of previously seized cocaine to be sold to drug traffickers in exchange for millions of dollars; interfered with drug-trafficking investigations and pending criminal cases in Venezuela and elsewhere; and helped provide the FARC with military-grade weapons, including machineguns, ammunition, rocket launchers, and explosives equipment. (*Id.* ¶ 14(e).)

> **2. The Defendant**

The defendant played a pivotal role in facilitating the foregoing activities. Between 2004 and 2011, the defendant was the director of Venezuela's military intelligence agency, which was known at the time as the *Dirección de Inteligencia Militar* ("DIM").[3] (*Id.* ¶ 9.) In 2013, Maduro made the defendant the director of DIM for a second time. (*Id.*) Between January 2014 and June 2014, the defendant held the title of Venezuela's consul general to Aruba. (*Id.*) Then, in January 2016, the defendant was elected to the Venezuelan National Assembly. (*Id.*) At the time of his election, the defendant was a fugitive on drug trafficking charges that had been filed in this District since 2011. (*Id.*)

To provide just some examples of the defendant's conduct: in 2006, the defendant worked with other Cartel members to coordinate a shipment of 5.6 tons of cocaine from Venezuela on a U.S.-registered aircraft. (*Id.* ¶ 15(d).) In 2008, the defendant attended a meeting with a FARC representative, during which the attendees (who included Maduro and Cabello) agreed that the

---

[3] The agency was later renamed the *Dirección General de Contrainteligencia Militar* ("DGCIM").

Cartel would provide the FARC with cash and weapons in exchange for increased cocaine production. (*Id.* ¶ 15(f).) Similarly, in 2009, the defendant met again with Maduro, Cabello, and a FARC representative to discuss a four-ton cocaine shipment that the FARC was prepared to transport to Venezuela, from where it would be eventually imported into the United States. (*Id.* ¶ 15(h).). In 2013, following the seizure of a 1.3-ton shipment of cocaine shipped by plane from Venezuela to Paris, the defendant met with Maduro and Cabello to discuss using other established drug routes to dispatch Cartel cocaine. (*Id.* ¶ 15(i).) The Government expects to prove these and other facts through witness testimony at trial.

### B.      Procedural History

The defendant has been charged with drug trafficking activities in this District since 2011. (*Id.* ¶ 9.) He was first arrested by Aruban authorities in July 2014 but released after Maduro and other members of the Cartel pressured Aruba and the Dutch government, including by deploying naval assets. (*Id.* ¶ 15(l).) The defendant was re-arrested in Spain and eventually extradited to the United States in July 2023. (D.E. 119.)  As to his co-defendants on this docket, Santrich died in or about March 2022. (D.E. 106.) Alcala pled guilty on June 29, 2023 and his sentencing is pending. (D.E. 117, 154.) The remaining defendants on the S2 Indictment have not been arrested.

### C.      The Government's Discovery Productions

Since the defendant's presentment, and pursuant to the protective order governing the production of unclassified discovery in this case (D.E. 130), the Government has produced voluminous unclassified discovery to the defendant that exceeds the requirements of Rule 16 and *Brady*. To date, the Government has made eight productions of discovery totaling over 700 gigabytes of data. In brief, the Government reviewed and produced Rule 16 materials from nearly 20 years of investigative records in the possession of the prosecution team in this case—the USAO-SDNY and the BIU. Those records included, among other things, the discovery produced to co-

6

defendant Alcala, as well as the discovery produced in other Venezuelan drug trafficking cases charged in this District, such as *United States v. Rios Galindo, et al.*, 11 Cr. 836 (VSB), and *United States v. Orense Azocar*, 21 Cr. 379 (VSB), and discoverable materials from *United States v. Makled-Garcia*, 09 Cr. 614 (RWS).

In addition to the above, and while under no obligation to do so, the Government requested a search of DEA investigative files across the entire agency for records that contained references to or variations of the defendant's name. This additional search involved the collection and review of records from all DEA components and offices outside the BIU that did not participate in the USAO-SDNY's investigation that resulted in the charges in this case. As such, the resulting reports and records were generated by entities within the DEA without any involvement or direction from any of the prosecutors in this case. Nor did the USAO-SDNY undertake any joint investigative activities with prosecutors from the USAOs in the Southern District of Florida ("USAO-SDFL") or the Eastern District of New York ("USAO-EDNY") in connection with its investigation of the defendant (or, as explained below, any of the five individuals at issue in the defendant's motion). For example, the USAO-SDNY did not participate in joint witness interviews with those USAOs,[4] make strategic decisions with those USAOs about any prosecutions of the defendant or his co-conspirators, or share documents apart from the limited examples described below in the *Orense Azocar* trial.[5]

---

[4] The Government anticipates that its Jencks Act disclosures will show that on two occasions, cooperating witnesses signed up by one USAO were made available to another USAO for proffer interviews. As is customary, members of the USAO responsible for the witness's cooperation sat in on those proffers. As discussed below, *infra* Section III.A.1, such participation has no bearing on the Court's prosecution team analysis.

