UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

HUGO ARMANDO CARVAJAL BARRIOS,
    a/k/a "El Pollo,"

                        Defendant.

S1 11 Cr. 205 (AKH)

---

# THE GOVERNMENT'S MOTIONS *IN LIMINE*

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Nicholas S. Bradley
Kaylan E. Lasky
Kevin T. Sullivan
Assistant United States Attorneys
        *Of Counsel*

# **TABLE OF CONTENTS**

BACKGROUND ......................................................................................................... 2

I.     Overview ......................................................................................... 2

II.    Venezuela ....................................................................................... 3

III.   The Cartel de Los Soles ................................................................. 5

IV.   The FARC ...................................................................................... 7

V.     The Defendant ................................................................................ 11

      A.      1999 – 2003: The Defendant Agrees to Protect FARC Operations and Drug Trafficking ................................................................. 12

      B.      2004 – 2007: The Defendant Works with Multiple Drug Traffickers to Ship Massive Amounts of Cocaine ............................................ 14

      C.      2007 – 2014: The Defendant Further Facilitates Weapons Shipments to the FARC, Protects His Drug Trafficking Operations, and Participates in Kidnappings, Murders, and Torture ......................... 18

      D.      The Defendant Attempts to Avoid Extradition and Prosecution in the United States ...................................................................... 22

ARGUMENT .......................................................................................................... 24

I.     Evidence of Drug-Related Corruption, Including Acceptance of Drug Proceeds to Facilitate Drug Trafficking, Is Admissible as Direct Evidence and Pursuant to Rule 404(b) ......................................................... 24

      A.      Applicable Law .......................................................................... 25

            1.     Direct Evidence of the Defendant's Guilt ........................... 25

            2.     Other Acts Evidence Under Rule 404(b) ............................ 26

            3.     Rule 403 ......................................................................... 27

      B.      Discussion ................................................................................. 28

II.    Evidence of the Defendant's Involvement in Drug-Related Violence Is Admissible as Direct Evidence and Under Rule 404(b) ............................... 31

      A.      Relevant Facts ........................................................................... 32

B.    Discussion ...................................................................... 33

III.    Evidence of Statements Made by the Defendant, and Certain of his Co-Conspirators, Including Members of the FARC, Drug Traffickers, and Venezuelan Officials, Is Admissible Under the Hearsay Rules ................................. 37

A.    Applicable Law ............................................................... 38

1.    Rule 801(d)(2)(A): Statement of a Party Opponent ........................... 38

2.    Rule 801(d)(2)(E): Co-Conspirator Statements ................................ 38

3.    Rule 804(b)(3): Statements Against Interest ..................................... 40

4.    Confrontation Clause ......................................................... 41

B.    Discussion ...................................................................... 42

1.    Evidence of Statements Made by Co-Conspirators to CW-1 Is Admissible Under the Hearsay Rules ............................... 42

2.    Evidence of Statements Made by Co-Conspirators to CW-2 Is Admissible Under the Hearsay Rules ............................... 45

3.    Evidence of Statements Made by Co-Conspirators to CW-3 Is Admissible Under the Hearsay Rules ............................... 51

4.    Evidence of Statements Made by Co-Conspirators to CW-4 Is Admissible Under the Hearsay Rules ............................... 54

5.    Evidence of Statements Made by Co-Conspirators to CW-5 Is Admissible Under the Hearsay Rules ............................... 57

6.    Evidence of Statements Made by Co-Conspirators to CW-6 Is Admissible Under the Hearsay Rules ............................... 60

7.    Evidence of Statements Made by Co-Conspirators to Witness-1 Is Admissible Under the Hearsay Rules ........................... 63

IV.    The Court Should Preclude Various Other Evidence and Arguments as Irrelevant and Unfairly Prejudicial ............................................. 65

A.    Applicable Law ............................................................... 66

B.    Discussion ...................................................................... 67

1.    References to the Time Period This Case Has Been Pending, that the Charged Conduct Occurred Primarily Outside of the United States, or Events After the Charged Conduct Should

Be Precluded as Irrelevant Under Rule 401 and Unfairly Prejudicial, Confusing, and Misleading Under Rule 403 .................. 67

2.      References to the FARC's 2021 Removal from the United States' List of Foreign Terrorist Organizations After the Charged Conspiracy Is Irrelevant Under Rule 401 and Unfairly Prejudicial Under Rule 403 ................................................... 70

3.      References to the Punishment the Defendant May Face if Convicted Should Be Precluded as Irrelevant Under Rule 401 and Unfairly Prejudicial Under Rule 403 ................................... 72

CONCLUSION .................................................................................................... 73

# TABLE OF AUTHORITIES

**Cases**

*Bourjaily v. United States*, 483 U.S. 171 (1987) ........................................................... 39

*Cruz v. New York*, 481 U.S. 186 (1987).................................................................. 19, 27

*Ohio v. Clark*, 576 U.S. 237 (2015)........................................................................... 41

*Old Chief v. United States*, 519 U.S. 172 (1997)....................................................... 26

*Parker v. Randolph*, 442 U.S. 62, 75 (1979) ............................................................. 27

*Rogers v. United States*, 422 U.S. 35 (1975) ............................................................. 72

*Shannon v. United States*, 512 U.S. 573 (1994)......................................................... 72

*Sparf v. United States*, 156 U.S. 51 (1895)............................................................... 67

*United States v. Abdalla*, 14 Cr. 716, 2018 WL 5819799 (S.D.N.Y. 2018)........................... 36, 37

*United States v. Abdullah*, 20 Cr. 677 (AT), 2024 WL 4652476 (S.D.N.Y. 2024)...................... 39

*United States v. Abel*, 469 U.S. 45 (1984) ................................................................ 25

*United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010)............................................. 25

*United States v. Arrington*, 867 F.2d 122 (2d Cir. 1989)............................................... 33

*United States v. Bakhtiari*, 913 F.2d 1053 (2d Cir. 1990) ............................................. 66

*United States v. Baptiste*, 264 F.3d 578 (5th Cir. 2001) ............................................... 37

*United States v. Baptiste*, 309 F.3d 274 (5th Cir. 2002) ............................................... 37

*United States v. Barnes*, 560 F. App'x 36 (2d Cir. 2014).............................................. 36

*United States v. Barret*, 10 Cr. 809, 2011 WL 6704862 (E.D.N.Y. 2011) .............................. 33

*United States v. Battaglia*, S9 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. 2008)................. 70

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989)........................... 49, 62

*United States v. Bick*, 711 F. App'x 664 (2d Cir. 2017)............................................... 41

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) ................................................ 26

*United States v. Chin*, 83 F.3d 83 (4th Cir. 1996) .......................................................... 37

*United States v. Cicale*, 691 F.2d 95 (2d Cir. 1982) ...................................................... 39

*United States v. Coonan*, 938 F. 2d 1553 (2d Cir. 1991) .............................................. 26

*United States v. Curley*, 639 F.3d 50 (2d Cir. 2011) ..................................................... 26

*United States v. Delligatti*, No. 15 Cr. 491, 2018 WL 1033242 (S.D.N.Y. 2018) .......... 57, 60, 62

*United States v. Demosthene*, 334 F. Supp. 2d 378 (S.D.N.Y. 2004) ............................ 70

*United States v. Díaz-Colón*, 651 F. Supp. 3d 468 (D.P.R. 2023) ................................. 67

*United States v. Doyle*, 130 F.3d 523 (2d Cir. 1997) ..................................................... 41

*United States v. Dupree*, 870 F.3d 62 (2d Cir. 2017) .................................................... 50

*United States v. Edwards*, 101 F.3d 17 (2d Cir. 1996) ........................................... 66, 70

*United States v. Epskamp*, 832 F.3d 163 (2d Cir. 2016) ............................................... 68

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ............................................... 27

*United States v. Fiumano*, 14 Cr. 518 (JFK), 2016 WL 1629356 (S.D.N.Y. 2016) ..................... 26

*United States v. Gadsden*, 300 F. App'x 108 (2d Cir. 2008) .................................... 33, 35

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995) .................................................... 27

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) ................................................... 49

*United States v. Gohari*, 227 F. Supp. 3d 313 (S.D.N.Y. 2017) ............................ 25, 30, 35, 44

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ........................................ 25, 26

*United States v. Gotti*, 457 F. Supp. 2d 395 (S.D.N.Y. 2006) ....................................... 38

*United States v. Hernandez Alvarado*, S2 15 Cr. 379 (PKC) (S.D.N.Y.) ...................... 29

*United States v. Hernandez*, S8 15 Cr. 379 (PKC) (S.D.N.Y) ..................................... 29

*United States v. Kotosky Villaroel Ramirez*, No. 11 Cr. 247 (BMC) (E.D.N.Y) ............ 51

*United States v. Kuthuru*, 665 F. App'x 34 (2d Cir. 2016) .................................. 43, 48, 56

*United States v. Kwong*, 69 F.3d 663 (2d Cir. 1995) .................................................................. 66

*United States v. Lang*, 589 F.2d 92 (2d Cir. 1978) ................................................................. 41

*United States v. Malpeso*, 115 F.3d 155 (2d Cir. 1997) ........................................................... 70

*United States v. Manzano*, 945 F.3d 616 (2d Cir. 2019) ......................................................... 67

*United States v. Matthews*, 20 F.3d 538 (2d Cir. 1994) .......................................................... 41

*United States v. Miller*, 626 F.3d 682 (2d Cir. 2010) .............................................................. 66

*United States v. Mostafa*, 16 F. Supp. 3d 236 (S.D.N.Y. 2014) ........................................... passim

*United States v. Orense Azocar*, 21 Cr. 379 (VSB) (S.D.N.Y.) ............................................... 14

*United States v. Ortiz*, 962 F. Supp. 2d 565 (S.D.N.Y. 2013) .................................................. 50

*United States v. Pabon-Cruz*, 391 F.3d 86 (2d Cir. 2004) ....................................................... 72

*United States v. Paone*, 782 F.2d 386 (2d Cir. 1986) ............................................................... 39

*United States v. Paul*, 110 F.3d 869 (2d Cir. 1997) ................................................................ 66

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011) .............................................................. 41

*United States v. Pipola*, 83 F.3d 556 (2d Cir. 1996) ................................................................ 31

*United States v. Pitre*, 960 F.2d 1112 (2d Cir. 1992) .......................................................... passim

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987) ............................................................... 39

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) ............................................................... 25

*United States v. Rivera*, 22 F.3d 430 (2d Cir. 1994) ........................................................... 39, 44

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012) ........................................................... 26

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ................................................ 27

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002) ................................................................ 38

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007) .......................................................... 27

*United States v. Sasso*, 59 F.3d 349 (2d Cir. 1995) ................................................. 44, 50, 54, 57

*United States v. Savoca*, 335 F. Supp. 2d 385 (S.D.N.Y. 2004) .................................... 49

*United States v. Simmons*, 923 F.2d 934 (2d Cir. 1988) ............................................... 39

*United States v. St. Rose*, 11 Cr. 349 (SJ), 2012 WL 1107659 (E.D.N.Y. 2012) ........................ 70

*United States v. Sureff*, 15 F.3d 225 (2d Cir. 1994) ................................................ 37

*United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997) ............................................... 67

*United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993) ................................................ 39

*United States v. Trujillo*, 714 F.2d 102 (11th Cir. 1983) ........................................... 67

*United States v. Tussa*, 816 F.2d 58 (2d Cir. 1987) ................................................. 27

*United States v. Ulbricht*, 79 F. Supp. 3d 466 (S.D.N.Y. 2015)............................... 26, 33, 36, 60

*United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008) ............................................... 40

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ........................................... 44, 54

*Williamson v. United States*, 512 U.S. 594 (1994) ................................................... 40

*Yu v. Kotobuki Rest., Inc.*, No. 17 Civ. 4202 (JMA) (JMW), 2025 WL 1446022 (E.D.N.Y. 2025)

............................................................................................... 72

**Statutes, Rules, and Other Authorities**

18 U.S.C. § 924 ..................................................................................... 23

21 U.S.C. § 959 ..................................................................................... 68

21 U.S.C. § 960a .................................................................................... 23

21 U.S.C. § 963 ..................................................................................... 23

Immigration and Nationality Act Section 219 ...................................................... 8, 71

Federal Rule of Evidence 401 .................................................................... passim

Federal Rule of Evidence 402 .................................................................. 25, 26, 66

Federal Rule of Evidence 403 .................................................................... passim

Federal Rule of Evidence 404(b) ............................................................................... passim

Federal Rule of Evidence 801 ................................................................................... passim

Federal Rule of Evidence 804 ................................................................................... passim

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

    - v. -

HUGO ARMANDO CARVAJAL BARRIOS,
    a/k/a "El Pollo,"

                 Defendant.

---

S1 11 Cr. 205 (AKH)

 

The Government respectfully submits this memorandum in support of its motions *in limine* seeking the following rulings with respect to the upcoming trial of the defendant, Hugo Armando Carvajal Barrios, a/k/a "El Pollo" (the "defendant" or "Carvajal"):

1. Evidence of the defendant's drug-related corruption, including his acceptance of drug proceeds to facilitate drug trafficking, is admissible as direct evidence and under Rule 404(b);

2. Evidence of the defendant's involvement in drug-related violence is admissible as direct evidence and under Rule 404(b);

3. Evidence of statements made by the defendant, and by his co-conspirators, including some members of the *Fuerzas Armadas Revolucionarias de Colombia* (the "FARC"), drug traffickers, and Venezuelan officials is admissible, under Rules 801 (d)(2)(A), 801(d)(2)(E), and 804 (b)(3); and

4. References and arguments regarding (i) the time period this case has been pending and criticism or disparagement of the fact that these charges have been brought and are being tried in New York City or the United States; (ii) the FARC's 2021 removal from the U.S. State Department's list of foreign terrorist organizations and other geopolitical events post-dating the charged conduct in this case; and (iii) the potential punishment the defendant may face if convicted, should be precluded because they are irrelevant under Rule 401, and would create substantial risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time under Rule 403.

# BACKGROUND[1]

## I.    Overview

For years, the defendant, the former head of Venezuela's military intelligence agency, worked with terrorists and other major drug traffickers in South America and elsewhere to ship massive quantities of cocaine into the United States. In doing so, the defendant and other high-ranking officials in the government of Venezuela comprising the *Cartel de Los Soles*, or "Cartel of the Suns" (the "Cartel") worked with the leadership of the FARC—which, at all relevant times, was designated as a foreign terrorist organization—to coordinate multi-ton drug shipments, provide heavily-armed security to protect those drug shipments, and flood the United States with cocaine. To accomplish cocaine distribution on this massive scale, the defendant accepted millions of dollars from drug traffickers. After taking these cocaine-fueled bribes, the defendant abused his immense government authority to ensure the safe passage of drug loads through Venezuela, where his drug trafficking co-conspirators dispatched tons of cocaine from clandestine airstrips, airports, and seaports under the defendant's protection. All the while, the defendant worked closely with the FARC, including by arming them with automatic weapons and explosives to further the group's drug trafficking and terrorist activities. The relationship between the defendant, the Cartel, and the FARC, combined with the drug-fueled corruption and violence that sustained it, is at the core of this case.

---

[1] The Government respectfully submits that all the evidence described in this brief is admissible as direct evidence and background to the charged conspiracy. The Government also hereby provides notice to the defendant that it intends to offer certain of the evidence described herein, in the alternative, pursuant to Rule 404(b), as described further below. The Government will continue to meet with potential witnesses between now and trial and will further supplement this notice as necessary should the Government learn of any additional potential Rule 404(b) evidence.

The Government will establish its case at trial through, among other evidence, testimony from the defendant's former co-conspirators and a former Venezuelan military officer; ledgers showing drug-related payments made to the defendant to facilitate drug trafficking through Venezuela; photographs from a Mexican law enforcement seizure of approximately 5.6 tons of cocaine that the defendant and his co-conspirators shipped from Venezuela to Mexico, en route to the United States; electronic evidence seized by Colombian law enforcement from two camps controlled by high-ranking FARC members showing the defendant's close contacts and coordination with the FARC; and expert testimony regarding (i) cocaine sources, manufacturing, and wholesale and retail prices, (ii) drug trafficking routes and methods commonly used to transport cocaine from Colombia and Venezuela to the United States, (iii) illicit business relationships among large-scale Venezuelan and Mexican narcotraffickers and Venezuelan politicians, law enforcement officers, and military leaders, (iv) the history, leadership, structure, operations, territory, goals, and objectives of the FARC, and (v) features of the weapons used by the defendant and his co-conspirators in connection with their drug trafficking.

