UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | S4 11-CR-205 (AKH) |
| CILIA ADELA FLORES de MADURO, *et al.* | : | |
| Defendants. | : | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF CILIA ADELA FLORES de MADURO'S APPLICATION FOR PRETRIAL RELEASE</u>**

# Table of Contents

**LIST OF EXHIBITS** ........ iii

**TABLE OF AUTHORITIES** ........ iv

**PRELIMINARY STATEMENT** ........ 1

**PROPOSED CONDITIONS** ........ 2

**STATEMENT OF FACTS** ........ 5

**LEGAL STANDARD** ........ 11

**ARGUMENT** ........ 13

**I. The Section 3142(g) Factors, Taken Together, Rebut the Presumption of Detention** ... 13

**A. Nature and Circumstances of the Offense** ........ 13

**B. Weight of the Evidence** ........ 13

**C. History and Characteristics of Defendant** ........ 13

**D. Nature and Seriousness of the Danger to the Community** ........ 17

**CONCLUSION** ........ 18

# LIST OF EXHIBITS

| | |
|---|---|
| **Ex. A** | Declaration of Louis J. Milione, dated September 8, 2026. |
| **Ex. B** | ECF 53, *United States v. Ng Lap Seng*, 1:15-cr-706 (VSB). |
| **Ex. C** | **Under Seal**- Medical Records for Cilia Adela Flores de Maduro with Declaration of Mark E. Donnelly, dated September 9, 2026. |

## TABLE OF AUTHORITIES

Page(s)

### CASES

Booker v. Griffin, 2024 U.S. Dist. LEXIS 31314 (S.D.N.Y. 2024) ....................8

Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) ....................8

In re Grand Jury Proceedings, Doe No. 700, 817 F.2d 1108 (4th Cir.1987)....................1, 8

Lawn v. United States, 355 U.S. 339, 78 S. Ct. 311, 2 L. Ed. 2d 321 (1958)....................11

Peoples v. Annucci, 180 F. Supp. 3d 294 (S.D.N.Y. 2016) ....................8

The People of the State of New York v. Dominique Strauss-Kahn, Docket No. 2011NY035773....................14, 15

United States v. Arena, 878 F. Supp. 439 (N.D.N.Y. 1995)....................11

United States v. Contreras, 776 F.2d 51 (2d Cir. 1985)....................11

United States v. Dreier, No. 09-CR-085 (JSR)....................16

United States v. English, 629 F.3d at 319 (2nd Cir. 2011)....................12

United States v. Gotti, 776 F. Supp. 666 (E.D.N.Y. 1991)....................15

United States v. Honeyman, 470 F.2d 473 (9th Cir. 1972)....................13

United States v. Jones, 2008 U.S. Dist. LEXIS 46116 (S.D.N.Y. 2008)....................13

United States v. Khusanov, 731 Fed. Appx. 19 (2nd Cir. 2018)....................12

United States v. Mercedes, 254 F.3d 433 (2d Cir. 2001)....................12

United States v. Ng Lap Seng, SDNY No. 1:15-cr-706 (VSB)....................16, 17

United States v. Orta, 760 F.2d 887 (8th Cir. 1985)....................12

United States v. Paulino, 335 F. Supp. 3d 600 (S.D.N.Y. 2018)....................12, 13

United States v. Rodriguez, 950 F.2d 85 (2d Cir. 1991)....................12

United States v. Sabhnani, 529 F. Supp. 2d 377 (E.D.N.Y. 2007)....................16

United States v. Salerno, 481 U.S. 739, 107 S. Ct. 2095 (1987)....................1

United States v. Shakur, 817 F.2d 189 (2d Cir. 1987)....................12

United States v. Webb, No. 15-CR-252 (RJD) (E.D.N.Y.)…………….....................16