[5] The Government is aware that the USAO-SDFL filed a separate indictment charging the defendant with narcotics importation conspiracy in or about May 16, 2013, as part of a separate and independent investigation that the USAO-SDFL conducted with another DEA component. (13 Cr. 20345 (KMM) (S.D.F.L. May 16, 2013), D.E. 3.) Around the time of the defendant's arrests in

**D.      The Defendant's Motion to Compel**

The defendant's motion to compel identifies five individuals charged by two separate USAOs in the USAO-SDFL and the USAO-EDNY named Luis Frank Tello Candelo, Pedro Luis Martin Olivares, Vassyly Kotosky Villaroel Ramirez, Fernando Blengio, and Rafael Antonio Villasana Fernandez. (Def. Mot. at 1-2.) Although not charged or independently investigated by the USAO-SDNY or the BIU, the defendant demands that the Government collect, review, and produce any materials held by the USAO-SDFL, USAO-EDNY, and their relevant investigating agencies "relating to cocaine trafficking from Venezuela between 1999 and 2019 by Kotosky, Tello, Makled,[6] Blengio, Martin and any others alleged to have conspired with Venezuelan government officials who the government claims are part of the conspiracy charged in the Indictment." (Def. Mot. at 11-12.) To the extent the prosecution team is in possession of Rule 16 materials in this case that reference those individuals, it has produced them in discovery. Neither the USAO-SDNY or the BIU independently investigated these individuals or charged them in any case in this District. Nor did the USAO-SDNY or the BIU participate in the investigative activities, witness interviews, or grand jury presentations of the USAO-SDFL or the USAO-EDNY in their separate cases against these individuals.

Nevertheless, to support his claim that the USAO-SDFL and USAO-EDNY are part of the prosecution team for the Government's disclosure obligations in this case, the defendant makes

---

Aruba and Spain, the Government engaged in deconfliction discussions within Justice Department regarding the separate investigations.

[6] The defendant likely means Villasana. As noted above, Makled, unlike the other individuals, was prosecuted by the USAO-SDNY and the Government therefore produced materials from that case in its possession under Rule 16. Accordingly, defense counsel has previously represented to the Government that they were satisfied with its production regarding Makled. (*See also* Def. Mot. at 2 n.2.)

two assertions. First, in March 2020, the Justice Department issued a joint press release announcing the USAO-SDNY's S2 Indictment, as well as multiple separate indictments by the USAO-SDFL and the USAO-EDNY against other Venezuelan individuals, including the USAO-EDNY's indictments of Kotosky and Villasana.[7] (*Id.* at 15.) Second, the USAO-SDNY made discrete requests to the USAO-SDFL—primarily for 3500 and *Giglio* materials—in preparation for a separate prosecution of Carlos Orense Azocar before Judge Broderick, which concluded late last year. *See* 21 Cr. 379 (VSB). The defendant also claims, without authority, that because the Government has in the past made requests of other offices and agencies, its disclosure obligations must necessarily extend at the very least to all DEA offices worldwide and multiple USAOs. (*See id.* at 17-18.)

The defendant further asserts that the requested materials held by the other USAOs and investigative agencies somehow contain exculpatory information because they "provide[] evidence that people other than Carvajal engaged in the acts that Carvajal is accused of." (*Id.* at 1.) Apart from speculation, the defendant cites two allegations to support this claim:

- A cooperating witness in the *Orense Azocar* trial testified that the defendant helped escort loads of cocaine along with Kotosky, who together also helped disable military radar to allow drug shipments to fly undetected. (*Id.* at 7-8.)

- A cooperating witness in the *Orense Azocar* trial also testified that the defendant and Martin worked together to supply Orense Azocar with cocaine from Colombia, and together would seek out and kill the cooperating witness if he returned to Venezuela. (*Id.* at 8.)

Finally, the defendant cites the importance of "[d]efense witness" Blengio, who has never met the defendant and, as the Court previously found, proffers "proposed testimony that Carvjajal's

---

[7] U.S. Department of Justice, Nicolás Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking and Other Criminal Charges, https://www.justice.gov/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco-terrorism (Mar. 26, 2020).

name was given to him in connection with bribes to exit Venezuela with a plane-load of narcotics, [which] suggests that Carvajal was involved in the scheme."[8] (D.E. 135 at 4.)

## III.   ARGUMENT

The defendant baldly and wrongly asserts that that USAO-SDFL, USAO-EDNY, and the entire DEA are part of the prosecution team in this case for the purposes of Rule 16 and *Brady*. That is not the law. The Second Circuit and multiple courts in this District have rejected the monolithic, whole-of-government approach to discovery that the defendant seeks. As explained below, the defendant's motion fails because the materials requested on the five individuals above are not in the possession of the prosecution team. Additionally, even if such materials were in the prosecution team's possession (and they are not), the fact that others participated in the defendant's narco-trafficking and narco-terrorism conspiracies is hardly "exculpatory" or material to his defense. Finally, to the extent the defendant seeks discovery of witness statements, the Government will provide Jencks Act and *Giglio* materials well in advance of the trial date in accordance with the trial schedule when it is set. Furthermore, as it did in the *Orense* trial, the Government will request Jencks Act and *Giglio* materials from any USAOs that have previously charged any cooperating witnesses that the Government expects to call at trial.