## II.    Venezuela

Venezuela—a country of approximately thirty million people—borders Colombia, Brazil, and Guyana and is comprised of 23 states. The most pertinent states at trial will be (1) Zulia, Tachira, Apure, and Amazonas, which border FARC territory in Colombia and have been used by the Cartel to facilitate FARC operations in Venezuela, including dispatching cocaine-laden aircraft from clandestine airstrips protected by the defendant and his co-conspirators; (2) Falcon, which includes the northernmost point in Venezuela and has been used by the Cartel to dispatch maritime cocaine shipments; (3) Guarico, which the defendant and his co-conspirators used for Cartel meetings, weapons transfers to the FARC, and cocaine shipments akin to those in the border region; (4) Carabobo, which includes the Valencia Airport and the port city of Puerto Cabello; and

(5) the Capital District and surrounding areas, which includes the capital city of Caracas, the Fuerte Tiuna military base (which has been used for Cartel operations), and the Simón Bolívar International Airport in Maiquetia (commonly referred to as Maiquetia, or the Maiquetia Airport), which has been used for larger aircraft shipments of cocaine dispatched from the presidential hangar controlled by former President Hugo Rafael Chavez Frias and later Nicolas Maduro Moros, who succeeded Chavez. Below is a map of Venezuela and its 23 states:



### III.    The Cartel de Los Soles

Starting at least in 1999, the Cartel and the FARC combined forces to enrich and empower themselves in a cocaine- and corruption-fueled relationship that has brought violence and terror to Venezuela, and devastation to American communities and elsewhere. As noted above, the Cartel is a Venezuelan drug trafficking organization comprised of the highest-ranking Venezuelan military and public officials who have abused the Venezuelan people and corrupted the legitimate institutions of Venezuela. The Cartel's corruption extends to the country's military, intelligence apparatus, legislature, and judiciary. The Cartel, whose name derives from the sun insignias on the epaulettes of Venezuelan generals, was first led by Chavez, who was president of Venezuela from 1998 until his death in 2013. After Chavez died, Maduro assumed the Venezuelan presidency and led the Cartel's massive cocaine trafficking. Under the leadership of both Chavez and Maduro, the Cartel trafficked staggering quantities of cocaine through Venezuela and into the United States. The Cartel did this not only to accumulate immense financial wealth, but also to weaponize cocaine by flooding it into the United States to inflict its harmful and addictive effects on communities throughout this country.

Through the Cartel's partnership with the FARC, Venezuela effectively became a narco-state that prioritized the safe passage of cocaine shipments through the country to Mexico, Honduras, the Caribbean, and elsewhere for eventual importation into the United States. At trial, witnesses will describe some of the high-level meetings in which the Cartel planned its cocaine trafficking partnership with the FARC. For example, in 2005, at a meeting with Maduro and a now-former Venezuelan government official ("CW-1"),[2] Chavez said it was necessary to remove

---

[2] The Government will provide under seal as Exhibit A a key to the anonymized names referenced in this motion.

several Venezuelan state judges not sympathetic to the regime from their positions because the court system needed to protect the drug routes that belonged to the FARC, which Chavez referred to as "friends of Venezuela." Around 2008, CW-1 attended meetings at Miraflores, the presidential palace in Caracas, with Chavez, Diosdado Cabello Rondon ("Cabello"), the former Vice President of Venezuela who has held a number of additional high-ranking positions, the defendant, and other Venezuelan government officials. During those meetings, Chavez described the need to use drugs to fight the United States, including through the Cartel's partnership with the FARC. Chavez instructed those in attendance to "flood" the United States with drugs and appointed Cabello to spearhead those efforts. Around February 2009, Cabello invited CW-1, the defendant, and other Venezuelan government officials to a meeting. There, Cabello explained that they would work with the FARC to send drugs to the United States and Europe, using the apparatus of the Venezuelan government, including the military and defense forces, to ensure that the drugs successfully departed Venezuela. Following this meeting, a smaller group of Venezuelan government officials, which included the defendant, met on a near-weekly basis to discuss facilitating the movement and protection of drug shipments through Venezuela.

Through their efforts and coordination, including the above-described meetings with CW-1, the FARC, the Cartel, and the drug traffickers who worked with them spent years dispatching cocaine from Venezuela, often to the United States via transshipment points in Central America and the Caribbean, to accomplish the Cartel's goal of "flooding" the United States with poison. Maritime shipments proceeded north from Venezuela's coastline using go-fast vessels, fishing boats, and container ships. Planes loaded with cocaine also took off from Venezuela, often from clandestine airstrips, typically made of dirt or grass, often in Apure State. In order to safely transport this cocaine, members and associates of the FARC paid bribes, which ultimately

6

benefitted the defendant and others in the Cartel who worked for the Venezuelan government, for access to ports and airspace, as well as protection from arrest and investigation. In addition, the defendant, along with other high-ranking members of the Venezuelan government, coordinated with the FARC to transport and distribute those cocaine shipments through other means, including the provision of heavily armed security to protect the cocaine, selling previously seized cocaine to drug traffickers for millions of dollars, interfering with drug trafficking investigations, and providing the FARC with military-grade weapons such as machineguns, rocket launchers, and explosives.

## IV.    The FARC

The FARC[3] was a violent guerilla group that formed in the 1960s, following years of sectarian violence in Colombia. At its peak, the FARC comprised approximately 18,000 fighters. The FARC's tactics have included kidnapping, extortion, murders, and bombings, some of which targeted U.S. citizens and interests. The FARC's violence caused hundreds of thousands of deaths. The FARC's goals have historically been to wage war against the Colombian government and its interests.

Although the FARC was initially focused on extortion and kidnappings, by the 1980s it had expanded into the drug trade to generate additional income. Colombia is the world's largest producer of cocaine, which is derived from the coca plant that grows primarily in the fertile regions of the country, specifically along the southern border with Ecuador and Peru, and the northeast border with Venezuela. The FARC historically controlled nearly all aspects of cocaine production

---

[3] As set forth below, this case focuses on events through 2019, the relevant time period charged in the operative charging instrument, during which the FARC was at all times designated as a foreign terrorist organization by the U.S. Secretary of State.

in the areas it operated, and between at least 1999 and 2019, most of the cocaine laboratories operating in Colombia were under FARC control. The FARC generated significant revenue through its cocaine trafficking, which it used to fund its operations, including, for example, large-scale weapons purchases.

The FARC carried out its terrorist and drug trafficking activities through a formal chain of command, which included a commander-in-chief with ultimate decision-making authority for the entire organization. The leadership of the FARC was known as the "Secretariat," a governing body that included the commander-in-chief and five to seven other senior FARC leaders who controlled operational movements and other critical functions of the group. The Secretariat and the commander-in-chief, together, composed the FARC's Central High Command. The FARC's guerilla forces were divided into multiple operational regions, which were called "blocs," that were in turn divided into "fronts." The FARC's Eastern Bloc, for example, historically operated in the Arauca Department of Colombia and also in Venezuela's Apure State and included, for example, the 10th and 16th Fronts. The FARC's Middle Magdalena Bloc historically operated west of the Eastern Bloc, bordering the Venezuela States of Zulia and Tachira and included the 33rd Front.

The FARC engaged in multiple acts of terrorism and violence against the Colombian government and the United States. The FARC's targeting of the United States and its interests was motivated, in part, by the United States government's efforts to combat the drug trade in Colombia by fumigating FARC-controlled coca fields and working with Colombian officials to disrupt and dismantle FARC-controlled cocaine manufacturing facilities. U.S. military and property were also targeted by the FARC because of the U.S. government's historic work with Colombian authorities.

In 1997, the U.S. State Department ("State Department") designated the FARC as a foreign terrorist organization ("FTO") under Section 219 of the Immigration and Nationality Act. The

FARC remained designated throughout the time period spanning the charged offenses. On November 30, 2021, years after the end of the charged conduct, the State Department removed the FARC from the FTO list and simultaneously designated two FARC successor organizations as FTOs: the FARC-EP and Segunda Marquetalia.

The Colombian government has executed military operations to disrupt FARC leadership operating in Colombia and on its borders, and recovered, among other things, evidence regarding the defendant's participation in the charged offenses. For instance, in 2008, Colombian forces attacked a FARC camp in northern Ecuador and killed Luis Edgar Devia Silva, a/k/a "Raul Reyes," a FARC Secretariat member. In 2010, Colombian forces attacked another FARC camp in the Meta Department of Colombia and killed Victor Julio Suarez Rojas, a/k/a "Jorge Briceno Suarez," a/k/a "Mono Jojoy," a FARC Secretariat member and a top military commander. Electronic evidence recovered from the Raul Reyes and Mono Jojoy FARC camps included, among other things, detailed information and correspondence regarding the FARC's historical ties with the Venezuelan government and the Chavez regime, including the defendant.[4] As just one example, authorities recovered from a hard drive at the Reyes FARC camp an October 28, 2004 letter addressed to "Comrade Raul" (*i.e.*, Raul Reyes) and "comrades of the Secretariat." (GX 304T). This letter describes a meeting involving the defendant and other Venezuelan officials, who offered help in planned attacks on Colombian military garrisons and how to provide the FARC with missiles that would not be traced back to Venezuela. (*See id.*). The letter further details that the defendant and the other officials at the meeting were "clear that the common enemy is the gringos" and that their

---

[4] In the absence of a stipulation, the Government anticipates calling Colombian law enforcement officials to authenticate these materials.

"interest is for us to take down as many 'Black hawks' as possible," referring to military helicopters. (*Id.*).

Additionally, a hard drive found at the Raul Reyes camp contained multiple images of the FARC's weapons of war, including explosive devices and automatic weapons, examples of which are below:









## V.    The Defendant

The defendant was one of the most powerful officials in Venezuela. For years, he abused his authority and played a pivotal role in carrying out the Cartel's drug trafficking mission. Between 2004 and 2011, the defendant was the director of Venezuela's military intelligence agency, which was known at the time as the *Direccion de Inteligencia Militar* ("DIM"). The

agency was later renamed the *Direccion General de Contrainteligencia Militar* ("DGCIM").[5] In 2013, Maduro made the defendant the director of the DIM for a second time. Between January 2014 and June 2014, the defendant held the title of Venezuela's Consul General to Aruba. The defendant's tenure in Aruba ended after he was briefly arrested in July 2014 on federal drug trafficking charges filed in another U.S. District Court. After the defendant was released from custody in Aruba, he returned to Venezuela and, in January 2016, the defendant was elected to the Venezuelan National Assembly.

### A. 1999 – 2003: The Defendant Agrees to Protect FARC Operations and Drug Trafficking

The defendant's commitment to the Cartel, drug trafficking, and the FARC was evident from the early days of the Chavez regime. Around 1999, the defendant met with two FARC operatives and large-scale cocaine traffickers ("CW-2" and "CC-1," respectively), and other DIM officials to propose a meeting with the FARC's Eastern Bloc Commander, Noe Suarez Rojas, a/k/a "Grannobles." The purpose of the meeting was to discuss ways the Venezuelan government could support the FARC and its cocaine production and trafficking, including by providing the FARC with weapons and by allowing the FARC to build encampments and use clandestine airstrips in Venezuela. Approximately two weeks later, the defendant met with Grannobles as planned. The defendant later told CW-2 and CC-1 that the meeting was a success, and that the defendant had made a commitment to support the FARC's Tenth Front.

Throughout his tenure in the DIM, the defendant continued his partnership with the FARC and its drug trafficking and terrorist activities. In approximately 2001, CW-2, at the request of a

---

[5] For consistency, this memorandum refers to Venezuela's military intelligence agency as the DIM throughout the relevant time period.

FARC Tenth Front commander, met with the defendant in Venezuela to request detonators (*i.e.*, devices used to activate explosives) to use against the Colombian military. Just one day later, the defendant provided 5,000 detonators to CW-2 with the aid of another DIM official in Guarico. That same year, CW-2 and CC-1 met with the defendant at Fuerte Tiuna outside of Caracas, where CW-2 relayed a message from Grannobles requesting the defendant's help with clearing Venezuelan patrols from the border area near Arauca, where the FARC's Tenth Front was sheltering. CW-2 also discussed the need for a clandestine landing strip in Guarico to dispatch drug flights. During another meeting at Fuerte Tiuna after they first met in 1999, CW-2 specifically explained to the defendant that the cocaine that CW-2 was trafficking for the FARC was destined for the United States. In response, the defendant expressed his approval, stating that drugs were a weapon to use against the "gringos" so that they could die.

The defendant also used his position to obstruct attempts by Venezuelan officials to investigate and combat the FARC. As a Venezuelan military official ("Witness-1") is expected to testify at trial, between approximately 2000 and 2002, when Witness-1 was posted to a military base on the Catatumbo River along the Colombia-Venezuela border and working to interdict FARC boats and personnel moving along the river, Witness-1 observed a DIM official ("CC-2") multiple times at the base, often accompanied by a FARC member from the 33rd Front. CC-2 repeatedly told Witness-1 that Witness-1 must let the FARC boats and personnel through the area and that CC-2 was acting on orders of the defendant. On one occasion, while CC-2 was at the base with two FARC members from the 33rd Front, Witness-1 heard CC-2 and one of the FARC members refer to "flooding" the "gringos" with drugs as they discussed the setup and supply of a FARC encampment west of the base. As noted above, Chavez later repeated that same message to other high-ranking members of the Cartel, including the defendant.

13

Later, in 2003, when Witness-1 and his commanding general were summoned to a meeting with the defendant in Caracas, the defendant told the general that Witness-1 should not be sent back to the border region because of Witness-1's problems with the FARC. Witness-1 was reassigned shortly afterward and then ultimately pressured to resign from the military. As explained further below, some years later, when Witness-1 attempted to leave Venezuela and travel to Peru and then Colombia, in part to meet with and provide information to agents of the U.S. Drug Enforcement Administration ("DEA"), DIM agents arrested and tortured Witness-1 at the direction of the defendant.

### B.    2004 – 2007: The Defendant Works with Multiple Drug Traffickers to Ship Massive Amounts of Cocaine

The defendant used his authority as head of the DIM to protect and facilitate massive cocaine shipments orchestrated by some of the most prolific drug traffickers in the world, including Walid Makled Garcia ("Makled,")[6] and Wilber Varela Fajardo ("Varela"),[7] and other large drug traffickers like Carlos Orense Azocar ("Orense").[8]

For example, between approximately 2003 and 2011, a Venezuela-based drug trafficker ("CW-3") trafficked multi-ton-quantities of cocaine with Orense, whose main cocaine distribution partners were the defendant and another high-ranking Venezuelan intelligence official ("CC-3").

---

[6] In 2010, Makled was arrested in Colombia based on an indictment returned in this District, S1 09 Cr. 614 (RWS). The United States submitted an extradition request to Colombia for Makled, but he was ultimately extradited to Venezuela, where public reporting indicates that he is currently serving a 14-year prison sentence.

[7] Varela was the leader of the North Valley Cartel and was charged in two indictments filed in other Districts before he was killed in Venezuela in January 2008.

[8] On December 12, 2023, a jury in this District found Orense guilty of conspiring to import cocaine into the United States and related firearms offenses involving machineguns. *United States v. Carlos Orense Azocar*, 21 Cr. 379 (VSB) (S.D.N.Y.) (Dkt. 60). Orense is awaiting sentencing before Judge Broderick.

Orense's drug trafficking organization launched drug-laden planes from clandestine airstrips in locations such as Guarico and Apure, along with go-fast boats to the Caribbean. The defendant helped Orense obtain cocaine from the FARC, which was its main cocaine supplier. CW-3 is anticipated to testify about the relationship between the defendant, Orense, and the FARC. For example, in approximately 2007 or 2008, the defendant admonished Orense that when it came to the FARC (which the defendant called the *patas de goma*, a reference to the rubber boots that FARC guerillas wear), Orense needed to be timely with his payments. The defendant also provided key logistical support for Orense, including government credentials and official vehicles to escort drug loads through Venezuela. Similarly, the defendant ordered Venezuelan military officials to disable military radars, allowing drug loads to take off undetected. As part of these efforts, the defendant met regularly with Orense, often with his heavily armed DIM security detail carrying automatic weapons.

The defendant also used his authority to protect drug shipments for Varela. In 2006, on two occasions, the defendant met in Caracas with an associate of Varela who also worked as a top deputy for Makled ("CW-4"). On each occasion, at Varela's direction, CW-4 paid the defendant an approximately $150,000 bribe of drug proceeds. Varela told CW-4 that the defendant was the one who had been protecting Varela for many years.