## STATUTES

18 U.S.C. § 3142....................2

U.S.C. § 3142(c)....................2

U.S.C. § 3142(c)(1)(B)....................5

U.S.C. § 3142(e)(3)(A)....................1

U.S.C. § 3142(g).................... 1,11,12

U.S.C. § 3142(g)(3)(A)....................14, 17

NY Crim Pro L § 510.10 (2025)....................15

**PRELIMINARY STATEMENT**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755, 107 S. Ct. 2095, 2105 (1987). Cilia Adela Flores de Maduro is the First Lady of the Bolivarian Republic of Venezuela and deserves the opportunity to await her trial while on home confinement, recovering from invasive heart surgery. Prior to the United States' military invasion of Venezuela, Ms. Flores de Maduro was physically healthy and took no ongoing medication, other than a monthly injection to help control her mitral valve prolapse. Now she is prescribed four medications, maintains nitroglycerin by her side in the event of a potential heart attack, and grapples with the continued medical advice suggesting coronary exploration and surgery. Both the Memorandum of Law submitted by Mr. Maduro in support of his motion to dismiss (ECF 321) (the "Maduro Memorandum" or "Maduro Mem.") and the Memorandum of Law submitted by Ms. Flores de Maduro in support of her motion to dismiss (ECF 325) (the "Flores Memorandum" or "Flores Mem."), adopted fully here, explain in part that international law regarding immunity ensures that leaders are not "subject to *detention*, arrest or embarrassment in a foreign country's legal system." *In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108, 1110 (4th Cir. 1987) (*emphasis added*). Yet Ms. Flores de Maduro was abducted from her home, suffered injuries at the hands of her captors, and now awaits trial in the female general population unit of the Metropolitan Detention Center in Brooklyn (the "MDC").

The determination of pretrial release in this unprecedented case requires unique analysis that should go beyond the four traditional factors of 18 U.S.C. § 3142(g). Ms. Flores de Maduro recognizes that this case triggers a rebuttable presumption under 18 U.S.C. § 3142(e)(3)(A). That presumption, however, is rebutted by several factors, not least of which include: her status as the

First Lady of Venezuela, at minimum *de facto* as stated in the indictment – the spouse of the sitting foreign head of state, her position as an elected and sitting deputy of Venezuela's National Assembly, the absence of danger to any community in which she may reside while awaiting trial, and her ongoing medical conditions. Not to be overlooked, Ms. Flores de Maduro has one very significant, current connection to the United States and that is her husband Nicolas Maduro Moros. She is committed to seeing out both her and her husband's case and is intent on supporting her husband with her constant presence.

Ms. Flores de Maduro respectfully submits this memorandum in support of her application for pretrial release pursuant to 18 U.S.C. § 3142, on conditions including home detention, GPS location monitoring, 24-hour armed surveillance, surrender of all travel documents, and appointment of a third-party custodian approved by Pretrial Services and the Court. Undersigned counsel has discussed Ms. Flores de Maduro's request for release under conditions with the government, and the government is opposed to her release. The parties have agreed to submit to the Court a letter request concerning a proposed briefing schedule following Ms. Flores de Maduro's submission. The availability of a strict conditions package sufficient to reasonably assure her appearance and the safety of the community coupled with a serious and documented cardiac condition, which independently warrants release, weigh in favor of release pending trial.

**Proposed Conditions That Reasonably Assure Appearance and Community Safety**

For reasons more thoroughly outlined herein, Ms. Flores de Maduro proposes the following conditions, individually and collectively sufficient to satisfy § 3142(c). As detailed in the Argument section C, below, other federal courts in New York have approved release with similar conditions.

1. Home detention, subject to exceptions approved in advance by Pretrial Services (e.g., medical appointments, legal visits),
    a. With a list of approved visitors to the Residence, approved by Pretrial Services and the United States Attorney's Office, and only approved visitors will be permitted entry into the Residence,
    b. With a visitor log transmitted on a daily basis to the United States Attorney's Office;
2. 24-hour armed surveillance, using a vendor approved by the Court after the government has had an opportunity to review and comment, with authorization for:
    a. use of reasonable, legal force as deemed appropriate to prevent Defendant from fleeing the Southern District of New York or otherwise violating the terms of release,
    b. providing the United States Attorney's Office with a schedule of armed security teams on a weekly basis,
    c. providing the Government with a copy of videotape monitoring taken of the Residence,
    d. providing a liaison and main point of contact for the United States Attorney's Office and Pretrial Services, with the POC being available/on call at all times of day and night,
    e. composition of the security detail without any input or disclosure to Ms. Flores de Maduro,

f. a consensual Title III wiretap for a single hardline in the residence, with charges submitted by the service provider for the setting up and maintenance of the consensual hardline to be paid for by Ms. Flores de Maduro. All phone calls using the hardline, which shall not contain call forwarding or other similar features, will be recorded and monitored with the exception of counsel calls which will be automatically minimized;