### A.   The Motion to Compel Fails Because the Materials Are Not in the Possession of the Prosecution Team

#### 1.   Applicable Law

"It is well established that the Government's 'discovery and disclosure obligations extend *only* to information and documents in the [G]overnment's possession.'" *United States* v. *Avenatti*,

---

[8] Although not material to his motion, the Government is not aware of any support for the defendant's claim there is "evidence that Martin gave the [DEA] false information about the murder of a DEA informant." (Def. Mot. at 8.)

559 F. Supp. 3d 274, 280 (S.D.N.Y. 2021) (quoting *United States* v. *Brennerman*, 818 F. App'x 25, 29 (2d Cir. 2020)); *see also United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) ("Clearly the government cannot be required to produce that which it does not control and never possessed or inspected.") (internal citation omitted). As used in this context, "the [G]overnment" refers to more than just the individual prosecutors handling the case; the "prosecutor is presumed . . . to have knowledge of all information gathered in connection with his [or her] office's investigation of the case and indeed has a duty to learn of any favorable evidence known to . . . others acting on the [G]overnment's behalf in the case." *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (internal quotation marks omitted). In other words, the Government's disclosure obligations extend only to materials in the possession of the "prosecution team." *United States* v. *Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015).

Beyond the prosecution team, however, "the Government has no obligation, under *Brady* or otherwise, to seek out information like a private investigator and valet gathering evidence and delivering it to opposing counsel." *Avenatti*, 559 F. Supp. 3d at 280 (cleaned up). Accordingly, "knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor." *Avellino*, 126 F.3d at 255. This well-recognized limitation applies with equal force under both *Brady* and Rule 16. *United States v. Chalmers*, 410 F. Supp. 2d 278, 289-90 (S.D.N.Y. 2006) (explaining that the "[G]overnment for purposes of Rule 16 should [not] be any broader than the 'prosecution team' standard that has been adopted in the *Brady* line of cases") (cleaned up).

The Second Circuit has long been clear about why disclosure obligations are cabined this way. "Limiting disclosure obligations to the 'prosecution team' prudently prevents a prosecutor from needing to search the 'whole-of-government' for possibly material information in myriad

cases and controversies before the courts. Such an obligation would clearly be an unworkable encumbrance on the system of justice." *United States v. Hunter,* 32 F.4th 22, 37 (2d Cir. 2022); *see also* Hr'g Tr. 10:6-10:21 (Jan. 18, 2024) (D.E. 152). The alternative approach (and one advocated by the defendant here) would "impos[e] . . . an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question," and "inappropriately require [the adoption of] a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis." *Avellino*, 136 F.3d at 255 (internal quotation marks omitted); *see also United States v. Alexandre*, 22 Cr. 326 (JPC), 2023 WL 416405, at *5 (S.D.N.Y. Jan. 26, 2023).

In defining the scope of a prosecution team, the Court must "examine the specific circumstances of the person alleged to be an arm of the prosecutor." *Hunter*, 32 F.4th at 35-36 (cleaned up); *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (holding that membership in the prosecution team is determined by "examining the specific circumstances"). The Second Circuit has "long rejected the notion that knowledge of any part of the government is equivalent to knowledge on the part of th[e] prosecutor." *Hunter*, 32 F.4th at 36 (internal quotation marks omitted) (citing *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) ("We will not infer the prosecutors' knowledge simply because some other government agents knew about the [information in question].")). Rather than a "broad, categorical approach," the Circuit has clearly explained that "the relevant inquiry is what the person *did*, not who the person *is*." *Stewart*, 433 F.3d at 298 (the imputation of knowledge to the prosecutor "does not turn on the status of the person with actual knowledge, such as a law enforcement officer, prosecutor or other government official"). Stated differently, "members of the [prosecution] team perform investigative duties and make strategic decisions about the prosecution of the case." *United States v. Meregildo*, 920 F.

Supp. 2d 434, 441 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir.

2015). And "[i]nteracting with the prosecution team, without more, does not make someone a team

member." *Id*.

Accordingly, "[w]hether the Government's discovery obligations extend to materials in

possession of another government agency turns on whether the Government and the other agency

conducted a 'joint investigation.'" *Alexandre*, 2023 WL 416405, at *5. "Relevant factors" courts

in this Circuit typically look to determine membership in the prosecution team "include the extent

to which the other agency '(1) participated in the prosecution's witness interviews, (2) was

involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared

documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or

(5) accompanied the prosecution to court proceedings.'" *Id.* (quoting *United States v. Middendorf*,

18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018)). In other words, "the more

involved individuals are with the prosecutor, the more likely they are team members." *Meregildo*,

920 F. Supp. 2d at 442.

The Second Circuit has also made clear that an entire agency does not become part of the

prosecution team because some agents from that agency participate in the investigation. *See, e.g.,*

*Locascio*, 6 F.3d at 948-49 (refusing, for *Brady* purposes, to impute to AUSAs prosecuting that

action with the assistance of certain Federal Bureau of Investigation ("FBI") agents knowledge of

reports about a cooperating witness prepared by FBI agents in another district who were

"uninvolved in the investigation or trial of the defendants"); *see also United States v. Saipov*, 17

Cr. 722 (VSB), 2023 WL 3495031, at *4-5 (S.D.N.Y. May 16, 2023) (finding that FBI field offices

which did not participated in the investigation at issue were not part of the prosecution team);