Similarly, Varela introduced one of his top deputies in the drug trafficking trade ("CW-5") to the defendant at a meeting in Caracas in 2006. During that meeting, the defendant described the protection services he would provide to Varela and CW-5 in exchange for monthly bribe payments. The defendant described himself as the number one person in intelligence in Venezuela. After the meeting, Varela told CW-5 that the Venezuelan generals had drugs and planes, and ran their own cartel, of which the defendant was a leader.

The defendant also directly participated in multiple cocaine shipments. For example, in 2006, the defendant worked with other Cartel members in the Venezuelan government to coordinate a shipment of approximately 5.6 tons of cocaine from Venezuela, which left on a DC-9 plane from the presidential hangar at the Maiquetia Airport. This included ensuring that the shipment would be protected from any interference.  For example, prior to the plane taking off, the defendant and another high-ranking Venezuelan government official ("CC-4") contacted CW-1 and told CW-1 that something big was happening the next day at the Maiquetia Airport and to not turn off his phone in case they needed CW-1 to intervene if there was any interference from local authorities. CW-3, too, participated in multiple meetings with Orense, the defendant, and others regarding security and logistics in the lead-up to the plane's departure. The shipment was eventually seized by Mexican officials in Campeche, Mexico. Examples of photographs taken by Mexican officials[9] of the DC-9 and of suitcases containing cocaine discovered inside the plane are below:



---

[9] In the absence of a stipulation, the Government anticipates calling Mexican law enforcement officials to authenticate the photographs.





Following the seizure, the defendant and CC-4 asked CW-1 to be ready to act if any legal action was taken against them.

As the director of the DIM, the defendant exploited his powers as a chief intelligence officer to secure millions of dollars in bribes from Varela's drug trafficking organization. Throughout 2007, CW-5 was personally responsible for paying the defendant for his corrupt services on behalf of Varela. In 2007 and 2008, CW-5 met with the defendant over a dozen times, during which the defendant boasted about his ability to suppress investigations into friendly drug traffickers. The defendant reaped enormous financial benefit from the bargains he struck with Varela and CW-5. In 2007 alone, CW-5 personally paid the defendant approximately $5 million on behalf of Varela. In exchange, the defendant protected CW-5 and Varela and secured the safe passage of their cocaine shipments by land, air, and sea, including by providing military personnel to escort cocaine through Venezuela, disabling radar detection for drug flights, and facilitating the loading of drugs onto container ships. The defendant also invested in their cocaine shipments bound for the United States and received lucrative percentages of the expected profits.

### C.    2007 – 2014: The Defendant Further Facilitates Weapons Shipments to the FARC, Protects His Drug Trafficking Operations, and Participates in Kidnappings, Murders, and Torture

The defendant's relationship with the FARC continued to expand during his leadership of the DIM and as he focused increasingly on providing the FARC with weapons to protect its drug trafficking and terrorist activities. Correspondence found on a hard drive at the Raul Reyes FARC camp included, for example, a January 4, 2007 letter from "Ivan" to "Comrades Secretariat" describing a meeting between FARC representatives, the defendant, and Venezuelan General Cliver Alcala Cordones ("Alcala"), during which the defendant and Alcala discussed sending to the FARC 20 "high-powered bazookas" and the "possibility of taking advantage of Venezuela's arms purchases from Russia to include containers destined for [the] FARC." (GX 305T). Similarly, a January 25, 2007 letter, also from "Ivan" to "Comrades Secretariat," addressed to the FARC

Secretariat described the defendant attending another meeting with FARC representatives and that he had "committed to bring an arms dealer from Panama." (GX 306T).

The defendant's support for the FARC extended to his own drug trafficking operations with Varela. In 2007, the defendant repeatedly encouraged Varela and CW-5 to source their cocaine from the FARC. That same year, upon learning that Varela bought multiple rifles from a supplier in China, the defendant proposed that Varela give those weapons to the FARC in exchange for cocaine. The defendant explained that he wanted the FARC to have the rifles because he had previously provided the FARC with arms from the Venezuelan military.

And the defendant made good on his word to protect drug shipments transiting through Venezuela on multiple occasions. Between 2007 and 2009, CW-5 on two occasions requested that the defendant assist with stopping drug seizures by Venezuelan authorities, including a 4,000-kilogram shipment that was stopped at a checkpoint on the way to the port city of Puerto La Cruz. Specifically, in that case, the defendant told CW-5 that he would handle the seizure, and CW-5 ultimately recovered the cocaine at a warehouse. CW-5 personally paid the defendant $1 million for this intercession. Throughout their many interactions, the defendant also offered to sell CW-5 cocaine that the defendant had seized from other drug traffickers. In 2007, at the defendant's behest, CW-5 provided 1,000 kilograms of cocaine to use in an orchestrated seizure by Venezuelan officials because the defendant was under pressure to "show a positive effort" regarding his role as head of the DIM.

During this same approximate period (2007 to 2008), the defendant introduced CW-2 and CC-1 during a meeting with Alcala and other Venezuelan officials at the Valencia airport as the men in charge of moving weapons, drugs, and money for the FARC's Tenth Front. The defendant

instructed Alcala to cooperate with CW-2 and CC-1 and their men because their work was for Grannobles.

The defendant also used his authority to facilitate acts of violence, kidnapping, and murder to protect his and his co-conspirators' drug trafficking. In 2007, the defendant and CC-4 kidnapped two associates ("Victim-1" and "Victim-2," respectively) of a rival drug boss from the *Envigado de Oficina* [10] on behalf of Varela while Victim-1 and Victim-2 were traveling through the international departures terminal at the Maiquetia Airport. In exchange, Varela paid the defendant and CC-4 $500,000. Victim-1 and Victim-2 were brought to Varela's residence, where Varela ordered his associates to execute them, but spared a third individual, ("CC-5"), who was another drug trafficking associate of Varela and CW-5. CW-5, who was present at Varela's residence, is expected to testify that, after learning that CC-5 was being spared, the defendant became angry and insisted to Varela multiple times that CC-5 had to be killed because he had seen the defendant and knew he was involved in kidnapping Victim-1 and Victim-2. Later that year, the defendant acknowledged to CW-5 that he orchestrated the forced disappearance and murder of another drug dealer before stealing 3,000 kilograms of his cocaine for Varela, who told CW-5 that the drug dealer had to be killed, and that the defendant picked up the rival and "disappeared him," which CW-5 understood to mean killed. The defendant received 1,500 kilograms of the stolen cocaine as payment for the murder.

The defendant's campaign of violence in support of his drug trafficking extended to Witness-1. In 2010, the defendant and his DIM operatives undertook a campaign of brutal reprisal and torture against Witness-1, who, as explained above, had previously sought to interdict FARC

---

[10] The *Envigado de Oficina* is a criminal organization that was originally founded as an enforcement wing and debt collection service of the Medellín Cartel.

activity that the defendant sponsored along the Catatumbo River. In approximately June 2010, after attempting to board a flight to Peru and then Colombia, in part, to meet with agents of the DEA to provide information regarding drug trafficking and FARC encampments along the Colombian-Venezuelan border, Witness-1 was forcibly pulled out of Maiquetia Airport by DIM officials and driven in a marked DIM truck to the agency's headquarters in Caracas. Once there, DIM officials stripped Witness-1 and beat him, calling him a rat and a traitor while accusing Witness-1 of meeting with the DEA. For more than 20 days, DIM guards brutally tortured and interrogated Witness-1, including by hanging him from a pipe, beating him, and hooking electrical equipment to Witness-1's testicles. Witness-1's torturers repeatedly spoke about the defendant and the questions the defendant wanted asked, referring to him as "my general Carvajal." Eventually, DIM officials brought Witness-1 to the defendant's office and gave him a script to read with a forced confession. Witness-1 immediately recognized the defendant from their prior meeting with his commanding general in 2003. During their meeting at the DIM headquarters, after Witness-1 had been tortured and beaten for more than 20 days, the defendant leaned in close to Witness-1 and said, "you're going to die here. You are fucked." The defendant told Witness-1, "now go tell the gringos to get you out of here." Witness-1 was eventually released in early 2011, but then later imprisoned the following year in Venezuela on treason and other charges.

The defendant's support for and participation in large-scale drug trafficking continued. For instance, between 2013 and 2014, the defendant worked with Colombian drug traffickers and the FARC to dispatch approximately seven cocaine-filled flights out of Venezuela bound ultimately for the United States. A drug trafficker ("CW-6") who served as an intermediary between the FARC Commander in Apure, the Colombian drug traffickers, and the Venezuelan government, worked closely on each cocaine shipment with one of the defendant's deputies ("CC-7"), who

reported directly to the defendant and described the defendant as the most powerful person in Venezuela. The FARC Commander told CW-6 that the defendant was a leader of the Cartel, which had control over the authorized airstrips and airports in Venezuela. Under this arrangement, the FARC was responsible for the cocaine transiting through Venezuela, the airplanes, and the clandestine airstrips. The defendant and CC-7, in turn, were responsible for controlling government radar installations and the safe arrival and departures of the drug flights. For each drug flight, the defendant and CC-7 held CW-6 as a hostage under the guard of two DIM sergeants at hotels in Caracas until the defendant received his money. The defendant communicated with CW-6 over electronic messages about these payments and warned CW-6 that CW-6 could think about what would happen to CW-6 if the defendant did not get paid on time.

In July 2014, the defendant was briefly arrested in Aruba on drug trafficking charges. After the defendant was released, he returned to Venezuela and resumed drug trafficking. Specifically, CC-7 contacted CW-6 and explained that four Venezuelan generals had 3,000 kilograms of cocaine, and the defendant was looking to ship his 750-kilogram share. CW-6 served as a broker to negotiate the shipment and receipt of the defendant's 750-kilogram cocaine load. During the negotiations, the defendant complained to CW-6 about the price, and warned that the shipment needed to be done well because Venezuela would not tolerate additional problems, which CW-6 understood to refer to another drug trafficking incident.

### D. The Defendant Attempts to Avoid Extradition and Prosecution in the United States

The defendant was first charged in this District in 2011 with conspiring to import cocaine into the United States. (Dkt. 2). That indictment was unsealed in July 2014 (Dkt. 3), after the defendant was arrested in Aruba on federal drug trafficking charges filed in another U.S. District Court. The defendant was released after Maduro and other members of the Cartel pressured Aruba

and the Dutch[11] government, including by reportedly deploying Venezuelan military ships to pressure the Arubans and Dutch to release him. On July 27, 2014, despite a ruling by an Aruban court that the defendant's provisional arrest was lawful and proper, the Dutch Foreign Minister released the defendant on the grounds that he had diplomatic immunity in Aruba. As noted above, in 2016, after returning to Venezuela, the defendant was elected to the Venezuelan National Assembly as a representative of Monagas State.

In February 2019, the defendant publicly spoke out against Maduro and offered his support to Venezuelan political opposition leader Juan Guaido Marquez. The defendant was later arrested in Madrid, Spain in 2019 on a provisional arrest warrant issued in connection with this case. On April 15, 2019, a grand jury in this District returned Superseding Indictment S1 11 Cr. 205 (AKH) (the "S1 Indictment"), which charged the defendant with (i) narcoterrorism conspiracy, in violation of 21 U.S.C. § 960a (Count One); (ii) cocaine importation conspiracy, in violation of 21 U.S.C. § 963 (Count Two); (iii) possession of machineguns and destructive devices, in violation of 18 U.S.C. § 924(c)(1)(A), (c)(1)(B)(ii), and 2 (Count Three); and (iv) conspiracy to possess machineguns and destructive devices, in violation of 18 U.S.C. § 924(o) (Count Four). (Dkt. 8). In September 2019, a Spanish court refused to extradite the defendant and ordered that he be released. In November 2019, a reviewing Spanish court reversed the lower court's decision and ordered the defendant's extradition to the United States, but the defendant fled before Spanish authorities could detain him. A Second Superseding Indictment (the "S2 Indictment") was filed on March 5, 2020, containing the same charges against the defendant and adding multiple co-

---

[11] Aruba is a constituent country within the Kingdom of the Netherlands.

defendants, including Maduro, Cabello, and Alcala.[12] The S2 Indictment also charged two members of the FARC's leadership bodies: Luciano Marin Arango, a/k/a "Ivan Marquez," and Seuxis Paucis Hernandez Solarte, a/k/a "Jesus Santrich." The defendant was arrested again by Spanish authorities in Madrid in September 2021.

In July 2023, the defendant was extradited from Spain to the United States, and he was presented in this District on July 20, 2023. As to his co-defendants on the S2 Indictment, Santrich died in or about March 2022. (Dkt. 106). On April 11, 2024, the Court sentenced Alcala to 260 months' imprisonment following his guilty plea to one count of providing, and aiding and abetting the provision of, material support or resources to the FARC. (Dkt. 176). The remaining defendants on the S2 Indictment have not been arrested.

## ARGUMENT

I. **Evidence of Drug-Related Corruption, Including Acceptance of Drug Proceeds to Facilitate Drug Trafficking, Is Admissible as Direct Evidence and Pursuant to Rule 404(b)**

As explained in part above, the evidence at trial will show that the defendant played a pivotal role in facilitating drug trafficking for the Cartel, which he effected through corruption and violence. Such corruption included the defendant's efforts to (i) reassign military officials who attempted to interdict FARC activities in Venezuela, (ii) provide DIM credentials to his drug trafficking partners, (iii) protect drug traffickers from investigation and detection, (iv) direct subordinates to disable military radars in order to allow drug flights to take off, and (v) release seized drug shipments. In exchange, the defendant received millions of dollars in bribe payments,

---

[12] The defendant will be tried on the charges in the S1 Indictment, which was the operative charging instrument upon which the United States sought the defendant's extradition, which Spain granted.

which drug traffickers like CW-4 and CW-5 personally gave to the defendant, and which the defendant showed in a safe to CW-1. Thus, evidence of drug-related corruption in Venezuela is admissible at trial, as direct evidence and pursuant to Rule 404(b), to establish the nature of the conspiracy and the defendant's role in it, the relationships between co-conspirators, and the defendant's motive and intent.

### A.    Applicable Law

#### 1.    Direct Evidence of the Defendant's Guilt

Federal Rules of Evidence 401 and 402 establish the broad principle that relevant evidence is admissible at trial except as otherwise provided by the Constitution, federal statute, or the Rules of Evidence. *See* Fed. R. Evid. 401, 402; *United States v. Abel*, 469 U.S. 45, 51 (1984). "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010). Under Rule 401, evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401; *see United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency.").

Thus, evidence is often admissible "to provide background for the events alleged in the indictment," or "to enable the jury to understand the complete story of the crimes charged," or "how the illegal relationship between [coconspirators] developed." *United States v. Reifler*, 446 F.3d 65, 91-92 (2d Cir. 2006) (internal quotation marks omitted); *see also United States v. Gohari*, 227 F. Supp. 3d 313,  317 (S.D.N.Y. 2017) (evidence is admissible if it relates to conduct that: (i) "'arose out of the same transaction or series of transactions as the charged offense'"; (ii) "'is inextricably intertwined with the evidence regarding the charged offense'"; or (iii) "'is necessary

to complete the story of the crime on trial.'" (quoting *United States v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012)). "Evidence fitting within one of these three categories is considered direct evidence and Rule 404 is not applicable." *United States v. Fiumano*, 14 Cr. 518 (JFK), 2016 WL 1629356, at *3 (S.D.N.Y. Apr. 25, 2016). "Background evidence may be admitted to show, for example, the circumstances surrounding the events, or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Coonan*, 938 F. 2d 1553, 1561 (2d Cir. 1991) (internal quotation marks omitted); *see United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (articulating well-established principle that evidence is direct evidence (and not other act evidence under Rule 404(b)) if it is inextricably intertwined with the evidence of the charged offense or necessary to complete the story of the charged offense (citing *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997))); *see also* Weinstein's Federal Evidence § 404.20 [2][c] (observing that evidence the absence of which "would leave a chronological or conceptual void in the story of the crime" is "intrinsic evidence"). As the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 183 (1997).

### 2. Other Acts Evidence Under Rule 404(b)

Additionally, under Rule 404(b), courts "may allow evidence of other acts by the defendant if the evidence is relevant to an issue at trial other than the defendant's character and if the risk of unfair prejudice does not substantially outweigh the probative value of the evidence." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015). "This Circuit follows the inclusionary approach, which admits all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (internal quotation marks

omitted). In general, evidence is admissible under Rule 404(b) "if (1) it is introduced for a proper purpose, (2) it is relevant to the charged offense, (3) its prejudicial effect does not substantially outweigh its probative value, and (4) is admitted with a limiting instruction if requested." *United States v. Rutkoske*, 506 F.3d 170, 176-77 (2d Cir. 2007).