3. The residence will be subject to random unannounced searches conducted by the security team accompanied by a representative of Pretrial Services, with the date and time of such searches will be determined by Pretrial Services, without notice to Ms. Flores de Maduro;

4. Location monitoring via GPS device, at Ms. Flores de Maduro's expense;

5. Surrender of Ms. Flores de Maduro's passport and any other travel or identification documents, and no application for any new travel document;

6. Appointment of an appropriate third-party custodian, acceptable to the Court, with an obligation to report any violation of conditions to Pretrial Services;

7. Regular reporting to Pretrial Services as directed; and

8. Completion of the recommended cardiac catheterization and any associated cardiac intervention with Ms. Flores de Maduro's treating cardiologist, with records provided to Pretrial Services on a schedule the Court deems appropriate.

Taken together, these conditions eliminate the practical means by which Ms. Flores de Maduro could flee. She has no travel documents, would be confined to a residence, would be electronically monitored in real time, would be under 24-hour armed surveillance, and would have a custodian

directly accountable for any violation. This is precisely the kind of restrictive package the Bail Reform Act contemplates as an alternative to detention. See 18 U.S.C. § 3142(c)(1)(B).

**STATEMENT OF FACTS**

On January 3, 2026, United States military undertook the unprecedented action of invading a sovereign nation and abducting the head of state, Mr. Maduro, together with his wife, Ms. Flores de Maduro, killing at least 100 people in the process. Maduro Mem. at 7. Venezuela immediately condemned the "foreign military aggression" and were joined in their protestations by several countries around the world. Tribunal Supremo de Justicia, Sala Constitucional, Sentencia No. 0001, Exp. No. 26-0001 (Jan. 3, 2026) (Maduro Mem. Exhibit 1 to the September 2, 2026 *Declaration of Barry J. Pollack*, attached as Exhibit A to the Maduro Mem.), S*ee also* President Luiz Inacio da Silva of Brazil @LulaOficial describing the action as a flagrant violation of international law (x.com/LulaOficial/status/2007436536590012845); President Gabriel Boric Font of Chile formally expressing energetic condemnation of the military actions (https://www.minrel.gob.cl/sala-de-prensa/declaracion-del-presidente-de-la-republica-gabriel-boric-font-por); President Claudia Sheinbaum Pardo @Claudiashein of Mexico citing Article 2, paragraph 4 of the United Nations Charter following Mexico's Ministry of Foreign Affairs public condemnation and rejection of the military action (https://www.gob.mx/sre/prensa/mexico-condemns-military-intervention-in-venezuela); Uruguay Ministry of Foreign Affairs Release No. 2/26 rejecting military intervention of one country in the territory of anther and calling for respect for the UN Charter (https://www.gub.uy/ministerio-relaciones-exteriores/comunicacion/comunicados/acerca-situacion-venezuela); Foreign Minister of France, Jean-Noël Barrot, stating that the military action contravenes the principle of non-use of force underlying international law (x.com/jnbarrot/status/2007463353631809684); China's Ministry of

Foreign Affairs @MFA_China strongly condemning the use of force against a sovereign state (https://x.com/MFA_China/status/2007460580089868702); European Union representative for foreign affairs @kajakallas advising that "the principles of international law and the UN Charter must be respected." (https://x.com/kajakallas/status/2007405051896123707).