*United States v. Noel*, 19 Cr. 830 (AT), 2020 WL 12834537, at *4, (S.D.N.Y. June 9, 2020) (even

though the Bureau of Prisons ("BOP") "is a component of the Department of Justice . . . that fact standing alone is not sufficient to make the BOP an arm of the prosecution"). So too for other components of the Justice Department, including USAOs. *United States v. Quinn*, 445 F.2d 940, 943-44 (2d Cir. 1971) (refusing to impute knowledge of an AUSA in Florida to the USAO-SDNY, rejecting as "completely untenable [the] position that knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor") (cleaned up); *see also United States v. Ghailani*, 687 F. Supp. 2d 365, 372 (S.D.N.Y. 2010) (holding that, in the context of a speedy trial motion, other members of the Justice Department who were involved in making decisions about timing and progress of the case were part of the "government" for Rule 16 purposes).

Against that backdrop, courts in this District have repeatedly rejected attempts to extend the prosecution team to government agencies that:

- **Conducted parallel or competing investigations**. *See, e.g.*, *Alexandre*, 2023 WL 416405, at *6-8 (Commodity Futures Trading Commission ("CFTC") conducted independent investigation, coordinated announcement of civil litigation with the USAO-SDNY's criminal charges, provided documents to the USAO-SDNY, and both offices thanked each other in press releases); *United States v. Avenatti*, 19 Cr. 374 (JMF), 2022 WL 457315, at *1-3 (S.D.N.Y. Feb. 15, 2022) (USAO-SDNY and USAO for Central District of California each prosecuted cases that included "deconfliction discussions," "discrete requests for certain materials," and "a small number of joint witness interviews"); *United States v. Ingarfield*, 20 Cr. 146 (RA), 2023 WL 3123002, at *1-2, 7 (S.D.N.Y. Apr. 27, 2023) (separate investigations involving co-conspirator conducted by the USAO-EDNY, the FBI, the Securities and Exchange Commission ("SEC"), and other agencies).

- **Shared documents with the prosecution team**. *See, e.g.*, *Ingarfield*, 2023 WL 3123002, at *4-5 (rejecting argument that the SEC was part of joint investigation with the USAO-SDNY because the SEC shared documents with the prosecution team as "rightly—and repeatedly—rejected in this district"); *Alexandre*, 2023 WL 416405, at *6 (explaining that "access grants" between government agencies are "hardly uncommon" and "do not indicate by themselves a joint investigation," and collecting cases); *United States v. Blaszczak*, 308 F. Supp. 3d 736, 738 (S.D.N.Y. 2018) (no joint investigation even though the SEC provided the USAO-SDNY with all the documents it obtained from its investigation).

14

- **Participated jointly in witness interviews**. *See, e.g.*, *Ingarfield*, 2023 WL 3123002, at *4 ("[T]he Court agrees with the courts in this district which have held that participating in joint interviews of a witness does not, without more, establish the existence of a joint investigation."); *United States v. Velissaris*, 22 Cr. 105 (DLC), 2022 WL 2392360, at *2 (July 3, 2022) ("[J]ointly conducted interviews, standing alone, do not support a conclusion that the SEC and USAO have conducted a joint investigation, particularly where the defendant's request is not limited to information about those interviews.")

- **Provided access and other materials related to a cooperating witness**. *See, e.g., Ingarfield*, 2023 WL 3123002, at *5 (finding no joint investigation with the USAO-EDNY when it "provided access to its cooperating witness," "attended three initial interviews of that witness," and "turned over materials related to [the cooperating witness]" at the USAO-SDNY's request).

- **Issued simultaneous press releases thanking the prosecution team**. *See, e.g.*, *Alexandre*, 2023 WL 416405, at *7 ("Nor is the fact that the U.S. Attorney's Office and the CFTC thanked each other in their press releases a basis for finding a joint investigation."); *United States v. Bogoraz*, 22 Cr. 19 (PGG), 2024 WL 36990, at *11 (S.D.N.Y. Jan. 3, 2024) (finding no joint investigation when the New York City Police Department Commissioner thanked the USAO-SDNY following the defendant's arrest and indictment).

As such, "under the totality of the circumstances, the more involved individuals are with the prosecutor, the more likely they are team members." *Meregildo*, 920 F. Supp. 2d at 442. Arguments about "bureaucratic proximity" between the Government and other federal litigating and investigating components "tell[] us little about the actual relationship between the prosecutors on the one hand, and the agencies, divisions, and subdivisions at issue, on the other." *Hunter*, 32 F.4th at 37.

        **2.    Discussion**

None of the materials requested by the defendant are in the possession of the prosecution team. The Government has exceeded its disclosure obligations in this case and will continue to remain in compliance with Rule 16 and *Brady*. To the extent the defendant requests discoverable materials related to the five individuals above that are in the possession of the prosecution team, those materials, to the extent they exist, have been disclosed. Indeed, to the extent those individuals

appeared in *any* DEA reporting agency-wide regarding drug trafficking with the defendant in the last twenty years, such materials would have been produced to the extent that the materials constituted Rule 16 (as opposed to, *e.g.*, Jencks Act materials).