### 3. Rule 403

The Court must also determine whether the probative value of the offered evidence is "substantially outweighed" by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Second Circuit has found admission appropriate where the offered evidence "'did not involve conduct any more sensational or disturbing than the crimes with which [the defendants were] charged.'" *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). To the extent there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant); *see generally Parker v. Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule'—indeed, the premise upon which the system of jury trials functions under the American judicial system—is that juries can be trusted to follow the trial court's instructions."), *abrogated on other grounds by Cruz v. New York*, 481 U.S. 186 (1987).

### B.    Discussion

The charged drug trafficking and firearms conspiracies were heavily intertwined with, and relied upon, rampant corruption in the form of bribes consisting of narcotics proceeds. The defendant and other members of the Cartel collected millions of dollars in bribes in exchange for protecting the drug trafficking activities the Cartel carried out to flood the United States with cocaine. At trial, the Government intends to offer evidence, including through cooperating witness testimony, of bribes that were paid to the defendant to facilitate such drug trafficking and for drug traffickers to avoid interdiction of their cocaine.

As described above, the Government will present testimony from cooperating witnesses such as CW-4, who will describe making approximately $150,000 in payments to the defendant on two occasions on behalf of Varela, who described the defendant as the one who protected his drug trafficking operations. Similarly, CW-5 will describe his extensive interactions with the defendant on behalf of Varela's drug trafficking organization, which will include the defendant's offer to provide protection to both CW-5 and Varela in Venezuela, and the defendant's demand for a $50,000 monthly bribe for those services. CW-5 will describe payments that CW-5 personally made to the defendant for protection and the release of seized drug loads; payments ranging between $200,000 and $1 million for the dispatch of drug shipments by plane and boat; and payments CW-5 made to the defendant for his own investment in the Varela and CW-5 shipments. CW-6 will describe how he served as an intermediary between the defendant and other Colombian drug traffickers, and how the defendant arranged for DIM officials to hold CW-6 hostage at hotels in Caracas until the defendant received his bribe payments for providing the radar codes necessary for drug flights to successfully leave Venezuela. All these payments were used by the defendant to enrich himself and others in the Cartel and ensure they stayed in power despite their flagrant abuse of the Venezuelan state and its populace.

Similarly, the charged offenses in this case were inextricably linked with the defendant's corrupt efforts to suppress investigations into the drug trafficking of his co-conspirators. For example, Witness-1 will describe how he was reassigned from the Catatumbo military base and ultimately pressured to resign after the defendant confronted Witness-1 following Witness-1's efforts to stop FARC activity on the Catatumbo River. Finally, as noted above, CW-5 will detail how the defendant intervened to secure the release of cocaine seized by other Venezuelan officials, and even offered to sell CW-5 and Varela cocaine that the defendant had seized from other traffickers.

In analogous trials involving drug trafficking by senior government officials in Honduras, Judge Castel granted similar motions in *limine*, finding that evidence of drug-related corruption constituted "direct evidence of the conspiracy," and permitted such evidence to be introduced at trial. *See United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC), Dkt. 85, Sept. 13, 2019 Final Pretrial Conference Tr. ("Tony Hernandez FPTC Tr.") at 4-5; *see also United States v. Juan Orlando Hernandez*, S8 15 Cr. 379 (PKC), Dkt. 671, Jan. 18, 2024 Final Pretrial Conference Tr. ("Juan Orlando FPTC Tr.") at 8-10 (ruling that "evidence of bribes paid to protect drug shipments" was "evidence in furtherance of the conspiracy" when the "Juan Orlando's role in the conspiracy was to use his political power to protect drug traffickers from investigation in Honduras . . . and to direct the police and military on Honduras to protect certain drug shipments in Honduras"); *United States v. Geovanny Fuentes Ramirez*, S6 15 Cr. 379 (PKC), Dkt. 251, Feb. 12, 2021 Final Pretrial Conference Tr. ("Fuentes Ramirez FPTC") at 7-8 (ruling that evidence of narcotics-related corruption was admissible as "evidence in furtherance and during the charged conspiracy"). As described below, the reasons that supported admission of evidence regarding drug-related corruption in those cases apply with equal force here.

29

Evidence of such high-level corruption involving the defendant and his co-conspirators is admissible as direct proof because it is inextricably intertwined with the charged crimes (indeed, it is an essential part of how the conspiracy operated) and is also necessary to complete the story of the crimes on trial. *See Gohari*, 227 F. Supp. 3d at 317. The evidence tends to explain, for example, why the co-conspirators came together, the relationships among co-conspirators, how they operated, and why they were able to continue crimes of this magnitude unabated for years. The defendant's receipt of bribes is an integral part of the charged conspiracy—the drug proceeds kept him in power, ensured that he could continue to protect his co-conspirators in the FARC and the Cartel, and provided him the resources necessary for the ongoing use of the Venezuelan state to facilitate the safe passage of cocaine from the FARC and other massive drug traffickers. Accordingly, the millions in dollars in bribes that the defendant received from various drug traffickers is direct evidence of the charged conspiracy. Indeed, for similar reasons and as noted above, the Government sought to admit, and Judge Castel permitted, such testimony in the trials of Juan Orlando Hernandez, Tony Hernandez, and Fuentes Ramirez regarding the state-sponsored narcotics trafficking and corruption in Honduras. For substantially the same reasons, the defendant's use of his authority to undermine investigations into his co-conspirators is direct evidence of the charged conspiracy because it shows what the defendant did in exchange for the millions of dollars in drug money he received—he used all the powers at his disposal to make sure wholesale drug trafficking thrived in Venezuela.

In the alternative, and for similar reasons, the corruption evidence is admissible pursuant to Rule 404(b). Evidence of drug-related corruption illustrates the broader criminal plan of the defendant and his co-conspirators to use drug trafficking to assert power and control in Venezuela, to accomplish the goals of the Cartel (including supporting the FARC and weaponizing cocaine

against the United States), and is probative of the defendant's motives and intent in joining the conspiracy, including to gain and maintain authority as a chief intelligence officer, and to enrich himself by receiving bribes from other drug traffickers. *See United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (noting that evidence is admissible under Rule 404(b) "to explain how a criminal relationship developed" and "help the jury understand the basis for the co-conspirators' relationship of mutual trust"). Thus, evidence of drug-related corruption involving the defendant and his co-conspirators is independently admissible under Rule 404(b) as well.

Finally, evidence of drug-related corruption is not unfairly prejudicial relative to other proof the Government expects to offer. The Government has alleged that the defendant and his co-conspirators in the Cartel, including Chavez, Maduro, Cabello, and other senior government officials, effectively operated Venezuela as a narco-state that encouraged the free flow of FARC-sourced cocaine through the country to enrich themselves, remain in power, and attack their enemies, including the United States. The allegations against the defendant include acts in furtherance of the conspiracy that involve facilitating kidnapping, murder, and torture, and abusing his power as the head of military intelligence, to support the Cartel and the FARC. The drug-related corruption described here, including the receipt of bribes and support of drug traffickers, and the steps the defendant took to make good on these corrupt payments, is no more sensational than other acts committed by the defendant and his co-conspirators in furtherance of the charged offenses and is highly probative. *See Pitre*, 960 F.2d at 1120. Accordingly, evidence of the full breadth of the corruption that facilitated the charged conduct is not barred by Rule 403.

## II. Evidence of the Defendant's Involvement in Drug-Related Violence Is Admissible as Direct Evidence and Under Rule 404(b)

As described above, the defendant conspired with Varela, CC-4, and other DIM officials to (i) forcibly kidnap individuals associated with rival drug traffickers who were later murdered;

(ii) murder another drug trafficker for Varela; and (iii) detain and torture Witness-1 after intercepting him at the airport en route to a meeting with DEA officials. Furthermore, CW-2 will testify that the FARC bombed Colombian pipelines, attacked the Colombian military, and engaged in kidnapping and extortion, and an expert will testify regarding violent acts of terrorism committed by the FARC, including murders and kidnappings.

Testimony from Witness-1, CW-2, CW-5, and the expert regarding these incidents is admissible as direct evidence and, in the alternative, under Rule 404(b). Under either theory, the evidence has significant probative value with respect to the charged cocaine importation and narcoterrorism conspiracies and related weapons offenses and is not unfairly prejudicial under Rule 403.

### A.    Relevant Facts

As explained in the Background section, the defendant participated in multiple acts of violence using his position as head of the DIM in furtherance of the charged drug trafficking, narcoterrorism, and weapons conspiracies. Specifically, CW-5 will testify that, in 2007, the defendant and CC-4 worked with Varela to kidnap Victim-1 and Victim-2 in the international departures terminal at the Maiquetia Airport and delivered them to Varela where they were murdered that night in exchange for $500,000. CW-5 will also testify that, in 2007, the defendant had another drug trafficker and his wife murdered for Varela. Finally, Witness-1 will testify that, in 2010, the defendant and DIM officials working at his direction dragged Witness-1 out of the Maiquetia Airport while Witness-1 was attempting to travel to Peru en route to Colombia, in part, to meet with DEA agents about drug trafficking in Venezuela. Then, at DIM headquarters, the defendant and others brutally tortured Witness-1 for nearly three weeks.

Additionally, the Government anticipates that CW-2 will testify that the FARC bombed Colombian pipelines and attacked the Colombian military and engaged in kidnappings and

extortion. The Government similarly expects to offer expert testimony regarding the FARC's history of committing violent acts of terrorism.

### B.    Discussion

First, with respect to (i) kidnapping individuals associated with rival drug traffickers who were later murdered; (ii) murdering another drug trafficker for Varela; and (iii) detaining and torturing Witness-1, evidence of the defendant's role in these kidnappings, murders, and torture is probative of his participation in the drug importation conspiracy charged in Count Two. This is particularly so because the Government expects that CW-5 will testify that the defendant engaged in the kidnappings of Victim-1 and Victim-2 and the murder of another drug trafficker in 2007 at the behest of Varela and in connection with his narcotics trafficking. As to the kidnappings and murders of Victim-1 and Victim-2, Varela sought to target the rival boss of another drug trafficking organization in Colombia, the *Envigado de Oficina*. Weeks later, when Varela told CW-5 that they had to kill another drug trafficker, and that Varela enlisted the defendant to do so, Varela and the defendant also stole approximately 3,000 kilograms of that trafficker's cocaine. Varela also told CW-5 that 1,500 kilograms would be used to pay the defendant. Such evidence illustrates the length that the defendant would go to assist his drug trafficking partners and enrich himself in the drug trade. *See Ulbricht*, 79 F. Supp. 3d at 485 (reasoning that "murder-for-hire evidence is directly relevant to proving the elements of the narcotics offense" because "the context of each of the alleged solicitations involves narcotics dealers"); *see also United States v. Gadsden*, 300 F. App'x 108, 110 (2d Cir. 2008) (affirming admission of "past violent acts" because "such evidence helps to explain the mutual trust that existed between coconspirators" (internal quotation marks omitted)); *United States v. Arrington*, 867 F.2d 122, 130 (2d Cir. 1989) (reasoning that a "plot to silence witnesses further[ed] the goals" of a narcotics conspiracy); *United States v. Barret*, 10 Cr. 809, 2011 WL 6704862, at *5 (E.D.N.Y. Dec. 21, 2011) ("Acts of violence are frequently deemed

to have been performed as overt acts in furtherance of, and thus are direct evidence of, an alleged drug distribution conspiracy."); *see also* Juan Orlando FPTC Tr. at 25-26 (ruling that "Evidence that Bonilla murdered Victim-1 at Tony Hernandez's direction using armed security and armored vehicles is direct evidence of Bonilla's role in the conspiracy, as the government alleges that Bonilla protected the conspiracy's operation and shipments."). The defendant's participation in these acts of violence therefore has significant probative value.

Second, so, too, with the narcoterrorism conspiracy charged in Count One. As noted above, the Government expects that Witness-1 will testify that he was kidnapped from the Maiquetia Airport by DIM officials just before his travel to Colombia, where he planned to meet with DEA agents. Witness-1's captors mocked Witness-1 during his torture and repeatedly referenced the defendant, for whom they were working. And Witness-1 recognized the defendant when he met with him while being held at the DIM headquarters, because the first time they met—in Caracas around 2003 at the Catatumbo River military base—the defendant warned Witness-1 to "behave" after Witness-1 had tried to stop FARC activity that the defendant had sanctioned. In short, the defendant coordinated the brutal abduction and kidnapping of Witness-1, who had attempted to thwart FARC activity years earlier and was planning to meet with DEA agents, which again demonstrates the lengths the defendant went to silence those who would undermine his support for the FARC and its drug trafficking.

Similarly, evidence of violent acts by FARC members and co-conspirators such as Grannobles is directly relevant to the charged offenses. As set forth in greater detail below, CW-2 is expected to testify at trial that the FARC engaged in terrorist acts, such as kidnappings, extortion, and bombings. For example, CW-2's anticipated testimony includes that in 2001 the FARC requested, and CW-2 thereafter obtained through the defendant, approximately 5,000 detonators

for bombs to use the against the Colombian military. CW-2's testimony about this sequence of events is inextricably intertwined with the evidence regarding the charged conduct—which in Count One concerns the defendant engaging in a narcotics conspiracy with the intent to provide something of pecuniary value (in this instance, weapons) to the FARC. *See Gohari*, 227 F. Supp. 3d at 313. Further, this evidence is directly relevant to an element of Count One—that the defendant knew that the FARC was or had been engaged in terrorism or terrorist activities. CW-2's testimony that the defendant provided detonators to the FARC so that they could conduct a terrorist attack on the Colombian military is thus directly relevant to an element of a charged offense.

Relatedly, CW-2 is expected to testify that, in approximately 1999 or 2000, CW-2 unsuccessfully attempted to convince Mono Jojoy and Raul Reyes—who testimony and other evidence at trial will show are the defendant's co-conspirators—to stop bombing Colombian pipelines and to instead focus on drug trafficking so that they could all make more money, and also discussed extortion payments for a kidnapped victim with the FARC leaders. This testimony is necessary to "complete the story of the crime on trial," as it demonstrates the FARC's terroristic activities, *Gohari*, 227 F. Supp. 3d at 313, and provides needed context regarding the relationship between co-conspirators (including between CW-2, Mono Jojoy, and Raul Reyes) and how that relationship developed, *Gadsden*, 300 F. App'x at 110.

Evidence related to the defendant's involvement in acts of violence is also direct proof of the defendant's use and possession of firearms, including automatic weapons and destructive devices, in furtherance of the drug trafficking conspiracy, as charged in Count Three, and his conspiracy with others to use firearms in furtherance of the drug trafficking conspiracy, as charged in Count Four. *See United States v. Abdalla*, 14 Cr. 716, 2018 WL 5819799, at *4 (S.D.N.Y. Oct.

23, 2018) (reasoning that murder in furtherance of uncharged drug trafficking conduct was "probative of the Defendants' opportunity to conspire to use and carry firearms in furtherance of drug crimes"); *see also United States v. Barnes*, 560 F. App'x 36, 41 (2d Cir. 2014) (reasoning that defendant's admission "about killing a rival drug dealer" was admissible "as direct proof of the charged crack conspiracy and of [defendant's] firearms possession related to that conspiracy"). For example, the Government anticipates that CW-5 will testify that there were approximately ten to twelve DIM officials carrying rifles and submachine guns at Varela's house on the night that Victim-1 and Victim-2 were kidnapped and murdered, which demonstrates the defendant's control over the heavily armed instruments of the Venezuelan state to protect the Cartel's drug trafficking partners. As a further example, the Government anticipates that Witness-1 will testify that he was abducted at the Maiquetia Airport by approximately six armed DIM agents before he could leave Venezuela and ultimately travel to Colombia to, in part, provide information to the DEA regarding drug trafficking along the Colombia-Venezuela border. This further exemplifies the defendant's use of weapons and force to protect the Cartel's drug trafficking partners.

Additionally, the defendant's work to facilitate kidnappings, murders, and torture, further demonstrates the relationships among the co-conspirators in the charged conspiracy, and the use of the Venezuelan state to effectuate its goals. Indeed, as described below, the Government expects that Witness-1 and CW-5 will testify about statements that the defendant made, as well as statements Varela made, which make it clear that the defendant undertook these violent acts as part of the charged conspiracy and to further their drug trafficking aims.