During the military operation, Ms. Flores de Maduro was thrown against a wall or dresser and suffered significant lesions to her forehead requiring some 20 stitches, as noted during her initial appearance on January 5, 2026. *Transcript of Proceedings as to Nicolas Maduro Moros, Cilia Adela Flores De Maduro* re: Initial Appearance on January 5, 2026 at 18 (2:14). Given that the United States knew "how [Maduro] moved, where he lived, where he traveled, what he ate, what he wore, what were his pets," it stands to reason that the government was aware that Ms. Flores de Maduro was recovering from a recent total hysterectomy performed in November of 2025. *Remarks of General Dan Caine, Chairman of the Joint Chiefs of Staff, following Operation Absolute Resolve*. She was ordered to abide by at least three months of restricted movement including resting at her home, not exerting herself physically through exercise, and limiting herself to the little walking she was able to do while at home. Her stitches had only recently been removed, and she was scheduled to follow up with her doctor to discuss the hormone treatment needed following her operation. Additionally, she had continued to manage ongoing mitral valve prolapse for years by taking a monthly injection.

The grand jury returned the operative Fourth Superseding Indictment under seal on December 23, 2025, and it was unsealed on January 3, 2026. ECF 258, 260. Ms. Flores de Maduro had never previously been charged in connection with this case, which was initiated in 2011. She

is named in Counts Two, Three, and Four.[1] The Flores Memorandum thoroughly details the counts which the government attributes to Ms. Flores de Maduro. Relevant to the inquiry here is that only one paragraph of the 25-page indictment, paragraph 21(d), references alleged violent conduct ordered by Ms. Flores de Maduro, and that allegation spoke generally of alleged orders being given without reference to where the acts are alleged to have occurred.

Ms. Flores de Maduro did not take medication for any other chronic condition and was, prior to her hysterectomy, an active First Lady and deputy to the National Assembly. She controlled her cholesterol through diet and exercise and addressed her gastritis through a strict paleo diet. Since her detention, she has been prescribed baby aspirin, a statin (atorvastatin), diltiazem, as well as nitroglycerin as needed for chest pains, she has continually suffered from reflux and gastritis, has lost two molars, and has lost more than 25 pounds. She has not received her monthly injection to aid the mitral valve prolapse since her incarceration. Most significantly, the medical team consulted by the MDC has advised that she should undergo cardiac catheterization which will likely lead to more invasive procedures related to her heart. Ms. Flores de Maduro is a 69-year-old woman who will need adequate time to recover from any procedures in a setting conducive to restoring her health. Despite the ongoing efforts of the MDC staff, a detention center lacks the conditions needed for such a recovery.[2] Moreover, the government is unable to commit to any course of treatment or recovery beyond advising that they will abide by

[1] Ms. Flores de Maduro is charged only in Counts Two (cocaine-importation conspiracy), Three, and Four (possession of, and conspiracy to possess, machineguns and destructive devices). ¶¶ 25-35; ECF 260 (docket text). She is not charged in Count One, the narco-terrorism conspiracy. The firearms counts are, as to her, predicated exclusively on Count Two. ¶¶ 32, 35.

[2] Ms. Flores de Maduro acknowledges that the staff at the MDC have been extremely respectful toward her and her husband, while also fully focused on the couple's safety. She also does not dispute that she has received excellent care from medical professionals, both inside the MDC and at the hospital. Finally, Ms. Flores de Maduro appreciates the effort that the prosecutors have made to work with the defense and provide all records requested since her initial detention. Nonetheless, she, and the defense, believe that the environmental conditions at the MDC both prior to and following any medical procedure are inadequate for full recovery.

whatever the medical team determines is medically appropriate. Her reticence to undergo cardiac exploration and surgery only to return to the conditions which have contributed to the deterioration of her health is reasonable. Ms. Flores de Maduro was ripped from her home, injured to the point of permanent scarring by her captors, watched as her husband was paraded before a DEA jet for photo ops, was kept in solitary confinement for three months, was subjected to continuous X-ray body scans following attorney visits, and has endured detention and embarrassment in a foreign country's legal system (*Doe No. 700*, 817 F.2d at 1110).