Here, the defendant demands materials specifically held by two other USAOs (the USAO-SDFL and the USAO-EDNY) and all DEA components that did *not* participate in this case "relating to cocaine trafficking from Venezuela between 1999 and 2019 by Kotosky, Tello, [Fernandez], Blengio, Martin and any others alleged to have conspired with Venezuelan government officials who the government claims are part of the conspiracy charged in the Indictment." (Def. Mot. at 11-12.) But the defendant offers no basis beyond speculation and assumption that the USAOs and their agency partners that investigated and charged these individuals were part of the prosecution team *in this case*. Similarly, the defendant does not—and cannot—offer any factual basis for his unsupported assertion that the Government here was part of the prosecution team in the USAO-SDFL's or USAO-EDNY's respective investigations and charges for these five individuals. Instead, the defendant asks the Court to adopt a broad-brush, categorical approach to discovery that is squarely foreclosed by Second Circuit law and repeatedly rejected by courts in this District. That is precisely the "state of paralysis" the Second Circuit sought to avoid in criminal prosecutions. *Avellino*, 136 F.3d at 255. The Court should deny the defendant's unprecedented request.

To prevail on his claim, the defendant "must offer evidence that these [other offices] have acted as an 'arm of the prosecutor' in the instant case." *Bogoraz*, 2024 WL 36990, at *10-11 (rejecting "mere[] assert[ion] – without explanation – that the [other government agency] played an integral part in the investigation") (internal quotation marks omitted). As noted above, the USAO-SDFL and USAO-EDNY did not work with the Government in its investigation and

prosecution of the defendant in this case. Same for the DEA components and other investigative agencies that worked with those USAOs for their respective charges against the five individuals. As such, they are not "part of the 'prosecution team' . . . who perform investigative duties or make strategic decisions about the prosecution of the case." *Barcelo*, 628 F. App'x at 38 (quoting *Stewart*, 433 F.3d at 298). That alone is fatal to the defendant's motion.

The defendant does not—and cannot—credibly assert that the Government has conducted a joint investigation as to the defendant or any of these individuals with the other USAOs and agencies. The defendant does not assert—nor can he—that there was any joint participation in witness interviews, involvement with each other's presentations to the grand jury, joint development of prosecution strategy, or joint attendance at court proceedings. *See Middendorf*, 2018 WL 3956494, at *4. Instead, the defendant cites to surface-level assertions of coordination that courts have repeatedly rejected as a basis for extending disclosure obligations to other government agencies.

### a.       The USAO-SDFL and USAO-EDNY Are Not Part of the Prosecution Team

*First*, the defendant argues that in March 2020, the Justice Department issued a joint press release announcing the USAO-SDNY's S2 Indictment against the defendant and other charges by multiple USAOs, including the USAO-SDFL and USAO-EDNY. (Def. Mot. at 15.) While the press release included the USAO-EDNY's unsealed charges against Kotosky and Villasana, it did not include any of the individuals in the defendant's motion who were charged by USAO-SDFL. In any event, issuing a joint press release has no bearing on a prosecution team analysis. *See Alexandre*, 2023 WL 416405, at *7 ("Nor is the fact that the U.S. Attorney's Office and the CFTC thanked each other in their [simultaneous] press releases a basis for finding a joint investigation."). The defendant cites no authority to the contrary. Indeed, a cursory examination of the press release

illustrates the absurd results the defendant now advocates. The press release makes no mention of three individuals featured in the defendant's motion to compel, presumably because they were charged at different times in other independent investigations, years before the 2020 announcement in connection with this case (*e.g.*, Tello was charged by USAO-EDNY in 2010; Blengio was charged by USAO-SDFL in 2011; and Martin was charged by USAO-SDFL in 2015). (Def. Mot. at 7-8.) The press release also announced the unsealing of charges in the U.S. District Court for the District of Columbia by the Narcotic and Dangerous Drug Section ("NDDS") of the Justice Department, prior sanctions imposed by the Treasury Department's Office of Foreign Assets Control, the State Department's Narcotics Rewards Program, and assistance provided by the Justice Department's Office of International Affairs and Office of Enforcement Operations. By the defendant's logic, the prosecution includes not only the USAOs who investigated individuals not even mentioned in the press release, but also any other referenced government component regardless of what they actually did (or did not do) in this case. *See Quinn*, 445 F.2d at 944 (rejecting as "reduction ad absurdum" the "completely untenable position" that "knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor"). As explained above, the Second Circuit has repeatedly rejected that position. *See, e.g.*, *Avellino*, 136 F.3d at 255. Finally, the press release itself says nothing to support the defendant's claims about "shared resources" or that "several U.S. attorney's offices . . . participated in the investigation of Hugo Carvajal." (Def. Mot. at 15-16.) In fact, it says the opposite—even the press release on the USAO-SDFL's website states the Carvajal case is being handled by the USAO-SDNY.[9]

_____

[9] The defendant's legally irrelevant reliance on press statements is also self-defeating. To illustrate, the USAO-SDFL issued a press release in September 2020 stating that Martin was charged by USAO-SDFL and made no mention of USAO-SDNY or other USAOs. *See* Rewards Offered for Capture of Three Former Venezuelan Officials Charged in Miami Federal Court with Drug