Finally, evidence related to the acts of violence described above is highly probative and not barred by Rule 403. "Since 'drug trafficking is often attended by violence,' courts in this Circuit repeatedly have declined to preclude evidence of violence in narcotics cases." *Ulbricht*, 79

F. Supp. 3d at 487 (quoting *United States v. Sureff*, 15 F.3d 225, 228-29 (2d Cir. 1994) and

collecting cases); *see also Abdalla*, 2018 WL 5819799, at *4; *United States v. Baptiste*, 264 F.3d

578, 590 (5th Cir. 2001) ("Although the evidence of the murders and attempted murders was

prejudicial, it was necessary for the jury to understand the brutal nature of the conspiracy."),

*withdrawn in part on other grounds on rehearing by* 309 F.3d 274 (5th Cir. 2002); *United States*

*v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996) (finding no Rule 403 violation where "the murder

demonstrated the extent to which [defendant] was willing to go, or at least threaten, in order to

ensure that the heroin deal and any future deals went smoothly"); *see also* Juan Orlando FPTC Tr.

at 26 (finding that evidence of murder was not excludable under Rule 403 "because it's evidence

of the operations of the conspiracy, and it bears on the nature, structure, roles in the conspiracy").

The Rule 403 balancing with respect to the violence described above must also take into account

that the evidence in this case relates to large-scale, state-sponsored drug trafficking in partnership

with a violent terrorist group that routinely employed automatic weapons and explosive devices.

Particularly in that context, which will be readily apparent through other evidence presented at

trial, evidence related to the defendant's participation in the kidnappings, murders, and torture

described above is highly probative of the charged crimes and not unfairly prejudicial. *Pitre*, 960

F.2d at 1120 (explaining admission of evidence appropriate when it "did not involve conduct any

more sensational or disturbing than the crimes with which [the defendants were] charged" (internal

citation omitted)).

III.    **Evidence of Statements Made by the Defendant, and Certain of his Co-Conspirators, Including Members of the FARC, Drug Traffickers, and Venezuelan Officials, Is Admissible Under the Hearsay Rules**

Several of the defendant's co-conspirators made statements to cooperating witnesses and

Witness-1 regarding the charged conspiracy, their joint efforts to protect themselves and their drug

trafficking operations, including with the FARC, and their attempts to further the Cartel's goal of

37

trafficking cocaine into the United States. As explained below, evidence of these statements is either not hearsay or admissible under a hearsay exception and offer significant probative value. This includes certain statements made by the defendant, which are admissible when offered against the defendant, co-conspirator statements made in furtherance of the charged conspiracy, and statements against penal interest made by certain of the declarants.

### A.    Applicable Law

#### 1.    Rule 801 (d)(2)(A): Statement of a Party Opponent

Federal Rule of Evidence 801(d)(2)(A) provides in relevant part that "[a] statement . . . is not hearsay [if] . . . [t]he statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A); *see also United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) ("Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party."). Moreover, statements made by a defendant are admissible under this exception even if the statement, on its face, is not incriminating. *See, e.g.*, *United States v. Gotti*, 457 F. Supp. 2d 395, 401-402 (S.D.N.Y. 2006) ("Cases explaining that an admission must be contrary to a position taken by the party at trial do so to distinguish Rule 801 (d)(2)(A) from the more limited exception for statements against interest under Rule 804 (b)(3), which must be against the declarant's interest at the time when made.").

#### 2.    Rule 801 (d)(2)(E): Co-Conspirator Statements

Rule 801 (d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement . . . is not hearsay [if] . . . [t]he statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." To admit a statement pursuant to this Rule, the Court must find two facts by a preponderance of the evidence: *first*, that a conspiracy that included the declarant and the defendant existed; and *second*, that the

statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Abdullah*, 20 Cr. 677 (AT), 2024 WL 4652476, at *1 (S.D.N.Y. Nov. 1, 2024) (citing *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993)). The Court may admit co-conspirator statements "on a conditional basis, subject to the later submission of the necessary evidence to establish that the statements are not hearsay." *Abdullah*, 2024 WL 4652476, at *1 (internal citation omitted).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801 (d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance." *United States v. Paone*, 782 F.2d 386, 391 (2d Cir. 1986) (internal quotation marks omitted). Indeed, "all that is required to meet the [Rule 801(d)(2)(E)] threshold is 'a showing of a likelihood of an illicit association between the declarant and the defendant.'" *Abdullah*, 2024 WL 4652476, at *2 (quoting *United States v. Cicale*, 691 F.2d 95, 103 (2d Cir. 1982)). There is no requirement "that the person to whom the statement is made is also a member of the conspiracy . . . [n]or is there a requirement that the co-conspirator declarant be identified by name." *Id.* (citation omitted). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1988), as do statements "that apprise a coconspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987). Similarly, statements are "in furtherance" of a conspiracy if they are "designed to promote or facilitate achievement of the goals of that conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994); *see also Abdullah*, 2024 WL 4652476, at *2.

### 3.    Rule 804 (b)(3): Statements Against Interest

Under Rule 804, if a declarant is "unavailable," there is an exception to the hearsay rule where:

> (A) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) if offered in a criminal case as one that tends to expose the declarant to criminal liability, is supported by corroborating circumstances that clearly indicate its trustworthiness after considering the totality of circumstances under which it was made and any evidence that supports or undermines it.

Fed. R. Evid. 804 (b)(3). This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

To satisfy Rule 804 (b)(3), the proponent of the statement must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted).

A declarant is unavailable for purposes of Rule 804 if, as relevant here, the declarant "is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), "cannot be present or testify at the trial . . . because of death," *id.* 804(a)(4), or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure . . . the declarant's attendance or testimony," *id.* 804(a)(5)(B).

"A statement will satisfy Rule 804 (b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted). Moreover, a declarant need not "be aware that the incriminating statement subjects him to immediate criminal prosecution," but instead, that the "incriminating statement sufficiently tended to subject the declarant to criminal liability so that a reasonable man in his position would not have made the statement unless he believed it to be true." *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978) (internal quotation marks and citation omitted).

Finally, the Second Circuit requires corroboration of both the declarant's and the statement's trustworthiness. *United States v. Doyle*, 130 F.3d 523, 543-44 (2d Cir. 1997). Statements made to co-conspirators, not in response to questioning, and not made in coercive atmospheres are sufficiently reliable for purposes of this Rule. *See, e.g.*, *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994).

### 4.    Confrontation Clause

Where hearsay is admissible under the Federal Rules of Evidence, it may nevertheless be prohibited by the Confrontation Clause of the Sixth Amendment. "But a statement 'cannot fall within the Confrontation Clause unless its primary purpose was testimonial'—that is, unless the statement, viewed objectively in light of all the relevant circumstances, was made or procured with a primary purpose of 'creating an out-of-court substitute for trial testimony.'" *United States v. Bick*, 711 F. App'x 664, 666 (2d Cir. 2017) (summary order) (quoting *Ohio v. Clark*, 576 U.S. 237, 244-45 (2015)).

B.    **Discussion**

1.    **Evidence of Statements Made by Co-Conspirators to CW-1 Is Admissible Under the Hearsay Rules**

CW-1 was a high-ranking official in Venezuela between in or about 2005 and in or about 2012. As described above, and further detailed below, CW-1 regularly met with the defendant and other Venezuelan government officials and used his authority to ensure the protection of FARC members and others working to support the Cartel's drug trafficking.

The Government respectfully submits that the following include statements that were made by co-conspirators to CW-1 in furtherance of the conspiracy, including those referred to below as "Statement [number]" and others like them, and are admissible through the testimony of CW-1:

1.    In 2005, at a meeting with Chavez and Maduro, among others, Chavez said it was necessary to remove several states of their judges because the courts needed to protect drug routes running through these states that belonged to the FARC, which Chavez described as "friends of Venezuela."

2.    In 2006, the defendant and CC-4, among other high-ranking officials, made multiple references to CW-1 regarding a drug trafficking event by the Cartel. Specifically, the defendant told CW-1 that something big was happening the next day at the Maiquetia Airport. The defendant said that "all of us" are going to participate and further noted that local and state police were not aware of what was going to happen. CC-4 further told CW-1, "don't turn off your phone," which CW-1 understood to express an expectation that, if there was any interference by other Venezuelan law enforcement, such as the local and state police, CW-1 should make sure he was available to intervene. Around this time, after the 2006 seizure in Mexico of the DC-9 plane loaded with 5.6 tons of cocaine that took off from the Maiquetia Airport—which CW-1 had heard about from various news sources—the defendant and CC-4 instructed CW-1 to be ready to act if any legal action was taken against them. After the seizure, CW-1 observed that the defendant, CC-4, and another high-ranking official with whom he met, who was then serving as the Minister of Interior and Justice, were more friendly than usual with CW-1, frequently paying for dinners and drinks. On one such occasion, the Minister of Interior and Justice told CW-1, in sum and substance, that "they gave us a big hit in Mexico," which CW-1 understood to be a reference to the seized cocaine load.

3.    In or about 2008, CW-1 attended two meetings in the presidential palace in Caracas with Chavez, the defendant, CC-4, the Minister of Interior and Justice, and several other high-ranking officials and judges. During these meetings, Chavez directed that those assembled had to use drugs to fight the United States, including through the

Cartel's partnership with the FARC. Chavez instructed that the attendees should "flood" the United States with drugs and appointed Cabello to lead this effort.

4. Later, in or about early 2009, CW-1 attended a third meeting led by Cabello, with the defendant, CC-4, and other high-ranking officials during which Cabello announced that the assembled were going to help facilitate and support the FARC's drug trafficking. Cabello said that Chavez wanted the defendant and CC-4 to help lead these efforts and expected that others in attendance to support such efforts and ensure that their respective organizations did not interfere.

These statements are relevant and admissible. First, the statements by the defendant himself, as reflected in Statement 2, above, are each admissible against the defendant as admissions of a party opponent under Rule 801 (d)(2)(A). Such statements made by the defendant to CW-1 are highly probative of the charged conduct. They directly implicate the defendant in the charged conspiracy by demonstrating his efforts, along with co-conspirators, like CC-4, to protect the trafficking of massive quantities cocaine for eventual importation into the United States. This is the heart of the charged conduct.

Second, insofar as any of Statements 1 through 4 above reflect requests, demands or instructions—such as (i) the defendant's and CC-4's instructions to CW-1 around the time of the 2006 DC-9 seizure, (ii) Chavez's 2005 directive regarding the removal of certain judges for protection of drug trafficking routes, and (iii) the demands of Chavez and Cabello in 2008 and 2009 regarding the weaponization of cocaine to "flood" the United States with drugs and the necessary coordination with, and support of, the FARC to do so—such statements are additionally admissible because they not hearsay at all. *See, e.g.*, *United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) ("Questions and commands are ordinarily not hearsay[.]").

Third, the statements and discussion by others in Statements 1 through 4 are all admissible against the defendant as co-conspirator statements under Rule 801 (d)(2)(E). The Government will establish that Chavez, Cabello, CC-4, and others were members of the charged conspiracy. As

43

described in the Background section above, the evidence at trial—which will include the testimony of several cooperating witnesses—will demonstrate, among other things, that the defendant and his co-conspirators, many of whom were high-ranking military and government officials, leveraged their power and influence within the Venezuelan government to facilitate drug trafficking through Venezuela on a massive scale. They did this, in part, by protecting drug traffickers and their means of moving drugs through Venezuela as well as by providing support, assistance, and protection to the FARC. The foregoing statements to CW-1 were made in furtherance of the conspiracy because they plainly concerned such activities, and therefore are relevant. *See Gohari*, 227 F. Supp. 3d at 317; *see also Rivera*, 22 F.3d at 436 (explaining statements are "in furtherance" of a conspiracy if they are "designed to promote or facilitate achievement of the goals of that conspiracy").

Fourth, the statements by Chavez, as reflected in Statement 1 and Statement 3 are also admissible under Rule 804 (b)(3)(B) as statements against penal interest. Here, Chavez's remarks would be probative of his guilt were he to stand trial on drug trafficking. Fed. R. Evid. 804(b)(3)(B) (a statement against interest is one that "if offered in a criminal case . . . tends to expose the declarant to criminal liability"). Chavez is unavailable because he is dead, Fed. R. Evid. 804(a)(4) (witness is unavailable where, among other things, that witness "cannot be present or testify at the trial or hearing because of death"), and the statements are sufficiently "trustworthy" under Rule 804(b)(3)(B) because they were made in confidence and to "a person whom the declarant[s] believe[d] [was] an ally, not a law enforcement official," *Sasso*, 59 F.3d at 349; *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007).

Finally, Statements 1 through 4 are not barred by Rule 403 because their probative value is not substantially outweighed by the danger of unfair prejudice. At trial, the jury will hear

evidence of state-facilitated drug trafficking in coordination with the FARC, which is at crux of the conspiracy charged in the S1 Indictment and described above in the Background. These statements—which go to the core of the Government's case—will be highly probative of the charged conduct. And these statements will not be unfairly prejudicial. The trial will be replete with evidence and testimony about large-scale narcotics trafficking, the use of firearms, and violence. In context of the other evidence that will be offered at trial, these statements do "not involve conduct any more sensational or disturbing than the crimes" with which the defendant has been charged. *Pitre*, 960 F.2d at 1120; *United States v. Mostafa*, 16 F. Supp. 3d 236, 256 (S.D.N.Y. 2014) (admitting evidence of the defendant's statements in support of Osama bin Laden and finding that, in a case where the defendant is charged with crimes relating directly to supporting bin Laden and al Qaeda, the statements were no more disturbing than the crimes charged). Accordingly, and for the reasons set forth above, the Government seeks an *in limine* ruling that Statements 1 through 4 to CW-1 are admissible at trial.

## 2. Evidence of Statements Made by Co-Conspirators to CW-2 Is Admissible Under the Hearsay Rules

As described in further detail above, CW-2 was a high-level FARC operative and cocaine trafficker who was a main interlocutor between the defendant and the FARC. CW-2's interactions with the defendant included coordinating meetings and relaying messages between the defendant and FARC Secretariat members such as Grannobles regarding the Venezuelan government's support for the FARC and its cocaine trafficking, as well as obtaining 5,000 detonators from the defendant so that the FARC could use them in explosives attacks against the Colombian military.

The Government respectfully submits that the following include statements made by co-conspirators to CW-2 in furtherance of the conspiracy, including those referred to below as "Statement [number]" and others like them, and are admissible through the testimony of CW-2:

45

1. In approximately 1999, CW-2 participated in a meeting in Arauca that included, among others, the defendant, a particular DIM official ("CC-8"), and CC-1. During that meeting, the defendant proposed to set a date to meet Grannobles to discuss ways in which the Venezuelan government could support the FARC, including by providing weapons to the FARC, allowing the FARC to build encampments and use clandestine airstrips in Venezuela, and supporting the FARC's cocaine trafficking. Approximately two weeks later, the defendant, CW-2, CC-1 and others traveled to FARC encampments in Arauca, where the defendant and CC-8 met with Grannobles and other FARC officials. Afterwards, the defendant told CW-2 that the meeting was a success, that the defendant had committed to supporting the FARC, and encouraged CW-2 and CC-1 to call the defendant with any issues.

2. In approximately 1999 or 2000, CW-2 and CC-1 met with FARC Secretariat members, including Mono Jojoy and Raul Reyes, at a FARC camp in Colombia. During the meeting, CW-2 urged FARC leadership to stop bombing Colombian pipelines and to instead focus on drug trafficking so that they could all make more money. Mono Jojoy rejected CW-2's proposal. CW-2 also encouraged FARC leadership to reduce the extortion payments being demanded of a Colombian politician whose son had been kidnapped because the politician could provide official Colombian vehicles to move money, and the FARC leadership agreed. Finally, they discussed various aspects of the FARC's partnership with the Venezuelan government.

3. In approximately 2001, CW-2—at the request of a 10th Front Commander—met with the defendant in Venezuela to request 5,000 detonators to use against the Colombian military. The next day, at the defendant's direction, CW-2 and CC-1 traveled to Guarico to meet with CC-8, who provided the detonators and explained that the defendant had helped him get the detonators from a Venezuelan military production facility. Subsequently, CW-2 provided approximately $8,000 to CC-1 as payment.