Ms. Flores de Maduro was initially held in solitary confinement for three months while the MDC explored housing options. During that time, she was unable to meaningfully communicate with anyone other than her counsel since the staff had few Spanish speakers and Ms. Flores de Maduro does not speak English. Courts in this district have found that extended solitary confinement can have prolonged negative effects on detainees. See *Peoples v. Annucci*, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016) ("After even relatively brief periods of solitary confinement, inmates have exhibited symptoms such as hypersensitivity to stimuli, perceptual distortions and hallucinations, increased anxiety, lack of impulse control, severe and chronic depression, appetite and weight loss, heart palpitations, sleep problems, and depressed brain functioning. As one expert in the field noted, '[t]he restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental functioning'—even causing 'confusional psychosis' in some inmates."); *Booker v. Griffin*, 2024 U.S. Dist. LEXIS 31314 (S.D.N.Y. 2024) *citing Hope v. Pelzer*, 536 U.S. 730, 738, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) ("the risk of harm is obvious" when an inmate is kept in solitary confinement for extended periods of time.) Still, Ms. Flores de Maduro respected the facility's need to ensure security and safety. She has tried to adapt to her settings as best as possible since her move to female general

population, but detention amongst 40-plus detainees makes the unit inadequate for proper recovery from cardiac surgery. As recently as Friday, August 14, 2026, a fight broke out in her unit and MDC staff was forced to deploy pepper spray. Following that incident, medical staff assessed Ms. Flores de Maduro, who indicated that she suffered chest tightness and needed to use her inhaler to deal with the symptoms from which she suffered.

Ms. Flores de Maduro suffers from several significant health conditions, including a history of rheumatic valve disease with mild stenosis and moderate regurgitation with good heart function.[3] She is also asthmatic. Following complaints suggestive of angina, MDC arranged for a stress test on April 23, 2026. That test was terminated due to shortness of breath and chest pressure. The test results showed significant induced arrhythmia consisting of frequent premature ventricular contractions as well as significant 1-2 millimeter ST depression readings in the lateral and inferior leads of the electrocardiogram. The medical staff recommended a cardiac catheterization to look for coronary artery disease.

In the months following the stress test, Ms. Flores de Maduro experienced palpitations and a fast heart rate. She underwent Holter heart monitoring from May 21 through May 26. Most concerning from the results was a 33-beat non-sustained ventricular tachycardia. This could be the result of ongoing cardiac ischemia at the time. More of these events in the future would put her at risk for a life-threatening sudden cardiac event.

When taken together with prior findings from her records, there is an indication that Ms. Flores de Maduro has suffered ischemic events. Prolonged ischemia could result in additional muscle damage and an ischemic event coupled with the arrythmia previously noted would require

[3] Ms. Flores de Maduro's medical records are attached as a SEALED exhibit, Exhibit C, to this motion.

immediate intervention with a defibrillator. Her legal team, after consultation with a cardiac expert, recommended the addition of a beta blocker. On July 29, 2026, Ms. Flores de Maduro suffered a significant, 30-minute episode of intense pressure in her chest along with feeling a lack of oxygen. She considered taking her sublingual nitroglycerin tablets but ultimately was able to overcome the symptoms without the medication. She reported that when she is startled, she experiences heart palpitations and has occasional epigastric pain. Ms. Flores de Maduro utilizes breathing exercises to help control these episodes, but she suffers from lingering light-headedness, dizziness, and shortness of breath.

Ms. Flores de Maduro experienced these ongoing symptoms in addition to excessive fatigue for the weeks that followed the July 29 episode. Her legal team, again in consultation with outside medical experts, believe she may have suffered a minor heart attack. No labs were taken or documented at that time in her medical records. Without performing an additional echocardiogram to compare heart function to her prior testing, it is unclear the extent of coronary damage she may have suffered. The MDC medical team ultimately discontinued Diltiazem and started her on a regiment of Toprol XL. Since then, she's noticed less palpitations and has attempted to increase her exercise. She still reports weakness, occasional tachycardia, occasional shortness of breath, and occasional chest pain and dizziness. As each of these episodes have manifested, she has tried to maintain some semblance of calm while situated amongst 40-plus female detainees who go about their own day-to-day with varied levels noise, agitation, and occasional disruption. Ms. Flores de Maduro reports that she sleeps no more than three to four hours per day and is unable to find any time in the middle of the day to rest and recover. In short, her medical condition is significant and her current housing, despite best efforts, is inadequate to allow for proper recovery from cardiac surgery.