*Second*, the defendant claims that "these offices have shared resources, including key testifying cooperators, in making cases against alleged members of this widespread conspiracy." (Def. Mot. at 15.) This also fails on the law and facts. Providing access to cooperating witnesses and responding to requests for Jencks Act and *Giglio* materials is not a basis for extending the prosecution team. *See, e.g.*, *Ingarfield*, 2023 WL 3123002, at *5 (finding no joint investigation with the USAO-EDNY when it "provided access to its cooperating witness," "attended three initial interviews of that witness," and "turned over materials related to [the cooperating witness]" at the USAO-SDNY's request). Courts in this district have also repeatedly rejected the claim that responding to document requests creates a joint investigation. *See, e.g., id.* at *4-5 (explaining that argument has been "rightly—and repeatedly—rejected in this district"); *Alexandre*, 2023 WL 416405, at *6 (explaining such arrangements are "hardly uncommon" and "do not indicate by themselves a joint investigation"); *Blaszczak*, 308 F. Supp. 3d at 738 (rejecting joint investigation despite SEC providing USAO-SDNY with all the documents it collected).

The defendant makes no credible claim that there were "shared resources" with the USAO-EDNY or any other USAO. The only example he provides is from the *Orense Azocar* trial, in which the USAO-SDFL responded to discrete document requests from the prosecutors in the USAO-SDNY, which almost exclusively related to the review of potential Jencks Act and *Giglio* materials in advance of testimony by three cooperating witnesses at trial who were previously charged by the USAO-SDFL. Judge Abrams rightly rejected a similar arrangement in *Ingarfield* as a basis for extending the prosecution team. There, the USAO-SDNY requested and produced *Giglio* materials for a cooperating witness and former co-conspirator charged by the USAO-EDNY

---

Trafficking and Other Crimes, https://www.justice.gov/usao-sdfl/pr/rewards-offered-capture-three-former-venezuelan-officials-charged-miami-federal-court (Sept. 29, 2020).

in advance of Ingarfield's trial. 2023 WL 3123002, at *1-2, 6-7. The cooperating witness had been previously charged in a USAO-EDNY investigation conducted with the FBI. *Id.* Judge Abrams rightly rejected the defendant's claim that sharing a cooperating witness, providing *Giglio* materials, and even participating in limited joint interviews expanded the USAO-SDNY's prosecution team to include the USAO-EDNY and FBI. *Id.* In doing so, Judge Abram noted the defendant cited no authority to suggest that "using a cooperating witness signed up by another U.S. Attorney's Office" undermines well-worn prosecution team precedent. *Id.* at *4. As such, the defendant's request for "all FBI 302 reports from the [USAO-EDNY] case against [the cooperating witness]" was "clearly overbroad, as defendants are not entitled under *Brady* to an entire investigative file that may touch upon a witness." *Id.* at *6. Accordingly, the Government's access requests to the USAO-SDFL in *Orense Azocar* have no bearing on the prosecution team in this case, and the Court should reject the defendant's unsupported claims to the contrary.

At bottom, the defendant asks the Court, without authority, to simply presume—largely because of a joint press release—that the Government is a monolithic entity that conducted a singular investigation of the defendant and the Cartel "whose various tendrils were divided up among different U.S. Attorney's Offices." (Def. Mot. 16-17.)  The defendant provides no legal or factual authority for this baseless assertion, and the Court should reject his motion on that basis alone. *Bogoraz*, 2024 WL 36990, at *10-11 (rejecting mere assertions that another agency played an integral part in the investigation and should therefore be on the prosecution team). Courts in this district routinely decline invitations to extend the prosecution team under the threadbare circumstances presented here. The Court should do the same and deny the defendant's motion.

### b.    The Entire DEA Is Not Part of the Prosecution Team

For similar reasons, the Court should also reject the defendant's demand that, "at a minimum," the Government should be required to request another search of DEA investigative

files across the entire agency for records that contain references to the five individuals in his motion. (Def. Mot. at 17-18.) As noted above, the Government already undertook this exercise DEA agency-wide for any variations of the defendant's name, above and beyond the materials in the possession of BIU, which was the DEA component on the prosecution team in this case. As a result of that review, and to the extent any discoverable DEA materials may exist that reference the defendant and these individuals, the Government has produced them under Rule 16. In other words, the defendant now demands any DEA files agency-wide that reference the five individuals in his motion, even though the resulting files will necessarily *not* include the defendant. Again, that is not the law.

Putting aside whether these materials are relevant in the first place, the defendant offers no legal basis to support his request. In fact, courts in this District have soundly rejected the defendant's claim that disclosure obligations turn on what is "accessible by the agents and prosecutors" (Def. Mot. at 11, 18), which simply ignores the prosecution team analysis. In *Saipov*, the prosecution team similarly "requested a search of the FBI's agency-wide electronic casefile system for any reports mentioning the name 'Saipov.'" *Saipov*, 2023 WL 3495031, at *4. The resulting reports turned over in Rule 16 discovery—as in this case—were "generated without *any* involvement or direction from any of the prosecutors in this case." *Id.* Against that backdrop, Judge Broderick found that the FBI field offices responsible for those reports were not part of the prosecution team. *Id.* That conclusion is well supported by others in this District. *See, e.g.*, *Alexandre*, 2023 WL 416405, at *13 ("The Court has already concluded herein that the Government's mere ability to access documents in the hands of other agencies does not evoke a joint investigation for *Brady* purposes . . .  and holds the same in the Rule 16 context."); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) ("The mere fact that the Government

may have requested and received documents from the NYSE in the course of its investigation does not convert the investigation into a joint one [for Rule 16 purposes].").