4. During a meeting at Fuerte Tiuna, the defendant asked CW-2 and CC-1 how the cocaine business was going, and they explained that Grannobles camps were moving deeper into Venezuela because there was less Venezuelan military presence there than along the border. CW-2 explained that the cocaine that he was trafficking for the FARC was going to Honduras, Guatemala, and ultimately the United States. The defendant stated that it was no problem if the cocaine ended up in the United States because that was a weapon to use against the "gringos" so that they can die.

5. In approximately 2005, CW-2 purchased at least 20-30 rifles from CC-8, which CW-2 used to protect one of CW-2's *fincas* (or ranches) in Guarico that CW-2 used for drug trafficking. Many of these weapons were official DIM weapons or were seized in DIM operations. During their negotiations for the weapons, CC-8 stated that portion of the money would go to the defendant, and on a later occasion, the defendant asked CW-2 how the guns turned out.

6. In approximately 2007 or 2008, several FARC members working on one of CW-2's airstrips in Apure were burned and killed by Colombian paramilitaries and one worker

was arrested. CW-2 asked the defendant for assistance, and the defendant agreed to investigate. Shortly after the attack, CW-2 and CC-1 met with the defendant, Alcala, and others at the Valencia Airport. The defendant introduced CW-2 and CC-1 to Alcala as the men in charge of moving weapons, drugs, and money for the 10th Front of the FARC, and instructed Alcala to cooperate with them because their work was for Grannobles. CW-2 explained to the group what had happened at his airstrip. The group then discussed the Venezuelan government's and military's intention to allow the FARC guerillas to operate without intervention, their efforts to hurt the careers of Venezuelan military officials who did not support the FARC, and additional ways in which FARC and the Venezuelan government and army could cooperate, including by allowing the movement of cocaine through Venezuela. The defendant ultimately had the Venezuelan military commander in Apure arrested, allegedly for aiding or sympathizing with Colombian paramilitaries.

7. In approximately 2007 or 2008 in Valencia, the defendant told CW-2 that he had a separate, open-ended budget from Chavez that the defendant was to use to keep Chavez in power. The defendant also said that Cabello was "up to date" with CW-2's drug movements, and that there would be no problem with the shipments.

8. In approximately 2007 or 2008, CC-1 told CW-2 about a meeting CC-1 had with the defendant and CC-8 in Puerto Cabello, during which the defendant had said that Cabello was close to Chavez and supported the FARC partnership, and CC-1 had explained that the FARC was pleased with the partnership and that the drug business was going well.

9. In approximately 2011, while CW-2 was imprisoned with an individual ("CC-9") in Venezuela and after CW-2 told CC-9 that he and the defendant were friends and trying to prevent CW-2's extradition to Colombia, CC-9 told CW-2 that he was a co-pilot for a DC-9 plane carrying cocaine departing from Maiquetia Airport, which was seized in Mexico. CC-9 explained that approximately 500 kilograms of the plane's approximately 5,000-kilogram load was obtained from the defendant at Fuerte Tiuna. CC-9 also stated that the defendant was in charge of the security at the airport for the plane and that the generals from Cartel were involved. CW-2 understood that CC-9 told him about this plane because he was interested in future narcotrafficking business with CW-2.

As an initial matter, the statements made by the defendant himself described above are admissions of a party opponent under Rule 801 (d)(2)(A) and are thus admissible against the defendant. These include parts of Statements 1 (the defendant's requests to meet with Grannobles and subsequent descriptions of their meeting), and 3, 4, 5 and 7 (the defendant's statements about drug trafficking, including using cocaine as a weapon against the "gringos," and about weapons

provided to the FARC), and 6 (the defendant's introduction of CW-2 to Alcala as being responsible for moving drugs, guns, and money for the FARC). Moreover, insofar as any of the statements reflect questions, requests, or demands—such as the defendant's questions about the state of CC-1 and CW-2's drug trafficking business, in Statement 8, or about how CW-2 liked the firearms that CW-2 purchased, in Statement 5—they are not hearsay. *See, e.g.*, *Kuthuru*, 665 F. App'x at 38 ("Questions and commands are ordinarily not hearsay[.]").

Additionally, other statements set forth above that were uttered by co-conspirators are admissible as co-conspirator statements under Rule 801 (d)(2)(E). First, the Government will establish at trial that CW-2 was the defendant's co-conspirator. The Government expects that CW-2 will testify that for years, the defendant worked with him and the other individuals—including FARC Secretariat members, CC-1, Alcala, other DIM officials such as CC-8—to, among other things, traffic massive amounts of cocaine ultimately bound for the United States, protect the FARC from interference by the Venezuelan military, and obtain weapons for the FARC to carry out violent acts. Accordingly, each of these declarants described above are co-conspirators.

Second, the statements described above were made in furtherance of the charged conspiracy. For example, CC-8 made Statement 3 to further the conspiracy's goals of supporting the FARC by explaining the defendant's role in obtaining the detonators for the FARC—thereby confirming the legitimacy of the weapons that the defendant was providing and his involvement in the weapons transfer. Similarly, Statement 5 by CW-2, indicating that the defendant would receive his share of a weapons payment, was also made in furtherance of the conspiracy. This statement was intended to assure CW-2 that the weapons transaction was being sanctioned by the defendant. As to Statement 8, CC-1's description of discussions during a meeting with the defendant in Puerto Cabello, including that CC-1 had stated that the FARC was pleased with the

Venezuelan government's partnership and that the drug business was going well, was meant to assure co-conspirators that the aims of the conspiracy were being achieved, in order to induce them to continue to participate. *See United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) (finding "in furtherance" requirement met where statements "induce a coconspirator's assistance"); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989) (finding "in furtherance" requirement met where statements "prompt the listener to respond in a way that facilitates the carrying out of criminal activity" (internal quotation marks omitted)). Lastly, Statement 9—regarding, among other things, the DC-9 plane carrying approximately 5,000 kilograms of cocaine that was seized in Mexico, including the defendant's share of the load and role in dispatching the plane—was also made in furtherance of the charged conspiracy. The Government expects that CW-2 will testify that, at the time that CC-9 made these statements, CW-2 had just told CC-9 about CW-2's drug trafficking bona fides and long-standing relationship with the defendant; accordingly, CW-2 understood that CC-9 (who, by CC-9's own account, was already doing drug business with the defendant) told CW-2 about the DC-9 because he saw CW-2 as a future potential drug trafficking contact. Accordingly, CC-9's statements were in furtherance of the drug trafficking conspiracy—in which CC-9 had already participated with the defendant, in connection with the DC-9 load described above.

In the alternative, CC-9's statements are admissible as statements against penal interest under Rule 804 (b)(3). As explained below, the declarant (CC-9) is unavailable, and his statements would be probative of his own guilt were he to stand trial on drug trafficking charges. Specifically, CC-9 is believed to be located abroad, in Venezuela, and outside the Government's subpoena power. CC-9 would likely invoke the Fifth Amendment if he were questioned under oath regarding their narcotics activities. *See United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y. 2004)

("[T]he 'unavailability' component is established by the fact that [the declarant] is expected to invoke his Fifth Amendment privilege."); *see also United States v. Ortiz*, 962 F. Supp. 2d 565, 573 (S.D.N.Y. 2013) (finding witness unavailable where located outside United States at time of trial). The statements are against the penal interest of the declarant because they "implicated [the declarants] in [illegal] activity," and the declarant "would not have made the statement unless he believed it to be true." *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017); *see also Ortiz*, 962 F. Supp. 2d at 573. CC-9's statements, which would be admitted through CW-2's testimony, are also sufficiently reliable because they were made in confidence and to "a person whom the declarant[s] believe[d] [was] an ally, not a law enforcement official." *United States v. Sasso*, 59 F.3d 341, 349 (2d Cir. 1995). Moreover, the statements do not reflect "effort to shift blame" away from the declarant, and there is no possibility that CC-9 would have uttered these remarks "solely to curry favor with the authorities." *Id.*; *see also Dupree*, 870 F.3d at 80 (finding sufficient trustworthiness where declarant spoke to perceived ally and did not attempt to shift blame).

Finally, these statements are not barred by Rule 403 because their probative value is not substantially outweighed by the danger of unfair prejudice. These statements will be highly probative of the charged conduct. And these statements are not unfairly prejudicial, against the backdrop of other anticipated trial testimony regarding large-scale narcotics trafficking, the use of firearms, and violence. In context of this other evidence, these statements are no more "sensational or disturbing" than the crimes with which the defendant has been charged. *Pitre*, 960 F.2d at 1120; *Mostafa*, 16 F. Supp. 3d at 256. Accordingly, and for the reasons set forth above, the Government seeks an *in limine* ruling that Statements 1 through 9 to CW-2 are admissible at trial.

### 3.    Evidence of Statements Made by Co-Conspirators to CW-3 Is Admissible Under the Hearsay Rules

At trial, the Government expects to offer additional testimony regarding the defendant's drug trafficking activity through CW-3, who trafficked multi-ton-quantities of cocaine with Orense, as well as Orense's partners, the defendant and CC-3, from approximately 2003 to 2011. As set forth in greater detail in the Background section above, the defendant sourced cocaine from the FARC for Orense, provided government credentials and official vehicles to escort drug loads, and ensured that cocaine loads were not interdicted by Venezuelan military officials.

The Government respectfully submits that the following includes statements made by co-conspirators to CW-3, including those referred to below as "Statement [number]" and others like them, and are admissible through the testimony of CW-3:

1. In approximately 2004 or 2005 CW-3 saw Orense, Varela, and the defendant meet at one of Orense's properties, where they discussed a problem that had occurred transporting cocaine through Apure. The defendant told Orense that this could not happen again. Upon hearing this conversation, other members of Orense's security detail commented to CW-3 that Varela was a big shot. Orense also later told CW-3 that Varela was a very powerful man from Colombia and was working out of Venezuela because he was having problems with the North Valley Cartel.

2. Between approximately 2004-2006, CW-3 participated in meetings in Valencia involving, among others, the defendant, Orense, Captain Vassyly Kotosky Villaroel Ramirez, a captain in the Venezuelan national guard who was a close associate of the defendant's ("Captain Kotosky" or "Kotosky") [13], and a Colombian individual regarding a large load of 4,500-5,000 kilograms of cocaine being transported by plane from Maiquetia Airport to Mexico. After the plane took off, the group learned that something had happened to the plane and were very upset. Orense yelled that his product was lost and told CW-3 that the operation had failed.

3. Orense told CW-3 that the defendant had a very good relationship with Mono Jojoy, which CW-3 understood to be about the defendant's help with allowing cocaine to move through Venezuela.

---

[13] On October 11, 2011, an indictment was unsealed charging Kotosky with international narcotics conspiracy and distribution. *See* No. 11 Cr. 247 (BMC) (E.D.N.Y). Public reporting indicates that Kotosky was arrested in Venezuela in or about 2015, and that he remains in Venezuela currently.

4. Between approximately 2007 and 2009, after CW-3 learned that the defendant was meeting with CW-2, Orense told CW-3 that CW-2 looked like a stupid fuck but was from the high command of the FARC.

5. In approximately 2007 or 2008, CW-3 heard the defendant admonish Orense not to be late in his payments to the FARC (whom the defendant referred to as the *patas de goma*) because they were sensitive.

6. At some point after CW-3 began working for Orense, CW-3 heard discussions between the defendant and Orense in which the defendant recommended that Orense seek the assistance of Alcala for the military's assistance with facilitating Orense's drug trafficking. Orense also told CW-3 that Alcala controlled the central region of Venezuela, and he was very close to Chavez.

7. In approximately 2008, Orense directed CW-3 to deliver money to Alcala, after CW-3 observed what appeared to be a tense meeting between Orense and Alcala. CW-3 subsequently delivered two large duffle bags containing approximately two or three million U.S. dollars to individuals driving official Venezuelan government vehicles.

8. In approximately 2008 or 2009, while escorting a load of cocaine in Venezuela, CW-3 was stopped at a military checkpoint. CW-3 called Orense for assistance, who stated he would call Alcala. Around ten minutes later, CW-3 received a phone call from Alcala, and handed the phone to the military official at the checkpoint; afterward, CW-3 was permitted to proceed through the checkpoint. Orense subsequently yelled at CW-3 for causing him to bother Alcala.

9. In approximately 2010 or 2011, Orense asked CW-3 to coordinate the transfer of approximately $9 million in narcotics proceeds being delivered by plane from the Dominican Republic to Venezuela. The individual that CW-3 asked to do the job went missing with the narcotics proceeds. Orense summoned CW-3 to a meeting with the defendant, Orense, and CC-3, who demanded that CW-3 assume the debt, which CW-3 refused. A few months later, two men shot CW-3 in the arm, and CW-3 believed that Orense had ordered him to be killed. In response, CW-3 tried to kill Orense, but, not finding Orense at his *finca*, CW-3 instead took approximately 80 weapons.

The statements described above are relevant and admissible. Any of the defendant's own statements described above are admissions of a party opponent under Rule 801 (d)(2)(A). These statements—such as those set forth within Statements 5 (the defendant admonishing Orense about a problem with a cocaine load), 9 (the defendant instructing Orense to pay the FARC on time), 10 (the defendant recommending that Orense seek Alcala's help in facilitating drug loads), and 13

(the defendant's demand that CW-3 pay back $9 million in drug proceeds that went missing)—demonstrate the defendant's direct involvement with drug trafficking and narcotics proceeds, and are directly applicable to the charged conduct.

The above-described statements by the defendant's co-conspirators—including Orense and members of his security detail, Alcala, and CC-3—are admissible against the defendant as co-conspirator statements under Rule 801 (d)(2)(E). The Government will establish that these individuals, among others, were the defendant's co-conspirators. For example, the Government expects that witness testimony, including through CW-3 and CW-2, will establish that (i) Alcala was a member of the Cartel, the defendant recommended Alcala to Orense to facilitate drug loads, and Alcala directed military officials to permit cocaine loads to safely transit through Venezuela; and (ii) the defendant and CC-3 were Orense's drug trafficking partners, and that the defendant, in particular, served as Orense's liaison to the FARC and ensured that drug loads passed safely through, and out of, Venezuela.

The co-conspirators' statements were clearly made in furtherance of the charged conspiracy because they directly relate to the defendant's facilitation of drug trafficking with the FARC, Venezuelan drug traffickers, and others. For example, co-conspirator statements such as those in Statements 7 (regarding the defendant's relationship with Mono JoJoy, a member of the FARC Secretariat) and 8 (regarding the defendant's relationship with CW-2, who Orense described to CW-3 as being from the FARC high command) bear directly on the defendant's close relationship with high-level members of the FARC, which is the crux of the charged narcoterrorism conspiracy. Co-conspirators statements such as those appearing in Statements 5, 6, 10, 11, and 12 relate to the defendant's active efforts to ensure the successful transit of cocaine shipments through and out of Venezuela, and his collaboration with Alcala to the same end. These statements are also

in furtherance of the charged conspiracy in that many of them, such as Statements 5, 7 and 9, identify conspiracy members and their roles in the charged conspiracy.

The statements by Varela are also admissible under Rule 804 (b)(3)(B) as statements against penal interest. Here, Varela's remarks would be probative of his guilt were he to stand trial on drug trafficking. Fed. R. Evid. 804(b)(3)(B) (a statement against interest is one that "if offered in a criminal case . . . tends to expose the declarant to criminal liability"). Varela is unavailable because he is deceased, Fed. R. Evid. 804(a)(4) (witness is unavailable where, among other things, that witness "cannot be present or testify at the trial or hearing because of death"),  and the statements are sufficiently "trustworthy" under Rule 804(b)(3)(B) because they were made in confidence and to "a person whom the declarant[s] believe[d] [was] an ally, not a law enforcement official," *Sasso*, 59 F.3d at 349; *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007).

Finally, these statements are not barred by Rule 403 because their probative value is not substantially outweighed by the danger of unfair prejudice. These statements will be highly probative of the charged conduct. And these statements are not unfairly prejudicial, against the backdrop of other anticipated trial testimony regarding large-scale narcotics trafficking, the use of firearms, and violence. In context of this other evidence, these statements are no more "sensational or disturbing" than the crimes with which the defendant has been charged. *Pitre*, 960 F.2d at 1120; *Mostafa*, 16 F. Supp. 3d at 256. Accordingly, and for the reasons set forth above, the Government seeks an *in limine* ruling that Statements 1 through 9 to CW-3 are admissible at trial.