Even assuming, *arguendo*, that she was to only undergo a cardiac catheterization and a possible stenting of any lesion, Ms. Flores de Maduro must be in a situation to attend to her continuously deteriorating health. As noted above, she has lost significant weight, suffers from ongoing reflux and gastritis, is unable to sleep for significant periods of time, and suffers tachycardia when startled. The MDC has gone to great lengths to support Ms. Flores de Maduro in her current situation, but the conditions don't support long-term health gains. Continued detention will not allow Ms. Flores de Maduro to properly rehabilitate her health. Cardiac catheterization will identify what further procedures are necessary to address certain heart issues. It will not, however, address those additional identified ailments from which she continues to suffer while incarcerated. Her health and those 3142(g) factors outlined below support release under strict conditions.

The defense is prepared to identify a suitable third-party custodian candidate for review by Pretrial Services and the Court. Any custodian will take whatever steps the Court deems necessary to ensure Ms. Flores de Maduro is actively reporting to her Pretrial officer and/or the Court and will ensure Ms. Flores de Maduro's appearance for all court settings.

## **LEGAL STANDARD**

"The Second Circuit has stated that an indictment returned by a duly constituted and unbiased grand jury satisfies the Constitution as to the existence of probable cause that the defendant committed the crimes enumerated therein." *United States v. Arena*, 878 F. Supp. 439 (N.D.N.Y. 1995) (*citing United States v. Contreras*, 776 F.2d 51, 54 (2d Cir. 1985), *Lawn v. United States*, 355 U.S. 339, 349, 78 S. Ct. 311, 317, 2 L. Ed. 2d 321 (1958)). A presumption of flight risk and dangerousness places "a limited burden of production—not a burden of persuasion on the

defendant to com[e] forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Khusanov, 731 Fed. Appx. 19 (2nd Cir. 2018) (*citing United States v. English*, 629 F.3d at 319 (internal quotation marks omitted)). Once rebuttal evidence is produced, the presumption does not disappear but remains a factor to be weighed alongside the § 3142(g) factors. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) A defendant's burden of production to rebut the presumption is not heavy, and once evidence is proffered, the burden of persuasion remains with the government. *See United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). The Court must weigh: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the defendant, including family ties, employment, community ties, and past conduct; and (4) the nature and seriousness of the danger to any person or the community posed by release. 18 U.S.C. § 3142(g). The Court must be left with the opinion that no condition or combination of conditions will reasonably assure the defendant's appearance and the safety of the community.

Still, pretrial detention should be the exception rather than the rule in Federal criminal cases. *See United States v. Orta*, 760 F.2d 887, 890-91 (8th Cir. 1985), *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) ("a court should bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial."). "The change from the negative to the positive in the flight determination standard and from 'will' to 'will reasonably assure' in the dangerousness evaluation criterion renders it more difficult to find the defendant a flight and safety risk." *Id*., at fn. 14. "In examining a given set of conditions, absolute certainty of their efficacy is not required, only a reasonable assurance ..." *United States v. Paulino*, 335 F. Supp. 3d 600, 619 (S.D.N.Y. 2018). As outlined below, there exists a combination of conditions to ensure Ms. Flores de Maduro's appearance and safety of the community.

## ARGUMENT

### I. The Section 3142(g) Factors, Taken Together, Rebut the Presumption of Detention

### A. Nature and Circumstances of the Offense

Ms. Flores de Maduro does not minimize the seriousness of the charges alleged in the government's fourth superseding indictment. Rather, she urges the Court to review the allegations considering the arguments and authorities accompanying the Maduro Memo and the Flores Memo.