This unremarkable conclusion is further supported by the *Hunter* decision the defendant cites. In *Hunter*, the Second Circuit rejected the "Defendants' suggestion" that the NDDS and DEA agents in the Special Operations Division, Special Project Section ("SPS") should be considered part of the prosecution team (which comprised the USAO-SDNY and the BIU) simply because the "[BIU] . . . and the DEA-SPS . . . are part of the same subdivision of the DEA." 32 F.4th at 37. In doing so, the Second Circuit explained that reliance solely on "bureaucratic proximity"—as defendant advocates here—"would ultimately undercut our clear pronouncement in *Stewart* that 'the relevant inquiry is what the person did, not who the person is.'" [10] *Id.* (quoting *Stewart*, 433 F.3d at 298).

In sum, the participation of the BIU in this case does not make the entire DEA part of the prosecution team. The Government's mere ability to request documents from other DEA components—as it has done here—does not change that calculus or mean the Government now has a roving responsibility under Rule 16 and *Brady* to "seek out information like a private

---

[10] Nor can the defendant credibly argue that the unique facts presented in *Hunter* are at all applicable here. There, the NDDS, without notice to the USAO-SDNY or defense counsel, filed a post-trial *ex parte* motion for a sealed, classified protective order "barring prosecutors from the [USAO-SDNY] and defense counsel from reviewing certain classified documents." *Hunter*, 32 F.4th at 27-28, 37 ("Indeed, we understand the position of the SDNY prosecutors, and also their frustration—the protective order sought and obtained by the Washington-based NDDS from the District Court specifically barred the disclosure of the withheld information to prosecutors from that office."). Under these specific circumstances, the Second Circuit questioned the applicability of its *Brady* jurisprudence when, as in *Hunter*, the "NDDS . . . stepped out of the shadows at least to the extent of asking the judiciary to bless its act of nondisclosure, even from local prosecutors and agents in the case." *Id.* at 37-38. No such entity has approached the Court here, nor are the facts remotely similar.

investigator and valet gathering evidence and delivering it to opposing counsel." *Avenatti*, 559 F. Supp. 3d at 280. The defendant's motion should be denied.

**B.    The Defendant's *Brady* Claims Are Speculative**

The Government has and will continue to adhere to its obligations under *Brady* and its progeny. As such, the Court should reject the defendant's request to issue a specific order under *Brady* regarding the allegations in the Indictment. *See, e.g.*, *United States v. Cordones*, 11 Cr. 205 (AKH), 2022 WL 815229, at *11-12 (S.D.N.Y. Mar. 17, 2022) (holding no *Brady* order necessary when defendant accused Government of failing to disclose certain witness statements when the Government "already has made substantial productions of information," "has not identified [responsive] witness statements in its possession," and agreed to produce any such statements on a rolling basis); *United States v. Tournant*, 22 Cr. 276 (LTS), 2023 WL 8649893, at *7 (S.D.N.Y. Dec. 13, 2023) ("The Government's reaffirmation of its obligations under *Brady* and its representation that it will produce all such material . . . are sufficient on this record to persuade the Court that the defense has neither shown the necessity of an order compelling immediate disclosure, nor even that the Government has undisclosed *Brady* material in its possession at this juncture."). A *Brady* order is particularly inappropriate in this case because the defendant offers no basis beyond speculation to believe such materials may exist. Finally, Judge Aaron's issuance of a Rule 5(f) order at the defendant's presentment on July 20, 2023 further obviates the need for an order such as the one that the defendant seeks here.

As noted above, the defendant's *Brady* argument is based on testimony at the *Orense Azocar* trial that two individuals—Kotosky and Martin—participated with the defendant in drug trafficking activities, which included providing military escorts to drug loads, tampering with radar equipment to facilitate drug shipments, and planning to kill a cooperating witness. (Def. Mot. at 7-8.) The defendant also cites the expected testimony of Blengio, who never met the defendant,

worked with multiple Venezuelan government officials to facilitate a drug shipment, agreed to pay a bribe to the defendant, and ultimately paid that bribe to someone he mistakenly thought was the defendant. (D.E. 108-1 ¶¶ 5(a)-(i).) Although the defendant claims these public statements and testimony "provide[] evidence that people other than Carvajal engaged in the acts that Carvajal is accused of" (Def. Mot. at 1), the mere presence of co-conspirators in a narcotics-importation and narco-terrorism conspiracy is not, standing alone, exculpatory. Furthermore, as Judge Abrams recently explained in *Ingarfield*, there is no authority to support the defendant's argument he is entitled to more than what is in the Government's possession, as the defendant is "not entitled under *Brady* to an entire investigative file that may touch upon a witness." *Ingarfield*, 2023 WL 3123002, at *6 (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)); *see also Tournant*, 2023 WL 8649893, at *7 ("*Brady* is not meant, however, to embrace 'all evidence in the [G]overnment's file which might conceivably assist [a defendant] in preparation of his defense.'") (citing *United States v. Ruggiero*, 472 F.2d 599 (2d Cir. 1973)); *Velissaris*, 2022 WL 2392360, at *3 (rejecting *Brady* argument that that "the Government is required to search 'the entire SEC case file' because the Indictment contains obstruction counts" as "without any basis in the law"). Nor it is clear by any means how such materials would be "material to preparing the defense" under Rule 16(a)(1)(E)(i). *Alexandre*, 2023 WL 416405, at *9 ("A defendant bears the burden to make a prima facie showing that information sought is material" and "must offer more than the conclusory allegation that the requested evidence is material") (internal quotation marks and citations omitted); *cf. Cordones*, 2022 WL 815229, at *10 (explaining, in bill of particulars context, that "[i]t is well settled" that "[d]etails as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial"). The Court should reject the defendant's attempt to use *Brady* to cause the Government to embark upon a fishing expedition based on a nonsensical *Brady* theory