### 4. Evidence of Statements Made by Co-Conspirators to CW-4 Is Admissible Under the Hearsay Rules

CW-4 was a Venezuelan drug trafficker and money launderer who worked, in part, as a top deputy to Makled, a major Venezuelan drug trafficker who effectively controlled the flow of narcotics and narcotics proceeds through the Valencia Airport as well as, in part, the seaport in

Puerto Cabello. As set forth above, and as the Government expects to establish at trial, Makled worked with several Venezuelan generals and officials to traffic cocaine through Venezuela, including the defendant. CW-4 also worked with several other drug traffickers, including, among others, Orense and Varela. CW-4 often used his contacts at the Maiquetia Airport, including Kotosky, to smuggle narcotics proceeds from Mexico back into Venezuela.

The Government respectfully submits that the following include were made by co-conspirators to CW-4 in furtherance of the conspiracy, including those referred to below as "Statement [number]" and others like them, and are admissible through the testimony of CW-4:

1. In 2006, the defendant attended a meeting of CW-4 and Varela in which CW-4 was delivering narcotics proceeds of Varela's that CW-4 had helped to smuggle through and pick up from the Maiquetia Airport. During the meeting, Varela directed CW-4 to give a portion of the narcotics proceeds to the defendant. Once the defendant left with the money, Varela told CW-4 that the defendant provided protection for Varela's drug trafficking operation in Venezuela.

2. Later in 2006, after CW-4 had again helped to smuggle narcotics proceeds of Varela's through the Maiquetia Airport and retrieve them, Varela instructed CW-4 to again give a portion of the narcotics proceeds to the defendant and further provided CW-4 a number at which to contact the defendant to arrange a meeting to deliver the payment, which CW-4 ultimately did.

3. Also, around 2006, Makled told CW-4 that he had an investment in cocaine in an approximately 6,000-kilogram drug load that was dispatched from the Maiquetia Airport to Mexico in a DC-9 plane but that had been seized by the authorities in Mexico upon landing there, as discussed in greater detail in the Background section above.

4. On at least two occasions, between 2006 and 2011, a Venezuelan military corporal who worked with Makled and CW-4, as well as with Varela ("CC-10"), and who was close with the defendant, was detained by the Venezuela military at the Maiquetia Airport in connection with drug loads that he was trying to move through the airport. On both occasions, CC-10 reached out to CW-4 and asked him to contact the defendant to get him released. CW-4 ultimately did so, and CC-10 was released.

5. As Makled's top deputy, CW-4 was told by Makled that Makled would, on occasion, make payments to the defendant and several other Venezuelan military and government officials, including CC-4, to protect his vast drug trafficking operation.

The above-described statements by Varela, Makled, and CC-10 to CW-4 are all admissible. As an initial matter, insofar as any of the Statements reflect questions, requests, or demands, such as Varela's directive to CW-4 to pay narcotics proceeds to the defendant, or CC-10's request to CW-4 that he contact the defendant for help in getting CC-10 released, they are not hearsay. *See, e.g., Kuthuru*, 665 F. App'x at 38 ("Questions and commands are ordinarily not hearsay[.]"). Moreover, as set forth below, each of the Statements is admissible for multiple independent reasons under the hearsay rules.

First, the statements are admissible against the defendant because they are co-conspirator statements under Rule 801 (d)(2)(E). The Government will establish that Varela, Makled, CC-10, and CW-4, among others, were members of the charged conspiracy. As described in the Background, the evidence at trial will demonstrate, among other things, that the defendant leveraged his government position and power to facilitate drug trafficking through Venezuela on a massive scale and to provide protection for drug traffickers, including Varela, Makled, and others, in exchange for the payment of significant sums of narcotics proceeds to the defendant. Such protection provided to those drug traffickers came from corrupt members of the Venezuelan military, such as Captain Kotosky and CC-10, among others, who were working at the direction of the defendant and other members of this conspiracy. The foregoing statements to CW-4 were made in furtherance of the conspiracy because they involved, among other things, the defendant using his state authority to enable drug trafficking at the scale the Cartel required through the efforts of its partners like Varela, Makled, and CW-4. This included, for example, as relevant to CW-4, allowing drug traffickers to move cocaine loads and smuggle narcotics proceeds through the Maiquetia Airport. These statements, which concern such drug trafficking activities critical to the charged conspiracy, are therefore relevant. Moreover, statements such as Statement 5 to CW-

4, identifying members of the conspiracy, like CC-4 and other military officials, their involvement, and who can be trusted in carrying out its drug trafficking objectives are clearly in furtherance of the charged conspiracy. *See, e.g.*, *United States v. Delligatti*, No. 15 Cr. 491, 2018 WL 1033242, at *6 (S.D.N.Y. Feb. 23, 2018) ("[S]tatements that convey information about others in the same organized crime syndicate are considered to be during and in furtherance of a conspiracy").

Second, the statements by Varela are also admissible under Rule 804 (b)(3) because the declarant is unavailable, and his remarks would be probative of his guilt were he to stand trial on drug trafficking. Varela is unavailable because he is deceased. Fed. R. Evid. 804(a)(4) (witness is unavailable where, among other things, that witness "cannot be present or testify at the trial or hearing because of death"). The statements are also sufficiently reliable because they were made in confidence and to "a person whom the declarant[s] believe[d] [was] an ally, not a law enforcement official." *Sasso*, 59 F.3d at 349.

Finally, these statements are not barred by Rule 403 because their probative value is not substantially outweighed by the danger of unfair prejudice. These statements will be highly probative of the charged conduct. And these statements are not unfairly prejudicial, against the backdrop of other anticipated trial testimony regarding large-scale narcotics trafficking, the use of firearms, and violence. In context of this other evidence, these statements are no more "sensational or disturbing" than the crimes with which the defendant has been charged. *Pitre*, 960 F.2d at 1120; *Mostafa*, 16 F. Supp. 3d at 256. Based on the foregoing, the Government seeks an *in limine* ruling that Statements 1 through 5 to CW-4 are admissible at trial.

### 5. Evidence of Statements Made by Co-Conspirators to CW-5 Is Admissible Under the Hearsay Rules

CW-5 worked as one of Varela's top deputies in Venezuela from 2006 until Varela's death in January 2008. Before and continuing after Varela's death, CW-5 worked extensively with the

defendant trafficking cocaine through and out of Venezuela. for example, in 2007, CW-5 paid the defendant approximately $5 million in bribes. In exchange, the defendant, among other things, provided protection to CW-5, Varela, and their drug trafficking organization, helped disable radars to ensure the safe dispatch of drug loads by plane, facilitated the loading of cocaine-filled containers onto vessels at multiple ports, and provided DIM officials to transport cocaine across Venezuela. The Government expects to offer testimony from CW-5 at trial about his personal involvement in drug trafficking efforts in Venezuela with the defendant, who provided a critical role facilitating Varela's and CW-5's multiple air and maritime cocaine shipments bound for the United States.

The Government respectfully submits that the following contain statements were made by co-conspirators to CW-5 in furtherance of the conspiracy, including those referred to below as "Statement [number]" and others like them, and are admissible through the testimony of CW-5:

1. In approximately 2006, after arriving in Venezuela, Varela introduced the defendant to CW-5. During a meeting in Caracas, the defendant described the control he had in Venezuela, the protection he could offer CW-5 in exchange for monthly payments, and the information he could provide to CW-5 and Varela about their enemies. In addition, the defendant described himself as the number one person in intelligence in Venezuela. After the meeting, Varela told CW-5 that these Venezuelan generals have drugs and planes, and run their own cartel that the defendant helped lead. Varela told CW-5 that they should take advantage of what they have.

2. In approximately 2006, a drug trafficking associate ("CC-6") described his cocaine investment in an approximately 6,000-kilogram drug load that was dispatched from the Maiquetia Airport (*i.e.*, the DC-9 plane that was seized in Campeche). CC-6 told CW-5 there was a problem with the plane, which was currently in Mexico, and that the defendant was involved in the cocaine load.

3. As described above, in approximately 2007, CW-5 was at Varela's house during the kidnapping and murder of Victim-1 and Victim-2, who were associates of a rival drug boss at the *Envigado de Oficina* in Colombia. Varela told CW-5 that he had called the defendant, who told CC-4 to kidnap Victim-1 and Victim-2 from the Maiquetia Airport and bring them to Varela. CW-5 was present when the defendant and Varela spoke by phone that evening and insisted that CC-5 needed to be killed because CC-5 had seen the defendant and knew of the defendant's involvement in the kidnapping.

4. As described above, in approximately 2007, the defendant helped Varela murder another drug trafficker and his wife before stealing approximately 3,000 kilograms of the trafficker's cocaine that the defendant and Varela then split among themselves. Varela told CW-5 that they had to kill the drug trafficker, and that the defendant "disappeared" him. Later, the defendant admitted he was involved in the disappearance and that he did it for Varela.

The statements described above are relevant and admissible. For starters, and as explained above, statements made by the defendant are admissions of a party opponent under Rule 801 (d)(2)(A) and are admissible against the defendant. Such statements are highly probative of the charged conduct because they directly implicate the defendant in the charged conspiracy, including through his protection of drug trafficking co-conspirators (Statement 1) and his involvement in acts of violence against rival drug traffickers (Statement 3 and Statement 4).

Additionally, the above-described statements by Varela and CC-6 are all admissible against the defendant because they are co-conspirator statements under Rule 801 (d)(2)(E). As set forth above, the Government will establish that Varela, CC-6, CW-5, and others, were members of the charged conspiracy. Furthermore, as described in the Background, the conspiracy, which will be established through the testimony of multiple cooperating witnesses, were focused primarily on using the tools of the Venezuelan state to facilitate massive armed drug trafficking efforts against the United States with the aid of the FARC and other large-scale traffickers. Such statements were made in furtherance of the conspiracy because they involved, among other things, the defendant using his state authority to enable drug trafficking at the scale the Cartel required through the efforts of its partners like Varela, CW-5, and CC-6. This included, for example, allowing drug traffickers to use the Maiquetia Airport to dispatch cocaine loads, kidnapping rival drug traffickers at the Maiquetia Airport, and murdering other rival traffickers in exchange for cocaine. These statements, which concern the drug trafficking activities of the charged conspiracy and efforts to

ensure that the Cartel accomplished its goals, are therefore highly relevant. Moreover, statements such as Statement 1 and Statement 2 identifying members of the conspiracy, their involvement, and who can be trusted in carrying out its drug trafficking objectives are clearly in furtherance of the charged conspiracy. *See Delligatti*, 2018 WL 1033242, at *6.

Finally, these statements are not barred by Rule 403 because their probative value is not substantially outweighed by the danger of unfair prejudice. These statements will be highly probative of the charged conduct. And these statements are not unfairly prejudicial, against the backdrop of other anticipated trial testimony regarding large-scale narcotics trafficking, the use of firearms, and violence. In context of this other evidence, these statements are no more "sensational or disturbing" than the crimes with which the defendant has been charged. *Pitre*, 960 F.2d at 1120; *Mostafa*, 16 F. Supp. 3d at 256. Although some of CW-5's statements relate to violent acts facilitated and undertaken by the defendant, because "drug trafficking is often attended by violence, courts in this Circuit repeatedly have declined to preclude evidence of violence in narcotics cases." *Ulbricht*, 79 F. Supp. 3d at 487 (internal quotations and citation omitted). Accordingly, and for the reasons set forth above, the Government seeks an *in limine* ruling that Statements 1 through 4 to CW-5 are admissible at trial.

### 6.    Evidence of Statements Made by Co-Conspirators to CW-6 Is Admissible Under the Hearsay Rules

As noted above, between 2013 and 2014, CW-6 worked with Colombian drug traffickers and the FARC to send multiple cocaine shipments out of Venezuela. CW-6 worked closely with CC-7, a DIM captain who represented the defendant in the drug deals. The Government expects CW-6 to testify regarding these drug shipments, including how the FARC was responsible for transporting the cocaine loads through Venezuela and maintaining the airplanes and clandestine

airstrips. CC-7 and the defendant's roles were to use their control over radar installations to ensure the safe arrival and departures of the drug flights.

The Government respectfully submits that the following contain statements were made by co-conspirators to CW-6 in furtherance of the conspiracy, including those referred to below as "Statement [number]" and others like them, and are admissible through the testimony of CW-6:

1. In approximately 2013, a FARC Commander who worked with CW-6 to safeguard cocaine transiting through Apure State, told CW-6 that the Cartel de Los Soles had control over authorized airstrips and airports, and that the defendant was very wealthy because he was a Cartel leader.

2. In approximately 2013, CC-7 spoke with CW-6 after CW-6's drug trafficking partners were delayed in making payments to the defendant for ensuring the safe passage of a drug flight out of Venezuela. CC-7 said that the defendant was CC-7's boss, and that CW-6 could not play games because the defendant was the most powerful person in Venezuela.

3. Also in approximately 2013, after another delayed payment for the protection of a drug flight, CC-7 told CW-6 that the defendant was very angry. Shortly afterward, the defendant sent electronic messages to CW-6 that said if the defendant did not get paid, then CW-6 could think about what would happen to him, implying to CW-6 that he would be in danger.

4. In approximately 2014, after the defendant had returned to Venezuela after being arrested in Aruba, CC-7 told CW-6 that four Venezuelan generals had 3,000 kilograms of cocaine, and that the defendant needed a plane and customer to receive his 750-kilogram share. The defendant later exchanged electronic messages with CW-6 regarding the price negotiations, and said they needed to do things well because Venezuela would not tolerate an additional problem, which CW-6 understood referred to drug trafficking incidents.

Each of these statements are admissible. First, any of the defendant's own statements described in Statements 3 and 4 are admissions of a party opponent under Rule 801 (d)(2)(A) and are not hearsay. Second, the statements are admissible as co-conspirator statements under Rule 801(d)(2)(E). The Government expects that CW-6 will testify that the FARC Commander in Apure State was responsible for, among other things, ensuring that cocaine loads traveled safely through FARC-controlled territory in Apure on the way toward the clandestine airstrips in Venezuela,

61

where the drugs were dispatched after the defendant and CC-7 supplied the radar codes and other information necessary for the planes to take off and fly through Venezuelan airspace without being intercepted. As such, each of these declarants are co-conspirators in the charged conspiracy against the defendant.

Additionally, each of the statements were made in furtherance of the conspiracy. Statements 1 and 2, for example, identify the defendant as a member of the conspiracy, as well as his role and bona fides. *See Delligatti*, 2018 WL 1033242, at *6. Statement 3 by CC-7, describing the defendant's reaction to the delayed drug payments, was similarly made in furtherance of the conspiracy in order to induce CW-6 to facilitate the intended payment as quickly as possible. *See Beech-Nut Nutrition Corp.*, 871 F.2d at 1199. Statement 3 is also corroborated by the defendant's subsequent communications with CW-6, including his veiled threat to CW-6, which, as noted above, are admissible statements of a party opponent under Rule 801 (d)(2)(A). Similarly, as to Statement 4, CC-7's offer to CW-6 to facilitate another drug shipment on behalf of the defendant after his return from Aruba, as corroborated by the defendant's negotiations with CW-6, is directly in furtherance of the charged drug trafficking activities.

Finally, these statements are not barred by Rule 403 because their probative value is not substantially outweighed by the danger of unfair prejudice. These statements are highly probative of the charged conduct. And these statements are not unfairly prejudicial, against the backdrop of other anticipated trial testimony regarding large-scale narcotics trafficking, the use of firearms, and violence. And, again, in context of this other evidence, these statements are no more "sensational or disturbing" than the crimes with which the defendant has been charged. *Pitre*, 960 F.2d at 1120; *Mostafa*, 16 F. Supp. 3d at 256. Accordingly, and for the reasons set forth above, the Government seeks an *in limine* ruling that Statements 1 through 4 to CW-6 are admissible at trial.

7.    **Evidence of Statements Made by Co-Conspirators to Witness-1 Is Admissible Under the Hearsay Rules**

Witness-1, as described above, was a Venezuelan military officer who worked in the Catatumbo region of Zulia State along the border between Colombia and Venezuela between in or about 2000 and 2004, including as the commanding officer of a military base on the Catatumbo River between in or about 2000 and 2002. As a result of his efforts to combat the FARC and interdict their boats and personnel moving through the region, he was ultimately forced to resign from the military in 2004. Later, in 2010, upon attempting to leave Venezuela and travel to Peru and then to Colombia, in part, to provide information to the DEA regarding drug trafficking and FARC encampments along the Colombia-Venezuela border, Witness-1 was detained at the Maiquetia Airport by DIM agents, imprisoned at the DIM headquarters, beaten and tortured, and later indicted, convicted, and sentenced to several years in prison.