### B. Weight of the Evidence

The government has indicated that it has provided the bulk of non-classified discovery to Ms. Flores de Maduro and will continue to do so in the coming months. As of the filing of this motion, very little is known about the specific acts in which the government alleges Ms. Flores de Maduro took part. Ms. Flores de Maduro denies the allegations against her and incorporates the reasoning and arguments outlined in the Maduro Memo and the Flores Memo. Moreover, "many courts have suggested that the weight of the evidence is the least important of the various factors." *Paulino*, at 613, *United States v. Jones*, 2008 U.S. Dist. LEXIS 46116 (S.D.N.Y. 2008) (*citing United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir. 1972) – "We think that the least weight should be given to the weight of the evidence against the accused.")

### C. History and Characteristics of Defendant

Ms. Flores de Maduro has lived her life in the public eye. She has served her country as Venezuela's Attorney General, as an elected member of both the National Assembly and the Constituent National Assembly, and in perhaps her most visible public role as Venezuela's First

Lady since 2013. The government can point to no evidence that Ms. Flores de Maduro has ever previously been charged by Venezuela or the United States for any unlawful conduct. This total absence of criminal history is a significant factor weighing in favor of release. *See* 18 U.S.C. § 3142(g)(3)(A).

As Venezuela's attorney general, she served her country in courts both foreign and abroad, including international tribunals. Ms. Flores de Maduro is in a unique position to understand and appreciate the consequences of noncompliance with any order from the Court. Given her status as the former Attorney General of Venezuela and a woman educated in legal affairs, she, more than others, understands the power of court orders and the requirement to adhere to them.

Ms. Flores de Maduro is only in this country because the government chose to abduct her from her home during a violent military operation. The fact that she has no significant ties to this district, let alone this country, should not be a factor weighing in favor of her detention. Instead, the Court can be reasonably assured that Ms. Flores de Maduro will remain under home confinement as she will be under 24-hour-a-day armed surveillance, has no travel documents, no ability to communicate other than in Spanish, and her only regular contact is with official representatives of the Venezuelan government and counsel. This unprecedented case demands unprecedented bail analysis. Ms. Flores de Maduro proposes a conditions package specifically calibrated to assure the Court that any perceived flight risk is neutralized. These factors would include continuous GPS location monitoring, home detention, 24-hour armed surveillance, and appointment of a third-party custodian responsible for reporting any violation to Pretrial Services.

Comparable conditions were authorized by the Honorable Michael Obus, New York County Supreme Court Justice, in *The People of the State of New York v. Dominique Strauss-*

*Kahn*, Docket No. 2011NY035773. Although a different sovereign, the court was faced with a similar need to make an individualized determination of bail considering the charges faced, the accused activities and history, any prior criminal convictions, and any evidence with respect to flight to avoid prosecution. *NY Crim Pro L § 510.10 (2025)*. The court ordered a significant cash bond with conditions including 24-hour armed guards (at the expense of the accused), electronic ankle monitoring, and house arrest. While Mr. Strauss-Kahn had some ties to the United States, he was also not a United States citizen. Nor was he faced with an incarcerated spouse who he was determined to support.

A similar set of restrictions was proposed by defendant Locascio following his detention pending trial. *United States v. Gotti*, 776 F. Supp. 666 (E.D.N.Y. 1991). The government established during Locascio's detention hearing that he was the underboss of an organized crime family who conspired to commit murders and tampered with witnesses. *Id*. at 671. Appealing his order of detention, Locascio proposed a set of conditions including house arrest, electronic monitoring of his movements, a pen register on all phones, and visits only by individuals approved by the court. *Id*. at 672. The court was troubled by the notion that the government would be required to expend law enforcement resources to support the needs of the proposed release.[4] *Id*. Here, the cost would be borne by Ms. Flores de Maduro's defense, who are responsible for standard monitoring costs and payments associated with pretrial release, and unlike her detention, would not be borne, even in part, by United States taxpayers. The questions before the Court then focus on the conditions, the assurance of community safety, and the conviction that Ms. Flores de

[4] The court also held that even if those concerns were placed aside, Locascio's danger to the community still overrode the interest in release on conditions.

Maduro will faithfully appear at all settings where she and her detained husband remain committed to clearing their name.