and rank speculation about how such theoretical materials might somehow exculpate the defendant.

Finally, the Government notes that at least some of the materials the defendant demands appear to be in the public domain. *See, e.g.*, *United States v. Moslem*, 19 Cr. 547 (CS), 2023 WL 5610297, at *5 (S.D.N.Y. Aug. 30, 2023) (noting that no *Brady* or *Giglio* violation occurs when a defendant could have found information in question in public domain) (citations omitted). The defendant cites some of those materials as exhibits to his motion. In addition, the USAO-SDFL has publicly explained that Blengio obstructed justice through offering to sell his testimony to other inmates. *See United States v. Castillo*, 568 F. App'x 774, 776 (11th Cir. 2014) (explaining the Government terminated Blengio's cooperation because, among other things, he "offered to sell his proposed testimony against a Mexican drug trafficker"); *see also* Brief for the United States, 2013 WL 5304252, at *11 (11th Cir. Sept. 16, 2013) (explaining "it was learned that Mr. Blengio had offered to sell his testimony against the Mexican drug trafficker to others housed in the Federal Detention Center with him," and that "Blengio obstructed justice, impaired the ability of the government to prosecute cases in which they received information from him, created the opportunity for perjury and lied about his activities when questioned by law enforcement").

Accordingly, the defendant's *Brady* concerns are misplaced and speculative, at best. To the extent the Government comes into possession of such materials, it will produce them in accordance with its obligations. No further order is necessary, and the defendant's motion should be denied.

**C.      The Government Will Collect and Review Possible *Giglio* and Jencks Act Materials from USAOs that Prosecuted Any Cooperating Witnesses in Advance of Trial**

Although it is not obligated to do so, the Government will agree, as it did in the *Orense Azocar* trial, to collect and review for *Giglio* and Jencks Act disclosures relevant materials for any cooperating witnesses that it anticipates calling at the defendant's trial known to have been

prosecuted by other USAOs. Additionally, as noted in the defendant's motion, the Government further will agree to a reasonable early disclosure schedule for Jencks Act and *Giglio* materials in advance of the trial date when it is set, subject to an appropriate protective order. *See Alexandre*, 2023 WL 416405, at *9 (explaining the Court "finds reassuring that the Government has [voluntarily] agreed to request and review CFTC witness interview notes for material that would be subject to disclosure were it in the Government's possession") (internal quotation marks omitted); *Velissaris*, 2022 WL 2392360, at *2 ("It is noteworthy that Government . . . has agreed to provide the notes and memoranda of interviews conducted by the SEC without the Government's involvement at the time it produces 3500 material."); *Ingarfield*, 2023 WL 3123002, at *6 (explaining, for cooperating witness, that the USAO-SDNY requested "all *Giglio* materials" from the USAO-EDNY, and "[t]here is no authority supporting [the defendant's] contention that he is entitled to more").

### D.     No Further Fact Finding Is Necessary

There is no meaningful dispute as to the critical facts and, as described above, the defendant's motion is entirely without merit. As such, the Court should reject the defendant's fishing expedition and attempt to elicit affidavits explaining "what access the agents in this case have to DEA files in various offices" as unnecessary. (Def. Mot. at 19.) As explained above, mere access to other agency files has no bearing on the scope of the prosecution team. *See, e.g.*, *Saipov*, 2023 WL 3495031, at *4. In any event, the Government has clearly described the request it made to *all* other DEA offices for records mentioning iterations of the defendant's name. Nor has the defendant offered any nonspeculative basis to believe that the Government has not complied with its disclosure obligations. *See Avellino*, 136 F.3d at 261 ("In the absence of a proffer by Avellino of any nonspeculative basis for inferring that . . . the government had not made available to him all pertinent material in its possession, it was well within the discretion of the court to conclude

that no evidentiary hearing was necessary."). The Court should deny the defendant's motion on the current record.

**IV.    CONCLUSION**

Accordingly, for the reasons set forth above, the Court should deny the defendant's motion.

Dated:      New York, New York
            February 9, 2024

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney
                                    Southern District of New York

                        By:    _____/s/_____
                                    Nicholas S. Bradley
                                    Kaylan E. Lasky
                                    Kevin T. Sullivan
                                    Assistant United States Attorneys
                                    (212) 637-1581 / -2315 / -1587