The Government respectfully submits that the following contain statements made by co-conspirators to Witness-1 made in furtherance of the conspiracy, including those referred to below as "Statement [number]" and others like them, and are admissible through the testimony of Witness-1:

1.  While Witness-1 was stationed as a border patrol commanding officer at a military post on the Catatumbo River between 2000 and 2002, a DIM agent with responsibility for the region, CC-2, visited Witness-1's base multiple times often with another individual, whom Witness-1 understood to be a member of the FARC's 33rd Front. CC-2 told Witness-1 about meeting with members of the FARC's 33rd Front and telling Witness-1 that Witness-1 had to let the FARC boats and personnel through as they moved along the river. CC-2 told Witness-1 that he (CC-2) was acting on orders of the defendant, whom Witness-1 understood to be second in command of the DIM and the head of the DIM's investigations at the time. CC-2 would repeatedly reference the defendant and note that the orders came from Caracas. Witness-1 was present for and heard a specific conversation at the post between CC-2, the aforementioned 33rd Front member, and another FARC member who was the head of logistics for the 33rd Front, in which they were discussing the setup of a FARC encampment up in the Perijá mountains east of the base. CC-2 specifically discussed "flooding" the "gringos" with drugs.

63

2. Around 2003, after Witness-1's forces along the Colombian border had interdicted multiple FARC boats and personnel, Witness-1 accompanied one of his commanding generals to a meeting with the defendant in Caracas. During the meeting, Witness-1 overheard the defendant tell the general that Witness-1 should not be sent back to the Colombia-Venezuela border because of Witness-1's problems with the FARC. Afterward, the defendant came into the room where Witness-1 had been waiting and told Witness-1, "Behave Major." Witness-1 asked what was going on, and the defendant responded, in sum and substance, that "it's the same FARC problem."

3. After Witness-1 was arrested by the DIM around June 2010 upon trying to leave Venezuela to, in part, meet with the DEA in Colombia, Witness-1 was detained inside of the DIM headquarters for an extended period of time where he was questioned by DIM officials about whom he was going to meet with, including the DEA, and what information he was going to provide. During this time, DIM officials tortured Witness-1, including beatings, isolation in a "crazy room," and electric shocks. Witness-1's captors referred to "my general" or "my general Carvajal" when asking him questions. On one occasion, Witness-1 was brought to Carvajal's office where the DIM officials tried to get Witness-1 to read from a script falsely confessing wrongdoing. The defendant was present for this meeting and, at one point, told Witness-1that "you're going to die here," "you are fucked," and "now go tell the gringos to get you out of here."

4. After Witness-1 was later indicted in Venezuela and convicted of various crimes against Venezuela, Witness-1 went on to serve a prison sentence. Shortly before Witness-1 was released in December 2014, DIM agents along with a colonel in the DIM searched Witness-1's cell. The colonel told Witness-1 they were there on orders from the defendant.

These statements are relevant and admissible. First, the statements by the defendant himself, as reflected in Statements 2 and 3, above, are each admissible against the defendant as admissions of a party opponent under Rule 801 (d)(2)(A). Such statements made by the defendant to Witness-1 in 2003 as well as in 2010 are highly probative of the charged conduct. They directly implicate the defendant in the charged conspiracy, including by demonstrating his support and protection of the FARC and their manufacturing and trafficking of cocaine, which, in part, fuels the Cartel's ability, with their co-conspirators, to traffic massive quantities of cocaine for eventual importation into the United States. Specifically, the defendant's 2003 statement to Witness-1 served as warning to not interfere with the FARC's operations. The defendant's 2010 statement to

Witness-1 was made after Witness-1 had been detained on his way to meet with the DEA to provide information regarding the FARC and then refused to cooperate with the DIM agents and the defendant. It plainly served as a warning and threat to Witness-1 to silence Witness-1 and further protect the FARC.

Second, the statements and discussion by others in Statements 1 through 4 are all admissible against the defendant as co-conspirator statements under Rule 801 (d)(2)(E) for substantially the same reasons described above,—that is, statements by FARC members and Venezuelan government officials, including, as relevant here, DIM officials under the command of the defendant, among others, to protect the FARC's production and trafficking of cocaine in partnership with the Cartel.

Finally, for many of the same reasons set forth above, Statements 1 through 4 made to Witness-1 are admissible under Rule 403 because the probative value of the statements is not substantially outweighed by the danger of unfair prejudice. These statements will be highly probative of the charged conduct. And these statements are not unfairly prejudicial, against the backdrop of other anticipated trial testimony regarding large-scale narcotics trafficking, the use of firearms, and violence. In context of this other evidence, these statements are no more "sensational or disturbing" than the crimes with which the defendant has been charged. *Pitre*, 960 F.2d at 1120; *Mostafa*, 16 F. Supp. 3d at 256. Accordingly, and for the reasons set forth above, the Government seeks an *in limine* ruling that Statements 1 through 4 to Witness-1 are admissible at trial.

## IV.    The Court Should Preclude Various Other Evidence and Arguments as Irrelevant and Unfairly Prejudicial

The defendant should be precluded from injecting into the trial a variety of impermissible arguments designed to encourage jury nullification and confuse issues, including that some of the evidence in this case occurred several years ago and primarily outside the United States, and that

the FARC, which at all times relevant to this case was a designated FTO, and was removed from the State Department's list of FTOs in 2021. The defendant should also be precluded from referencing events involving Venezuela that occurred after the charged conspiracy, including current events regarding Venezuelans, or suggestions that the defendant has been persecuted by the Venezuelan regime. Such arguments are improper and would put the Government at a significant and unfair disadvantage at trial. Additionally, as explained below, they would also create the substantial risk of creating a trial-within-a-trial regarding issues concerning the defendant's arrest, protracted extradition proceedings, and status for years as an international fugitive. For similar reasons, the defendant should be precluded from offering arguments regarding the potential punishments he may face if convicted.

### A.    Applicable Law

As explained above, under Federal Rule of Evidence 402, "irrelevant evidence is not admissible" at trial, and under Federal Rule of Evidence 403, a court may exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667 (2d Cir. 1995), and so long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the defense does not have a basis in fact or law, a court should not allow the defendant to present the evidence or advance the argument to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997); *United States v. Edwards*, 101 F.3d 17, 20 (2d Cir. 1996) (holding that a "[d]efendant is not entitled

to a jury charge based on a theory that the court properly found to be invalid and irrelevant and hence without foundation") (citation omitted).

Relatedly, a defendant is not entitled to advance an argument or introduce evidence to obtain an acquittal or mistrial through jury nullification. A defendant's attempt to focus the jury on sympathy, prejudice or public opinion in coming to a verdict, rather than on the evidence and facts before it, "subverts the jury's solemn duty to 'take the law from the court, and apply that law to the facts of the case as they find them to be from the evidence.'" *See In re United States*, 945 F.3d 616, 627 (2d Cir. 2019) (quoting *Sparf v. United States*, 156 U.S. 51, 102 (1895)). Trial courts have a duty to forestall or prevent such conduct. *See United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent"); *see also United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983) ("We therefore join with those courts which hold that defense counsel may not argue jury nullification during closing argument"); *United States v. Díaz-Colón*, 651 F. Supp. 3d 468, 480 (D.P.R. 2023) ("This Court possesses the discretion to block defense attorney's attempts to serenade a jury with the siren song of nullification, and may instruct the jury on the dimensions of their duty to the exclusion of jury nullification") (citation and quotation marks omitted).

B.    **Discussion**

1.    **References to the Time Period This Case Has Been Pending, that the Charged Conduct Occurred Primarily Outside of the United States, or Events After the Charged Conduct Should Be Precluded as Irrelevant Under Rule 401 and Unfairly Prejudicial, Confusing, and Misleading Under Rule 403**

The Court should preclude defense counsel, whether through argument (explicit or otherwise) or through the cross-examination of Government witnesses, from arguing that acquittal or even nullification is warranted because the relevant facts occurred years ago and/or

extraterritorially. Because such testimony or argument would be irrelevant to the defendant's guilt or innocence and would only serve to seek to elicit the jury's sympathy, it should not be permitted.

The relevant time period charged in the S1 Indictment extends from 1999 to 2014 (for Count One), and from 1999 to 2019 (for Counts Two through Four). Accordingly, the bulk of the evidence that the Government anticipates presenting at trial will concern events that occurred within this time frame. Relatedly, as the case includes charges of drug importation, much of the evidence will relate to events that occurred overseas—in particular, in Venezuela and Colombia.

The time period this case has been pending or age of the case and that many of the relevant events occurred outside the United States have no probative value. Even if these factors had some probative value—and they do not—any such value would be substantially outweighed by the significant likelihood that injecting such argument or evidence at trial would lead to unfair prejudice, undue delay, confusion of the issues and misleading the jury. Fed. R. Evid. 403. First, it is entirely unremarkable that evidence in a drug importation trial would involve conduct that occurred outside the United States, particularly where, as here, the defendant and his co-conspirators in the FARC and the Cartel purposely sought to bring as much cocaine to the communities of the United States as possible. *See* 21 U.S.C. § 959(d) (stating that "[t]his section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States"); *United States v. Epskamp*, 832 F.3d 163-64, 168 (2d Cir. 2016) (holding that 21 U.S.C. § 959 applies extraterritorially and comports with the requirements of due process).

Similarly, the age of the case is entirely irrelevant, and, in large part, a consequence of the defendant's own making. As described in the Background, the defendant has been publicly charged in this District since July 2014 (Dkt. 3) on charges filed in 2011 (Dkt. 2). He was arrested in Aruba

in July 2014 and released after the Venezuelan government reportedly deployed naval assets toward Aruba. (S2 Indictment ¶ 15(l)). After he was next arrested in Spain in 2019, he immediately fled after his release and was arrested again by Spanish authorities in Madrid two years later, in September 2021. The defendant then fought his extradition from Spain to the United States, arriving in this District in July 2023. Given this history, it would be particularly inequitable for the defendant to benefit from circumstances that he engineered, after years spent evading U.S. law enforcement's efforts to have him stand trial. Moreover, such arguments would invariably create a trial within a trial regarding the ultimately irrelevant suggestion about the timeliness of the Government's prosecution and require the Government to proffer evidence to rebut such claims, including the circumstances regarding the defendant's arrests, extradition, and years of living as an international fugitive. And, even if the delay had not been of the defendant's doing, this evidence would needlessly distract the jury from the task at hand—evaluating evidence of the defendant's own conduct during the time periods charged in this case.

Finally, the defendant should be precluded from referencing events in Venezuela that post-date the charged time period, including any suggestion that he faces persecution by the Venezuelan regime or any discussion of recent events in Venezuela that have precipitated large-scale emigration because of the regime. Such arguments are irrelevant to the charged conduct and would only seek to inflame and distract the jury. The defendant is not charged with participating in the charged conspiracy after he left Venezuela in 2019. Nor does the Government intend to offer evidence suggesting otherwise in its case-in-chief.

Moreover, any argument that suggests the defendant is now being persecuted by the ruling regime, or that somehow equates the defendant's actions with recent events or conditions in Venezuela and its population, would be transparent attempts to invite jury sympathy and potential

nullification. The Court should preclude such arguments at trial. *See United States v. Malpeso*, 115 F.3d 155, 163 (2d Cir. 1997) (finding that district court properly exercised its discretion in precluding evidence regarding confidential information allegedly leaked by an FBI agent to a mafia member during the Colombo war, which the Government had argued was being sought to distract the jury and discredit the Government); *United States v. St. Rose*, 11 Cr. 349 (SJ), 2012 WL 1107659, at *1 (E.D.N.Y. Apr. 2, 2012) (granting the Government's motion in *limine* to prevent defense from arguing "that she should be acquitted out of sympathy for her, her family, or her immigration status"); *United States v. Battaglia*, S9 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (granting the Government's motion in *limine* to exclude evidence of defendant's family and personal status, as irrelevant); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (finding that defense may not argue before the jury issues relating to the overall propriety of the Government's investigation); *see also United States v. Edwards*, 101 F.3d 17, 19-20 (2d Cir. 1996) (finding that district court properly rejected defense's proposed instruction that even if the government proved its case beyond a reasonable doubt the jury could acquit if it "believe[d] that the [defendant's] actions should not be considered to be criminal by society").

    **2.**    **References to the FARC's 2021 Removal from the United States' List of Foreign Terrorist Organizations After the Charged Conspiracy Is Irrelevant Under Rule 401 and Unfairly Prejudicial Under Rule 403**

At trial, the defendant should be precluded from offering evidence or argument concerning the FARC's removal, or delisting, from the State Department's list of FTOs in 2021—two years after the conclusion of the conduct charged in Counts Two through Four, and seven years after the conclusion of the conduct charged in Count One. Such arguments would not only be irrelevant, but they would also create substantial risk of juror confusion given the multiple successor FARC organizations that still exist as FTOs to this day.

The Government intends to elicit testimony at trial that, throughout the time period relevant to this case, the FARC historically controlled a great deal of the lucrative cocaine trade in Colombia and Venezuela, from which it generated significant revenue that it used to finance its terrorist operations, including weapons purchases. Anticipated testimony at trial will also establish that the FARC has directed multiple acts of violence that included attacks against U.S. persons and property.[14] Consistent with those activities, in 1997, the State Department designated the FARC as an FTO under Section 219 of the Immigration and Nationality Act. The FARC remained so designated until November 30, 2021.[15]

The FARC remained a designated FTO throughout the relevant time period described in the S1 Indictment—1999 to 2019. To the extent that the defense seeks to introduce evidence indicating that the State Department delisted the FARC after this time period, this would be entirely irrelevant, and risk misleading the jury, confusing the issues, and creating undue delay by requiring the Government to explain its irrelevance to the jury. The FARC's delisting after the S1 Indictment was returned has no relevance to the charges that the defendant faces at trial because that delisting occurred long after the charged time period. Relatedly, counsel should not be permitted to argue or suggest to the jury that it should acquit the defendant because the FARC is no longer designated or to imply that the FARC no longer represents a threat to U.S. interests. First, the FARC's delisting—which falls outside the relevant time period—has no probative value in this case, in which the relevant facts occurred between 1999 and 2019. Second, this line of argument would lead to unfair prejudice, confusion of the issues, and misleading the jury. Fed. R. Evid. 403. *See,*

---

[14] These topics are described in greater detail in the Government's April 24, 2025 expert notice for Eric Putnam of the DEA.

[15] As noted above, simultaneous to that delisting, the State Department designated two successor organizations of the FARC as FTOs: the FARC-EP and Segunda Marquetalia.

*e.g.*, *Yu v. Kotobuki Rest., Inc.*, No. 17 Civ. 4202 (JMA) (JMW), 2025 WL 1446022, at *1-*2 (E.D.N.Y. May 20, 2025) (precluding plaintiff from introducing documents "outside the relevant time period" pursuant to Rules 401 and 403, finding they were "likely to mislead and confuse the jury"). That is particularly so because, as noted above, the FARC's removal from the FTO list coincided with the State Department's designations of two FARC successor organizations as FTOs, which underscore the ongoing danger that certain FARC adherents and related dissident groups continue to pose to the region. Accordingly, the Government respectfully requests that the Court prohibit defense counsel from arguing, suggesting, hinting, or presenting evidence to the jury relating to the FARC's 2021 delisting.

### 3. References to the Punishment the Defendant May Face if Convicted Should Be Precluded as Irrelevant Under Rule 401 and Unfairly Prejudicial Under Rule 403

The defendant should be precluded from offering evidence or argument concerning the punishment or consequences he faces if convicted, which includes a mandatory minimum term of imprisonment for the charged narcotics and firearms offenses. Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* The Second Circuit has directly held that a jury should not be instructed on or aware of possible mandatory minimum sentences. *See United States v. Pabon-Cruz*, 391 F.3d 86, 91-92 (2d Cir. 2004). Accordingly, the defendant should be precluded from offering evidence or argument concerning the punishment or other potential consequences stemming from a conviction in this case.

## **CONCLUSION**

Accordingly, the Government respectfully requests that the Court grant the relief requested

herein.

Dated:  New York, New York
        June 3, 2025

                                    Respectfully submitted,

                                    JAY CLAYTON
                                    United States Attorney
                                    Southern District of New York


                            By:     ___/s/_____
                                    Nicholas S. Bradley
                                    Kaylan E. Lasky
                                    Kevin T. Sullivan
                                    Assistant United States Attorneys
                                    (212) 637-1581 / 2315 / 1587

Cc:     Robert Feitel, Esq. (via ECF & email)
        Sandi Rhee, Esq. (via ECF & email)