Courts in this district have supported the evolution of release packages that envisioned home confinement under armed surveillance. In the 2015 case *United States v. Ng Lap Seng*, 1:15-cr-706 (VSB), the Honorable Vernon S. Broderick rejected the government's appeal of Seng's release order, finding release appropriate under a combination of strict conditions. *Id*. at ECF 53. The *Seng* case involved a defendant who was alleged to be "a wealthy, foreign national with ties to the Chinese government" who was "likely to flee." *Id*. at ECF 615 pg. 1. Seng was released under a nearly identical set of proposed conditions and those conditions proved successful in assuring the appearance of the accused throughout all settings.[5]

*Seng* is not alone in being approved for release under a restrictive set of conditions. Other honorable judges in New York federal courts have approved a package of conditions allowing for constant surveillance and restricted movements. *See Id*. at pg. 9-10 (citing *United States v. Sabhnani*, 529 F. Supp. 2d 377 (E.D.N.Y. 2007) (granting post-conviction release "[d]espite the high risk of flight due to multiple counts of conviction for serious crimes; a lengthy term of protracted imprisonment; considerable financial resources; and significant ties to various countries throughout the world." (internal citations omitted)); *United States v. Webb*, No. 15-CR-252 (RJD) (E.D.N.Y) (granting release pending sentencing despite "role in massive racketeering and bribery case" and international connections.); *United States v. Dreier*, No. 09-CR-085 (JSR) (S.D.N.Y. 2009) (granting release pending sentencing despite government's argument that it was unfair to allow those with significant financial means such security options for release)).

[5] After two years of successful pretrial release, the government sought to remand Seng following a jury's finding of guilt. ECF 615 is a letter memorandum in opposition of the government's motion to remand.

The company proposed by Ms. Flores de Maduro to assure surveillance and security, Guidepost Solutions, LLC ("Guidepost"), is the same that was approved in the *Seng* case and has significant experience in this space. In their affidavit in support of this application, attached as Ex. A, Guidepost President Louis J. Milione indicates that Guidepost has worked in compliance with federal court orders in several matters and that Guidepost's team of "former federal prosecutors… former law enforcement officers from agencies including the Secret Service, the DEA, the FBI, the Department of Homeland Security, and the New York City Police Department" are able to provide "bail monitoring security for Cilia Adela Flores de Maduro that reasonably assures her appearance as required by the Court." Ex. A ¶ 2, 3. Undersigned counsel echoes the comments of counsel in *Seng*, that counsel is unaware of any defendant who has ever fled or escaped while under Guidepost's supervision. *Seng* ECF 615 at pg. 9.

Ms. Flores de Maduro's health is a substantial and independently significant factor under § 3142(g)(3)(A), which directs the Court to consider the defendant's "physical and mental condition." As detailed above, Ms. Flores de Maduro is suffering from extensive medical conditions that require urgent and ongoing treatment. These conditions materially reduce any likelihood of flight, since doing so would jeopardize her medical care and the support of any custodian proposed here.

**D. Nature and Seriousness of the Danger to the Community**

Ms. Flores de Maduro is not a danger to the community. The allegations in the indictment accuse her of supposedly ordering others to perform activities in Venezuela and nearby countries, not the United States, using the power available to her at that time as a government official in Venezuela. There is no allegation or evidence that points to a present danger to any community in

the United States, let alone the greater New York area. The Court even noted during the March 26, 2026 hearing, albeit during a discussion regarding OFAC's concerns related to national security and foreign policy, that "[t]he defendant Maduro is here, Flores is here. They present no further national security threat. I don't see it." ECF 297 at 14 (21:22). This would hold true whether Ms. Flores de Maduro was detained or released under conditions. The conditions proposed above will ensure that Ms. Flores de Maduro only leaves if authorized by the pretrial services department and/or the Court, addressing any residual concern regarding the safety of the community.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant her application for pretrial release on the conditions proposed above.

Dated: September 9, 2026

Respectfully submitted,

*/s/ Mark E. Donnelly*___________
Mark E. Donnelly
Andres Sánchez
Parker Sánchez & Donnelly, PLLC
700 Louisiana, Suite 4520
Houston, Texas 77002
(713) 659-7200
Mark@PSD.law

*Counsel for Cilia Adela Flores de Maduro*